Case No. 1:17-cv-07379-GHW

**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**

| | |
|---|---|
| In re:<br><br>AVAYA INC., et al.,<br><br>                    Debtors. | On appeal from the United States Bankruptcy Court for the Southern District of New York, Ch. 11 Case No. 17-10089-smb |
| MARLENE CLARK,<br>                    Appellant,<br><br>        - against -<br><br>AVAYA INC., et al.,<br>                    Appellees. | |

**APPENDIX OF APPELLANT (Vol. 2 of 2)**

Dated: October 4, 2017

Avery Samet
Jeffrey Chubak
STORCH AMINI PC
140 East 45th Street, 25th Floor
New York, New York 10017
(212) 490-4100
asamet@storchamini.com
jchubak@storchamini.com

*Attorneys for Appellant Marlene Clark*

## TABLE OF CONTENTS

| Document Description | Filing Date | ECF No. | Appendix Page |
|---|---|---|---|
| Marlene Clark's Motion | 5/5/17 | 522 | 1 |
| Debtors' Objection (Excluding Exhibit A) | 5/18/17 | 609 | 46 |
| Ad Hoc First Lien Group's Objection | 5/18/17 | 612 | 64 |
| Ad Hoc Crossover Group's Objection | 5/18/17 | 614 | 70 |
| Official Committee of Unsecured Creditors' Objection | 5/18/17 | 616 | 78 |
| Marlene Clark's Reply | 5/21/17 | 635 | 86 |
| Debtors' Sur-Reply | 5/24/17 | 653 | 115 |
| Marlene Clark's Letter Briefly Responding to Debtors' Sur-Reply | 5/24/17 | 670 | 127 |
| Transcript of May 25, 2017 Hearing | N/A | N/A | 134 |
| Memorandum Decision | 9/18/17 | 1182 | 172 |
| Order | 9/20/17 | 1201 | 190 |
| Notice of Appeal | 9/20/17 | 1202 | 192 |

i

James H.M. Sprayregen, P.C.
Jonathan S. Henes, P.C.
KIRKLAND & ELLIS LLP
KIRKLAND & ELLIS INTERNATIONAL LLP
601 Lexington Avenue
New York, New York 10022
Telephone:     (212) 446-4800
Facsimile:     (212) 446-4900

- and -

Patrick J. Nash, Jr., P.C. (admitted *pro hac vice*)
Ryan Preston Dahl (admitted *pro hac vice*)
Bradley Thomas Giordano (admitted *pro hac vice*)
KIRKLAND & ELLIS LLP
KIRKLAND & ELLIS INTERNATIONAL LLP
300 North LaSalle Street
Chicago, Illinois 60654
Telephone:     (312) 862-2000
Facsimile:     (312) 862-2200

*Counsel to the Debtors and Debtors in Possession*

**UNITED STATES BANKRUPTCY COURT**
**SOUTHERN DISTRICT OF NEW YORK**

| | | |
|---|---|---|
| In re: | ) | Chapter 11 |
| | ) | |
| AVAYA INC., *et al.*[1] | ) | Case No. 17-10089 (SMB) |
| | ) | |
| Debtors. | ) | (Jointly Administered) |
| | ) | |

**DEBTORS' OBJECTION TO MARLENE CLARK'S MOTION**
**FOR ORDER COMPELLING COMPLIANCE WITH 11 U.S.C. § 1114(e)**
**AND APPOINTING AN OFFICIAL COMMITTEE UNDER 11 U.S.C. § 1114(d)**

---

[1]  The Debtors in these chapter 11 cases, along with the last four digits of each Debtor's federal tax identification number, include: Avaya Inc. (3430); Avaya CALA Inc. (9365); Avaya EMEA Ltd. (9361); Avaya Federal Solutions, Inc. (4392); Avaya Holdings Corp. (9726); Avaya Holdings LLC (6959); Avaya Holdings Two, LLC (3240); Avaya Integrated Cabinet Solutions Inc. (9449); Avaya Management Services Inc. (9358); Avaya Services Inc. (9687); Avaya World Services Inc. (9364); Octel Communications LLC (5700); Sierra Asia Pacific Inc. (9362); Sierra Communication International LLC (9828); Technology Corporation of America, Inc. (9022); Ubiquity Software Corporation (6232); VPNet Technologies, Inc. (1193); and Zang, Inc. (7229). The location of Debtor Avaya Inc.'s corporate headquarters and the Debtors' service address is:  4655 Great America Parkway, Santa Clara, CA 95054.

# Table of Contents

**Page**

**Preliminary Statement**.................................................................................... 1

**Background and Procedural History** ............................................................ 4

**Argument** ........................................................................................................ 6

I.      **The ASPP Does Not Offer "Retiree Benefits" Under Any "Plan, Fund, or Program" as Those Terms Are Defined Under 11 U.S.C. § 1114**............................. 6

      A.    The ASPP Does Not Provide "Retiree Benefits" Under 11 U.S.C. § 1114............ 7

      B.    The ASPP Is Not A "Plan, Fund, or Program" as Those Terms Are Defined Under 11 U.S.C. § 1114........................... 11

II.     **The Appointment of A Committee of Retired Employees Under 11 U.S.C. § 1114 Is Unwarranted.** .......................................... 13

**Conclusion** ...................................................................................................... 14

i

KE 47012722

A-047

## Table of Authorities

**Page(s)**

**Cases**

Fort Halifax Packing Co. v. Coyne,
    482 U.S. 1 (1987) ...................................................................................................11

In re Exide Techs.,
    378 B.R. 762 (Bankr. D. Del. 2007) .................................................................8, 9

In re Farmland Indus., Inc.,
    294 B.R. 903 (Bankr. W.D. Mo. 2003) ..............................................4, 7, 8, 9, 13

In re Lyondell Chem. Co.,
    445 B.R. 296 (Bankr. S.D.N.Y. 2011) ......................................................... *passim*

In re New York Trap Rock Corp.,
    126 B.R. 19 (Bankr. S.D.N.Y. 1991) ................................................................11

In re Worldcom, Inc.,
    364 B.R. 538 (Bankr. S.D.N.Y. 2007) ............................................................8, 9

Kosakow v. New Rochelle Radiology Assocs., P.C.,
    274 F.3d 706 (2d. Cir. 2001) .............................................................................11

McMillan v. LTV Steel, Inc.,
    555 F.3d 218 (6th Cir. 2009) ............................................................................7, 8

Nowak v. Int'l Fund Servs. (N.A.), LLC,
    2009 U.S. Dist. LEXIS 69097 (S.D.N.Y. August 7, 2009) ..............................12

**Statutes**

11 U.S.C. § 1114 .............................................................................................. *passim*

11 U.S.C. § 1114(a) ...........................................................................3, 6, 7, 9, 13

11 U.S.C. § 1114(d) ...............................................................................4, 13, 14

11 U.S.C. § 1114(e)(1) .............................................................................................14

11 U.S.C. §1114(e)(2) ...............................................................................................4

29 U.S.C. § 1001 .......................................................................................................4

KE 47012722

The above-captioned debtors and debtors in possession (collectively, the "Debtors") hereby object to *Marlene Clark's Motion for Order Determining Survivorship Benefits Under Supplemental Plan are "Retiree Benefits" Under Bankruptcy Code Section 1114(a), Compelling Compliance with Section 1114(e), and Appointing an Official Committee Under Section 1114(d)* (the "Motion"). In support of this objection (the "Objection"), the Debtors respectfully state as follows:

## Preliminary Statement[2]

1.      As a preliminary matter, the Debtors are cognizant of the hardship the cessation of payments under the ASPP has placed on the affected participants and understand the frustrations that led to the filing of the Motion. That being said, the Motion should be denied. Benefits under the ASPP are, by the ASPP's own terms, nothing more than prepetition general unsecured obligations of the Debtors. Specifically, the ASPP provides as follows:

> The Plan constitutes as mere promise by the Company and the Participating Companies to make benefit payments, if any, in the future. No Participant, Surviving Spouse, beneficiary or any other person shall have any interest in any particular assets of a Participating Company by reason of the right to receive a benefit under the Plan and to the extent the Participant, Surviving Spouse, beneficiary or another person acquires a right to receive benefits under this Plan, such right shall be no greater than the right of any unsecured creditor of a Participating Company.[3]

As debtors in bankruptcy, the Debtors, therefore, are prohibited from continuing payments under the ASPP.

2.      Additionally, payments under the ASPP are not "retiree benefits" as defined in

---

[2]   All capitalized terms used but not defined in the Preliminary Statement have the meanings given to such terms in this Objection.

[3]   ASPP at § 8.2

1

A-049

section 1114 of the Bankruptcy Code. Rather, payments under the ASPP are deferred compensation and supplemental pension benefits in the form of an annuity to participants and their surviving spouses.[4] Such payments do not qualify as "retiree benefits" under the Bankruptcy Code.[5]

3. Payments under the ASPP are likewise not subject to section 1114 of the Bankruptcy Code because the ASPP is not a "plan, fund, or program" as those terms are used by section 1114, unlike, for example, health insurance premiums provided for retired employees.[6] Distinct from such insurance benefits, payment terms under the ASPP are established at the outset of a participant's qualification for benefits and require no further administrative oversight other than the continuance of payments.[7] Such payments are, therefore, not "programs" subject to section 1114.[8] Moreover, the ASPP does not provide insurance benefits of any kind, as is required by the statutory text to qualify as a "retiree benefit."[9]

4. Of course, the Motion asks this Court to determine that payments under the ASPP qualify as "retiree benefits" under section 1114 of the Bankruptcy Code because a surviving spouse of a participant is entitled to payments under the ASPP upon the participant's death.[10] In

---

[4]    See ASPP at §§ 1, 4.2, 5.2. A copy of the ASPP is attached as **Exhibit A**.

[5]    See, e.g., In re Lyondell Chem. Co., 445 B.R. 296, 299 (Bankr. S.D.N.Y. 2011) ("Pension benefits or benefits that provide for annual payments upon retirement are not 'retiree benefits.'").

[6]    In re Arclin U.S. Holding, Inc., 416 B.R. 117, 119 (Bankr. D. Del. 2009).

[7]    See ASPP at §§ 3.2, 4.2, 5.2, 6.1 (explaining one-time calculation of single life annuity amount).

[8]    See Lyondell, 445 B.R. at 300 ("An annuity contract does not require an 'ongoing, particularized, administrative analysis' or any 'managerial discretion' after it is formalized. An annuity is simply a stream of payments actuarially equivalent to lump-sum payment, which is then distributed over time in a pre-determined fashion.").

[9]    See id.

[10]    See Motion at 5.

2

A-050

particular, the Motion relies on an excerpted quote from section 1114 of the Bankruptcy Code to argue that any type of survivorship benefit qualifies as a "retiree benefit."[11] Such a conclusion, however, ignores the entirety of the statutory text, which has been consistently interpreted to apply only to the provision of health and life insurance benefits.[12] A survivorship provision does not change this outcome or transform a pension payment into a "benefit" per section 1114.[13]

5. The Motion additionally directs this Court to the broad "dictionary definition" of "benefit" as further support for its characterization of an annuity as a "retiree benefit" per section 1114.[14] But, this argument ignores the statutory definition of "retiree benefit."[15] In doing so, the Movant broadens the application of section 1114 of the Bankruptcy Code beyond its actual definition. Instead of maintaining a safety net against the termination of insurance benefits, the Movant would have this Court give special priority to not just "retiree benefits," but literally any pension payments, which, in this instance, include "deferred compensation . . . for a select group of management or highly compensated employees" as well as employees that reached the ERISA cap under the Debtors' standard pension plan for salaried employees.[16] Such a conclusion is simply not consistent with section 1114 of the Bankruptcy Code.

6. Because the ASPP is not a "retiree benefit" or provided for under a "plan, fund, or program," the balance of relief requested by the Motion should also be denied. Section 1114 of

---

[11] See id. ("Monthly payments to surviving spouse beneficiaries under the Supplemental Plan plainly qualify as "payments to any . . . person for the purpose of providing . . . payments for . . . spouses . . . for benefits in the event of . . . death" under a prepetition plan.").

[12] See, e.g., Arclin, 416 B.R. at 119.

[13] See Lyondell, 445 B.R. at 301 (explaining that the feature of an annuity arrangement to provide contingency payments to the spouse of a deceased beneficiary does not change pension benefits into retiree benefits)

[14] See Motion at 5.

[15] See 11 U.S.C. § 1114(a).

[16] See ASPP at § 1.

KE 47012722

the Bankruptcy Code does not apply to payments under the ASPP, and therefore, ASPP beneficiaries are not entitled to assert claims for administrative expenses.[17]  Moreover, because no "retiree benefits" are at issue, the appointment of a committee under section 1114 of the Bankruptcy Code is unnecessary and unwarranted.[18]  The Motion, therefore, should be denied in its entirety.

<u>**Background and Procedural History**</u>

7.      Avaya Inc. ("<u>Avaya</u>") is a global company that provides mission-critical real-time communication applications to private and government customers and platforms.  Avaya provides a full complement of software and service solutions for contact centers, unified communications, and integrated networking, which software and services are offered on-premises, in the cloud, or using a hybrid cloud.  Avaya is headquartered in Santa Clara, California, but its operations are extensive and span across Asia, the Middle East, Europe, and North America.

8.      Avaya sponsors two separate single employer pension plans, which constitute qualified plans for purposes of the Employee Retirement Income Security Act of 1974, 29 U.S.C. §§ 1001, <u>et al.</u> ("<u>ERISA</u>").[19]  Additionally, Avaya sponsors the Avaya Inc. Supplemental Pension Plan (the "<u>ASPP</u>"), a non-qualified plan "intended to constitute both (i) an unfunded 'excess benefit plan' . . . and (ii) an unfunded plan primarily for the purpose of providing deferred compensation and pension benefits."[20]  Approximately 830 individuals are beneficiaries of the

---

[17]   <u>See</u> 11 U.S.C. § 1114(e)(2).

[18]   <u>See</u> 11 U.S.C. § 1114(d); <u>see also</u> <u>In re Farmland Indus., Inc.</u>, 294 B.R. 903, 920 (Bankr. W.D. Mo. 2003).

[19]   *Declaration of Eric Koza (I) in Support of First Day Motions and (II) Pursuant to Local Bankruptcy Rule 1007-2* [Docket No. 22] at ¶ 49 ("<u>First Day Decl.</u>")

[20]   <u>See</u> ASPP at § 1; *Disclosure Statement for the Joint Chapter 11 Plan of Reorganization of Avaya Inc. and its Debtor Affiliates* [Docket No. 388] at 18, 19 ("<u>Discl. Stat.</u>").

ASPP.[21]   Under the ASPP, an individual or their surviving spouse is "eligible to receive a Survivor Benefit in the form of single life annuity" in the form of a pre-determined stream of cash payments if the participant died before December 31, 2003.[22]   The ASPP does not provide insurance benefits.  By its terms, the Debtors' obligations under the ASPP are general unsecured claims.[23]

9.    As a result of the Debtors' January 19, 2017, bankruptcy filing, the Debtors were required to suspend payments to all beneficiaries under the ASPP, including payments to surviving spouses of deceased beneficiaries.   On May 16, 2017, Debtor Avaya Inc. filed amended Schedules of Assets and Liabilities, which listed, among other things, prepetition amounts owed under the ASPP as general unsecured claims.[24]

10.    On May 5, 2017, Marlene Clark (the "Movant"), the surviving spouse of retiree Stephan Clark and a participant in the ASPP, filed the Motion seeking a determination that payments under the ASPP are "retiree benefits" under section 1114 of the Bankruptcy Code.[25] The Motion also seeks an order:  (a) compelling the Debtors to continue payments under the ASPP; (b) awarding administrative expense status to unpaid postpetition amounts under the ASPP; and (c) appointing a retiree committee under section 1114 of the Bankruptcy Code.[26]

---

[21]    Discl. Stat. at 18.

[22]    ASPP at § 4.3.

[23]    Id. at § 8.2.

[24]    See Docket No. 590.

[25]    See Motion at 1-2.

[26]    Id.

KE 47012722

A-053

**Argument**

**I.**  **The ASPP Does Not Offer "Retiree Benefits" Under Any "Plan, Fund, or Program" as Those Terms Are Defined Under 11 U.S.C. § 1114.**

11.  The Motion should be denied because the benefits provided under the ASPP do not qualify as a "retiree benefit" under a "plan, fund, or program" as is required under section 1114 of the Bankruptcy Code.[27]  Section 1114 of the Bankruptcy Code applies only to "retiree benefits," defined as "payments to any . . . person for the purpose of providing or reimbursing payments for retired employees and their spouses . . . for medical, surgical, or hospital care benefits, or benefits in the event of sickness, accident, disability, or death under any plan, fund, or program (through the purchase of insurance or otherwise) . . . ."[28]  Pension benefits, such as the ASPP, that provide annuity payments for retirement income and deferred compensation are not payments or reimbursements for medical, surgical, or hospital care benefits, nor are they benefits in the event of sickness, accident, disability or death.[29]  Further, and as discussed more fully below, the ASPP is not a "plan, fund, or program" as those terms are defined in section 1114 of the Bankruptcy Code.  Rather, the ASPP is a non-qualified "employee pension benefit plan" or "pension plan" as defined in ERISA because the ASPP provides a single life annuity to participants and their surviving spouses for the purpose of providing retirement income or deferred compensation.[30]  The ASPP, therefore, is not subject to section 1114 of the Bankruptcy Code, and the Motion should be denied.

---

[27]  11 U.S.C. § 1114(a).

[28]  Id..

[29]  Lyondell, 445 B.R. at 299

[30]  See 29 U.S.C. § 1002(2)(A) (defining "employee pension benefit plan" and "pension plan" as any "plan, fund, or program . . . established or maintained by an employer . . . to the extent that . . . such plan, fund, or program (i) provides retirement income to employees, or (ii) results in a deferral of income by employees for periods extending to the termination of covered employment or beyond . . . .")

6

## A. The ASPP Does Not Provide "Retiree Benefits" Under 11 U.S.C. § 1114.

12.     "Retiree benefits," as that term is defined in section 1114 of the Bankruptcy Code, are payments "for the purpose of providing or reimbursing payments for retired employees and their spouses and dependents, for medical, surgical, or hospital care benefits, or benefits in the event of sickness, accident, disability, or death under any plan, fund, or program (through the purchase of insurance or otherwise) maintained or established in whole or in part by the debtor prior to filing a petition commencing a case under this title."[31]  By definition, then, "retiree benefits" cover benefits other than pension benefits such as retirement income or deferred compensation.[32]

13.     The ASPP, by its terms, is a non-qualified supplemental pension plan,[33] which does not provide for "retiree benefits" as that term is defined in section 1114 of the Bankruptcy Code.[34]  Rather, the ASPP provides an "unfunded excess benefit plan . . . primarily for the purpose of providing deferred compensation and pension benefits" in the form of a single life annuity.[35]  Moreover, the ASPP is not triggered upon the death of a participant, but merely transfers an already existing "Minimum Retirement Benefit in the form of a single life annuity" from a participant to a surviving spouse of such participant upon a participant's death prior to

---

[31]  11 U.S.C. § 1114(a).

[32]  See McMillan v. LTV Steel, Inc., 555 F.3d 218, 226 (6th Cir. 2009) (section 1114 does not apply to a benefit program directed at administering pensions since it does not provide payments for medical, surgical, or hospital care benefits as required by section 1114(a)); Lyondell, 445 B.R. at 299; Farmland, 294 B.R. at 919 (benefits provided under a deferred compensation plan, supplemental executive retirement plan, union equity plan, and director deferred compensation plan were not "retiree benefits" because they were either deferred compensation benefits or benefits based on retirement)

[33]  ASPP at § 1 (stating that the ASPP exists only to provide "deferred compensation and pension benefits for a select group of management or highly compensated employees for purposes of [ERISA]").

[34]  McMillan, 555 F.3d at 226.

[35]  See ASPP at § 1.

7

A-055

December 31, 2003.[36] The ASPP, therefore, is not a "retiree benefit" subject to section 1114 of the Bankruptcy Code because the payments provided under the ASPP are a pension benefit even when paid to surviving beneficiaries, and not benefits for the purpose of "providing or reimbursing payments for medical, surgical, or hospital care benefits, or benefits in the event of sickness, accident, disability, or death."[37] Section 1114, therefore, does not apply to payments under the ASPP.[38]

14.    Case law is also uniform on this point.  Pension benefits similar to payments under the ASPP have been analyzed by this and other Courts on multiple occasions, and, in each instance, these Courts determined that pension benefits are not covered by section 1114:

- In re Lyondell Chem. Co.  In Lyondell, the Court analyzed a private annuity contract which became payable to the beneficiary's spouse upon his death in a lump sum payment.[39]  In determining that the annuity was not covered by section 1114 of the Bankruptcy Code, the Court held that "[p]ension benefits or benefits that provide for annual payments upon retirement are not 'retiree benefits' . . . [a]nd the feature of the annuity arrangement to provide contingency payments" to the surviving spouse of the participant "[did] not change that."[40]

- McMillan v. LTV Steel, Inc..  In McMillan, the Court analyzed a defined contribution pension plan.[41]  In making its determination that section 1114 of the Bankruptcy Code did not apply to the defined contribution pension

---

[36]    See ASPP at §§ 4.2, 4.3.

[37]    See McMillan, 555 F.3d at 226; Lyondell, 445 B.R. at 299–301; Farmland, 294 B.R. at 919; Worldcom, 364 B.R. at 549–50; Exide, 378 B.R. at 768.

[38]    Lyondell, 445 B.R. at 301; In re Worldcom, Inc., 364 B.R. 538, 549–50 (Bankr. S.D.N.Y. 2007) (finding an argument that a deferred compensation plan was retiree benefits "without merit" even though the agreement provided for alternative payment schemes in the event of the beneficiary's death or disability); In re Exide Techs., 378 B.R. 762, 768 (Bankr. D. Del. 2007) (annual retirement payments under a SERP were not retiree benefits under section 1114, notwithstanding the contingency of a death benefit payment to participant's beneficiary.)

[39]    Lyondell, 445 B.R. at 297–98.

[40]    Id. at 301.

[41]    McMillan, 55 F.3d at 221.

KE 47012722

plan, the Court explained that pension plans do not "provide payments for medical, surgical, or hospital-care benefits as required by § 1114(a)."[42]

- In re Farmland Industries, Inc. In Farmland, the Court analyzed several types of benefits, including benefits provided under a deferred compensation plan, a SERP, a union equity plan, and a director deferred compensation plan, none of which were found to be covered by section 1114 of the Bankruptcy Code.[43] In reaching this conclusion, the Court determined that the plans at issue were not "retiree benefits" because such plans provided for "either deferred compensation benefits or benefits based on retirement," and not "payments or reimbursements for medical, surgical, or hospital care," or "benefits payable in the event of sickness, accident, disability, or death" as required by section 1114(a) of the Bankruptcy Code.[44]

- In re Worldcom, Inc.. Worldcom analyzed a deferred compensation plan for prior board members, which could be altered in the event of death or disability.[45] Holding that such a plan was not covered by section 1114 of the Bankruptcy Code, the Court explained:

  > "At best, Whittaker argues that payments under the Deferred Compensation Plan are "retiree benefits" because the Deferral Agreement provided for alternative payments schemes in the event of her death or disability . . . Nonetheless, the Deferred Compensation Plan was not 'for the purpose of providing . . . benefits in the event of sickness, accident, disability, or death . . . .' The purpose of the Deferred Compensation Plan was to defer income, and the requisite income taxes, until some later date. That the timing and method of payment of the deferred income may have been altered in the event of death or disability is merely incidental to that purpose."[46]

- In re Exide Techs. In Exide, the Court looked at a SERP that paid a former executive an annual income for 10 years following retirement.[47] The SERP additionally provided that the executive's

---

[42]  Id. at 226.

[43]  Farmland, 294 B.R. at 908-11.

[44]  Id. at 919.

[45]  Worldcom, 364 B.R. at 541.

[46]  Id. at 550.

[47]  Exide, 378 B.R. at 764.

9

spouse would receive a lump sum distribution equal to the present value of the former executive's remaining retirement benefit in the event of the former executive's death prior to the end of the 10 year retirement payout.[48] Addressing the apparent change in benefit upon the death of the former executive, the Court concluded that the lump sum payment to the surviving spouse simply provided "an alternative for the timing and method of the annual payments that are due; it [did] not provide for additional benefits due upon the [former executive's] death."[49]

15.     Similar to the pension benefits at issue in the above cases, the ASPP provides

income to retirees and their spouses in the form of a single life annuity and does not provide

benefits such as insurance in the event of the contingencies contemplated by section 1114 of the

Bankruptcy Code (i.e., sickness, accident, disability or death).[50] Importantly, the ASPP provides

the same benefits regardless of whether death or disability occurs—the participant's death only

shifts the payments from the participant to the participant's surviving spouse.[51] The shift of

benefits from the participant to a surviving spouse, therefore, does not change payments under

the ASPP into a "retiree benefit" subject to section 1114 of the Bankruptcy Code.[52]

16.     Because payments under the ASPP are not "retiree benefits" under section 1114

of the Bankruptcy Code, the relief requested in the Motion must be denied.  The terms of the

ASPP are clear: the entitlement to payments under the plan amount to general unsecured claims

of the Debtors upon a chapter 11 filing.[53] Continuation of payments, therefore, is prohibited.

---

[48]   Id.

[49]   Id. at 768-69.

[50]   ASPP at §§ 4.2, 5.2.

[51]   Id. at § 4.3.

[52]   See Lyondell, 445 B.R. at 301 ("Pension benefits or benefits that provide for annual payments upon retirement are not 'retiree benefits.'  And the feature of the annuity arrangement to provide contingency payments to Mr. Jahnke's beneficiary upon death does not change that.").

[53]   See ASPP at § 8.2.

Accordingly, the Debtors may not be: (a) compelled to make timely payments under the ASPP; (b) prohibited from modifying the ASPP; or (c) required to treat payments under the ASPP as administrative expenses.

> **B.** **The ASPP Is Not A "Plan, Fund, or Program" as Those Terms Are Defined Under 11 U.S.C. § 1114.**

17. The Motion should also be denied because the ASPP is not a "plan, fund, or program" under section 1114 of the Bankruptcy Code. The Bankruptcy Code does not define the terms "plan, fund or program." Courts, therefore, look to the definition of a "plan" under ERISA when asked to determine whether a pension or other type of retiree program qualifies as a "plan, fund or program" under section 1114 of the Bankruptcy Code.[54]

18. ERISA defines a "plan" as requiring an "ongoing administrative program to meet [an] employer's obligations."[55] In the Second Circuit, the existence of an ongoing administrative program sufficient to constitute a plan under ERISA exists where: (a) an employer's undertaking requires managerial discretion—that is, where the undertaking could not be fulfilled without ongoing, particularized, administrative analysis of each case; (b) a reasonable employee would perceive an ongoing commitment by the employer to provide some employee benefits; and (c) the employer was required to analyze the circumstances of each employee's termination separately in light of certain criteria.[56]

19. The ASPP does not qualify as a "plan, fund, or program" under ERISA because it does not meet all three elements of the test detailed in the Second Circuit's opinion in Kosakow v. New Rochelle Radiology Assocites, P.C.

---

[54] Lyondell, 445 B.R. at 299; In re New York Trap Rock Corp., 126 B.R. 19, 22 (Bankr. S.D.N.Y. 1991).

[55] Lyondell, 445 B.R. at 299 (citing Fort Halifax Packing Co. v. Coyne, 482 U.S. 1, 11–12 (1987)).

[56] Lyondell, 445 B.R. at 299; see also Kosakow v. New Rochelle Radiology Assocs., P.C., 274 F.3d 706 (2d. Cir. 2001).

11

A-059

- <u>First</u>, the annuity payments offered under the ASPP do not require an "ongoing, particularized, administrative analysis" or any "managerial discretion" after the amount of the payments is determined.[57] This lack of need for administrative oversight, in turn, makes payments under the ASPP more equivalent to a single payment than to a complex plan.[58]

- <u>Second</u>, nothing about the ASPP suggests that the ASPP provides "an ongoing commitment to provide employee benefits in an insurance context."[59] The ASPP clearly provides income payments for retirees and not insurance-type benefits.[60]

- <u>Third</u>, while the ASPP requires an upfront analysis to determine the amount and extent of the stream of payments based on an individual employee's tenure with the Debtors or the Debtors' predecessors, such analysis does not require an individualized analysis in light of certain criteria based on the circumstances of such employee's termination. Rather, payments under the ASPP were simply based off of an employee's tenure with the Debtors and the employee's last date of employment.[61]

20. Because the ASPP does not meet any, let alone all three elements of the Second Circuit's test in <u>Kosakow</u>, the ASPP is not a "plan, fund, or program" pursuant to section 1114 of the Bankruptcy Code. Thus, even if the annuity payments under the ASPP participants could be construed as "retiree benefits" (and they cannot), such benefits are not payments under any

---

[57] <u>See</u> ASPP at § 3.2 (calculation of amount of "Excess Retirement Benefit"); § 4.2 (calculation of "Minimum Retirement Benefit"); § 5.2 (calculation of "Mid-Career Pension Benefit"); § 6.1 ("Benefit payments shall be calculated in accordance with the rules, procedures, and assumptions used under the applicable Qualified Plan."); <u>see also</u> ASPP at § 8.2 ("The Plan constitutes as mere promise by the Company and the Participating Companies to make benefit payments, if any, in the future. No Participant, Surviving Spouse, beneficiary or any other person shall have any interest in any particular assets of a Participating Company by reason of the right to receive a benefit under the Plan and to the extent the Participant, Surviving Spouse, beneficiary or another person acquires a right to receive benefits under this Plan, such right shall be no greater than the right of any unsecured creditor of a Participating Company.")

[58] <u>See</u> <u>Lyondell</u>, 445 B.R. at 300 (an annuity is "simply a stream of payments actuarially equivalent to a lump-sum payment, which is then distributed over time in a pre-determined fashion").

[59] <u>See</u> ASPP at § 1 (stating the purpose of the ASPP is to provide deferred compensation and pension benefits for a select group of management or highly compensated employees).

[60] <u>Lyondell</u>, 445 B.R. at 300 ("Typically, when the only interaction between employer and employee is the distribution of checks, there is no 'ongoing relationship' under ERISA.") (citing <u>Nowak v. Int'l Fund Servs.</u> <u>(N.A.), LLC</u>, 2009 U.S. Dist. LEXIS 69097, *6 (S.D.N.Y. August 7, 2009)).

[61] ASPP at §§ 3.1, 4.1, 5.1.

12

"plan, fund or program (through the purchase of insurance or otherwise) maintained or established in whole or in part by the debtor."[62]  Section 1114 of the Bankruptcy Code, therefore, does not apply to payments under the ASPP and the Motion should be denied.

## II. The Appointment of A Committee of Retired Employees Under 11 U.S.C. § 1114 Is Unwarranted.

21.     The appointment of a retiree committee is not required in these chapter 11 cases. Pursuant to section 1114(d) of the Bankruptcy Code, the court "shall order the appointment of a committee of retired employees if a debtor seeks to modify or not pay the retiree benefits or if the court otherwise determines that it is appropriate."[63]  The Debtors, however, have not sought to modify or cease payment of any retiree benefits.  In fact, the Debtors are continuing to maintain other post-employment benefits in the ordinary course of business.[64]  The Debtors simply cannot continue payments under the ASPP as they are general unsecured claims.[65]  The appointment of a committee under section 1114(d) of the Bankruptcy Code, therefore, is wholly unwarranted.

22.     Unless and until the Debtors actually seek to modify or terminate retiree benefits per section 1114, there is no basis for the appointment of a committee of retired employees.[66]  As explained in section I, supra, the ASPP is not a plan that provides retiree benefits under section 1114 of the Bankruptcy Code.  Further, the Debtors have not sought to modify or cease payment on any other retiree benefits, and the Movant has not suggested any different potential retiree

---

[62]   11 U.S.C. § 1114(a).

[63]   11 U.S.C. § 1114(d).

[64]   Discl. Stat. at 19.

[65]   See ASPP at § 8.2; see also, 11 U.S.C. § 1122; 11 U.S.C. § 507.

[66]   Farmland, 294 B.R. at 920.

13

A-061

benefits that the Debtors have modified or failed to pay. Accordingly, the appointment of a committee of retired employees at this time is not only unnecessary, but it would simply create unnecessary cost and delay in the Debtors' continued efforts to reorganize.

### Conclusion

23.     The Debtors should not be compelled to immediately reinstate monthly payments to surviving spouse beneficiaries under the ASPP pursuant to section 1114(e)(1) of the Bankruptcy Code. Moreover, payments under the ASPP should not be afforded administrative priority status, because the monthly payments under the ASPP are not "retiree benefits" as that term is defined in section 1114 of the Bankruptcy Code. Further, because payments under the ASPP are not "retiree benefits" and the Debtors have not stopped paying or modified any retiree benefits, the appointment of a committee of retired employees under section 1114(d) of the Bankruptcy Code is unnecessary and improper. The Motion, therefore, should be denied in its entirety.

*[Remainder of Page Intentionally Left Blank]*

14

A-062

WHEREFORE, for the foregoing reasons, the Debtors request that the Court enter an Order denying the Movant's Motion for an order compelling payments under the ASPP as administrative priority expenses and the appointment of a committee of retired employees under section 1114 of the Bankruptcy Code.

Dated: May 18, 2017
New York, New York

/s/ Jonathan S. Henes, P.C.
James H.M. Sprayregen, P.C.
Jonathan S. Henes, P.C.
KIRKLAND & ELLIS LLP
KIRKLAND & ELLIS INTERNATIONAL LLP
601 Lexington Avenue
New York, New York 10022
Telephone:    (212) 446-4800
Facsimile:    (212) 446-4900

- and -

Patrick J. Nash, Jr., P.C. (admitted *pro hac vice*)
Ryan Preston Dahl (admitted *pro hac vice*)
Bradley Thomas Giordano (admitted *pro hac vice*)
KIRKLAND & ELLIS LLP
KIRKLAND & ELLIS INTERNATIONAL LLP
300 North LaSalle Street
Chicago, Illinois 60654
Telephone:    (312) 862-2000
Facsimile:    (312) 862-2200

*Counsel to the Debtors and Debtors in Possession*

15

AKIN GUMP STRAUSS HAUER & FELD LLP
One Bryant Park
New York, New York 10036
(212) 872-1000 (Telephone)
(212) 872-1002 (Facsimile)
Ira S. Dizengoff
Philip C. Dublin
Abid Qureshi

*Counsel to the Ad Hoc First Lien Group*

# UNITED STATES BANKRUPTCY COURT
# SOUTHERN DISTRICT OF NEW YORK

| | | |
|---|---|---|
| In re: | ) | Chapter 11 |
| | ) | |
| AVAYA INC., *et al.*[1] | ) | Case No. 17-10089 (SMB) |
| | ) | |
| Debtors. | ) | Jointly Administered |
| | ) | |

## OBJECTION OF THE AD HOC FIRST LIEN GROUP TO MARLENE CLARK'S MOTION FOR ORDER DETERMINING SURVIVORSHIP BENEFITS UNDER SUPPLEMENTAL PLAN ARE "RETIREE BENEFITS" UNDER BANKRUPTCY CODE SECTION 1114(a), COMPELLING COMPLIANCE WITH SECTION 1114(e), AND APPOINTING AN OFFICIAL COMMITTEE UNDER SECTION 1114(d)

The Ad Hoc First Lien Group,[2] comprising holders of over 50% of the Debtors' first lien

debt, by and through its undersigned counsel, hereby files this objection (the "Objection") to

*Marlene Clark's Motion for Order Determining Survivorship Benefits under Supplemental Plan*

*Are "Retiree Benefits" under Bankruptcy Code Section 1114(a), Compelling Compliance with*

---

[1]     The Debtors in these chapter 11 cases, along with the last four digits of each Debtor's federal tax identification number, include:  Avaya Inc. (3430); Avaya CALA Inc. (9365); Avaya EMEA Ltd. (9361); Avaya Federal Solutions, Inc. (4392); Avaya Holdings Corp. (9726); Avaya Holdings LLC (6959); Avaya Holdings Two, LLC (3240); Avaya Integrated Cabinet Solutions Inc. (9449); Avaya Management Services Inc. (9358); Avaya Services Inc. (9687); Avaya World Services Inc. (9364); Octel Communications LLC (5700); Sierra Asia Pacific Inc. (9362); Sierra Communication International LLC (9828); Technology Corporation of America, Inc. (9022); Ubiquity Software Corporation (6232); VPNet Technologies, Inc. (1193); and Zang, Inc. (7229).  The location of Debtor Avaya Inc.'s corporate headquarters and the Debtors' service address is:  4655 Great America Parkway, Santa Clara, CA 95054.

[2]     As set forth in the *Fourth Amended Verified Statement Pursuant to Bankruptcy Rule 2019* [Docket No. 454].

*Section 1114(e), and Appointing an Official Committee under Section 1114(d)* [Docket No. 522]

(the "<u>Motion</u>"). In support of this Objection, the Ad Hoc First Lien Group respectfully

represents as follows:

## OBJECTION

1.      By the Motion, Marlene Clark ("<u>Clark</u>"), a surviving spouse of a former employee

of Avaya Inc., seeks entry of an order (i) determining that the survivorship benefits under the

Avaya Inc. Supplemental Pension Plan[3] (the "<u>Supplemental Pension Plan</u>") constitute "retiree

benefits" under Bankruptcy Code section 1114(a); (ii) reinstating payment of monthly payments

under the Supplemental Pension Plan to surviving spouse beneficiaries under Bankruptcy Code

section 1114(e)(1); (iii) granting administrative expense status to postpetition accrued benefits

under Bankruptcy Code section 1114(e)(2); and (iv) appointing an official committee under

Bankruptcy Code section 1114(d).

2.      While the Ad Hoc First Lien Group is sympathetic to Ms. Clark's situation, the

Motion must be denied because (i) the benefits provided by the Supplemental Pension Plan are

not "retiree benefits" as defined in Bankruptcy Code section 1114(a)[4] and (ii) payments made to

a surviving spouse do not become "retiree benefits" upon the death of a plan participant.

3.      "Retiree benefits," as defined in Bankruptcy Code section 1114(a), cover

payments for the purpose of providing medical, surgical, or hospital care benefits, or benefits in

the event of sickness, accident, disability or death. *In re Lyondell Chem. Co.*, 445 B.R. 296, 301

---

[3]      A copy of the Supplemental Pension Plan is attached as <u>Exhibit 2</u> to the Motion.

[4]      Bankruptcy Code section 1104 provides, in relevant part:

(a)   For purposes of this section, the term "retiree benefits" means payments to any entity or person for the purpose of providing or reimbursing payments for retired employees and their spouses and dependents, for medical, surgical, or hospital care benefits, or benefits in the event of sickness, accident, disability, or death under any plan, fund, or program (through the purchase of insurance or otherwise) maintained or established in whole or in part by the debtor prior to filing a petition commencing a case under this title.

11 U.S.C. § 1114(a).

A-065

(Bankr. S.D.N.Y. 2011). The law is well settled that pension benefits or benefits providing for annual payments upon retirement are not "retiree benefits" under Bankruptcy Code section 1114(a). *See McMillan v. LTV Steel, Inc.*, 555 F.3d 218, 226 (6th Cir. 2009) (holding that Bankruptcy Code section 1114 does not apply to program directed at administering pensions); *Lyondell*, 445 B.R. at 301 (holding that pension benefits and benefits providing for annual payments do not constitute retiree benefits); *In re WorldCom, Inc.*, 364 B.R. 538, 549 (Bankr. S.D.N.Y. 2007) (holding that payments under deferred compensation plan do not constitute retiree benefits).

4.      By its own terms, the Supplemental Pension Plan is an unfunded "excess benefit plan" as defined in ERISA § 3(36)[5] and an unfunded plan primarily for the purpose of providing deferred compensation and pension benefits to certain management and highly paid employees. Supplemental Pension Plan, Article 1. The movant has not attempted to argue otherwise and appears to concede that the "monthly payments [under the Supplemental Pension Plan] are not 'retiree benefits' under section 1114(a)." Motion at 2. Instead, Ms. Clark contends that the benefits paid to surviving spouse beneficiaries under the Supplemental Pension Plan become "retiree benefits" under Bankruptcy Code section 1114(a) when the beneficiary spouse unfortunately passes away. Motion at 5. This argument relies on a convoluted reading of the definition of "retiree benefits" that strings together certain non-consecutive words from the

---

[5]      "ERISA" means the Employee Retirement Income Security Act of 1974, as amended, 29 U.S.C. § 1001, *et seq.* ERISA § 3 provides, in relevant part:

(36)   The term "excess benefit plan" means a plan maintained by an employer solely for the purpose of providing benefits for certain employees in excess of the limitations on contributions and benefits imposed by section 415 of title 26 on plans to which that section applies without regard to whether the plan is funded. To the extent that a separable part of a plan (as determined by the Secretary of Labor) maintained by an employer is maintained for such purpose, that part shall be treated as a separate plan which is an excess benefit plan.

29 U.S.C. § 1002(36).

A-066

statute to manufacture a favorable definition.  *See*, *generally*, 11 U.S.C. § 1114(a).  Indeed, Ms. Clark does not provide any support for her position that while benefits under the Supplemental Pension Plan do not constitute "retiree benefits" when payable to former employees, payments made to surviving spouses constitute "benefits in the event of…death" under Bankruptcy Code section 1114(a).  *Id.*

5.      To the contrary, courts addressing this issue consistently have held that pension or annuity benefits paid to the beneficiaries of plan participants upon death are not "death benefits" under Bankruptcy Code section 1114(a).  *See Lyondell*, 445 B.R. at 301 (holding that contingency payments to beneficiary upon death of retiree did not change fact that plan provided pension benefits and not retiree benefits); *In re Exide Techs.*, 378 B.R. 762, 768 (Bankr. D. Del. 2007) (holding that payments to beneficiary upon death of retiree were not death benefits under Bankruptcy Code section 1114(a)); *WorldCom*, 364 B.R. at 550 (holding that provisions in deferred compensation plan providing for alternative payment schemes upon death of retiree did not change fact that plan did not provide retiree benefits).  This is the only credible interpretation of the statute as it avoids the incongruous result of payments under the Supplemental Pension Plan constituting "retiree benefits" for beneficiaries of deceased participants but not direct participants under the same plan.

6.      The Court also should deny the request for the appointment of an official committee of retirees.  Bankruptcy Code section 1114(d), which governs appointment of an official committee of retirees provides:

> The court, upon a motion by any party in interest, and after notice and a hearing, shall order the appointment of a committee of retired employees if the debtor seeks to modify or not pay the retiree benefits or if the court otherwise determines that it is appropriate, to serve as the authorized representative, under this section, of those persons receiving any retiree benefits not covered by a collective bargaining agreement. The United States trustee shall appoint any such committee.

A-067

11 U.S.C. § 1114(d). First, as previously discussed, the benefits payable to Ms. Clark under the

Supplemental Pension Plan do not constitute "retiree benefits," and, thus, Bankruptcy Code

section 1114(d) does not apply. Second, Ms. Clark lacks standing to move for appointment of an

official committee under Bankruptcy Code section 1114(d) to act as an authorized representative

on behalf of persons receiving any retiree benefits not covered by a collective bargaining

agreement. Although Ms. Clark, as a general unsecured creditor, is a party in interest in these

chapter 11 cases, she lacks Article III standing to move for the appointment of an official

committee under Bankruptcy Code section 1114(d). *See In re Motors Liquidation Co.*, 430 B.R.

65, 92 (S.D.N.Y. 2010) (stating that party in interest must satisfy constitutional and prudential

standing). The elements of Article III constitutional standing are (1) a concrete and

particularized injury that is actual or imminent, (2) a causal connection between the injury and

the conduct complained of, and (3) likely redressability of injury by favorable decision. *Lujan v.*

*Defs. of Wildlife*, 504 U.S. 555, 560-61 (1992). In addition to Article III standing, a litigant must

prove prudential standing, including by establishing that the litigant's complaint falls within the

"zone of interests protected by the law invoked." *Elk Grove Unified Sch. Dist. v. Newdow*, 542

U.S. 1, 12 (2004). Ms. Clark lacks Article III standing because her injury, non-payment of

benefits that do not constitute "retiree benefits," would not be redressed by the appointment of an

official committee of retirees, which will represent the interests of only those persons actually

receiving "retiree benefits." Ms. Clark also lacks prudential standing as her interest does not fall

within the "zone of interests" protected by Bankruptcy Code section 1114(d) because the

provision, by its express terms, is only intended to protect the interests of persons who actually

are receiving "retiree benefits."

5

A-068

7.  Finally, even assuming that benefits payable under the Supplemental Pension Plan were "retiree benefits" and Ms. Clark has standing to move for the appointment of official committee, relief under Bankruptcy Code section 1114 would be unavailable because the statute does not apply to plans that, as is the case here, are terminable-at-will by the debtor.[6] *In re Chemtura Corp.*, No. 09-11233 (REG), 2011 WL 1344573, at *6 (Bankr. S.D.N.Y. Apr. 8, 2011); *In re Delphi Corp.*, No. 05-44481 (RDD), 2009 WL 637315, at *6 (Bankr. S.D.N.Y. Mar. 10, 2009).

## <u>CONCLUSION</u>

**WHEREFORE**, the Ad Hoc First Lien Group respectfully requests that the Court (a) deny the relief requested in the Motion and (b) grant such further relief as the Court deems just, proper and equitable.

Dated:  New York, New York
       May 18, 2017

By:  /s/ Ira S. Dizengoff
     Ira S. Dizengoff
     Philip C. Dublin
     Abid Qureshi
     AKIN GUMP STRAUSS HAUER & FELD LLP
     One Bryant Park
     New York, New York 10036
     (212) 872-1000 (Telephone)
     (212) 872-1002 (Facsimile)

     *Counsel to the Ad Hoc First Lien Group*

---

[6]    *See* Supplemental Pension Plan, Article 10.1(a) ("The Board or its delegate…may from time to time amend, suspend or *terminate the Plan at any time.*") (emphasis added).

6

STROOCK & STROOCK & LAVAN LLP
Kristopher M. Hansen
Sayan Bhattacharyya
Gabriel E. Sasson
180 Maiden Lane
New York, New York 10038-4982
Telephone: (212) 806-5400
Facsimile: (212) 806-6006

*Counsel to the Ad Hoc Crossover Group*

**UNITED STATES BANKRUPTCY COURT**
**SOUTHERN DISTRICT OF NEW YORK**

|  |  |  |
|---|---|---|
| In re: | ) | Chapter 11 |
|  | ) |  |
| AVAYA INC., *et al.*,[1] | ) | Case No. 17-10089 (SMB) |
|  | ) |  |
| Debtors. | ) | (Jointly Administered) |
|  | ) |  |

**OBJECTION OF THE AD HOC CROSSOVER GROUP TO MARLENE CLARK'S
MOTION FOR ORDER DETERMINING SURVIVORSHIP BENEFITS UNDER
SUPPLEMENTAL PLAN ARE "RETIREE BENEFITS" UNDER BANKRUPTCY CODE
SECTION 1114(a), COMPELLING COMPLIANCE WITH SECTION 1114(e), AND
APPOINTING AN OFFICIAL COMMITTEE UNDER SECTION 1114(d)**

The ad hoc group (the "Ad Hoc Crossover Group") of certain beneficial holders, or

investment advisors or managers of certain beneficial holders, of first lien and second lien debt

issued by the Debtors, by and through its undersigned counsel, hereby submits this objection

(this "Objection") to *Marlene Clark's Motion for Order Determining Survivorship Benefits*

*Under Supplemental Plan are "Retiree Benefits" Under Bankruptcy Code 1114(a), Compelling*

---

[1]    The Debtors in these chapter 11 cases, along with the last four digits of each Debtor's federal tax identification
number, include:  Avaya Inc. (3430); Avaya CALA Inc. (9365); Avaya EMEA Ltd. (9361); Avaya Federal
Solutions, Inc. (4392); Avaya Holdings Corp. (9726); Avaya Holdings LLC (6959); Avaya Holdings Two, LLC
(3240); Avaya Integrated Cabinet Solutions Inc. (9449); Avaya Management Services Inc. (9358); Avaya Services
Inc. (9687); Avaya World Services Inc. (9364); Octel Communications LLC (5700); Sierra Asia Pacific Inc. (9362);
Sierra Communication International LLC (9828); Technology Corporation of America, Inc. (9022); Ubiquity
Software Corporation (6232); VPNet Technologies, Inc. (1193); and Zang, Inc. (7229).  The location of Debtor
Avaya Inc.'s corporate headquarters and the Debtors' service address is:  4655 Great America Parkway, Santa Clara,
CA 95054.

A-070

*Compliance with Section 1114(e), and Appointing an Official Committee Under Section 1114(d)*
[Docket No. 522] (the "Motion"),[2] and in support hereof, respectfully states as follows:

## PRELIMINARY STATEMENT

1.      It is well settled that the definition of "retiree benefits" under section 1114(a) of the Bankruptcy Code does not include pension benefits. Notwithstanding this, relying on the dictionary definition of the word "benefit," the Motion argues that pension benefits payable to surviving spouse beneficiaries under a pension plan should be deemed to be "retiree benefits" for purposes of section 1114 of the Bankruptcy Code. However, other courts that have addressed essentially this same argument have uniformly held that the fact that pension benefits may become payable to the beneficiary of a deceased pension participant does not render such payments "retiree benefits" for purposes of section 1114.

2.      Consistent with these cases, this Court should find that death benefits payable to surviving spouses under the Avaya Inc. Supplemental Pension Plan (the "Survivorship Benefits") are not "retiree benefits" within the meaning of section 1114 and are not entitled to payment on a current basis or administrative expense status under section 1114(e) of the Bankruptcy Code. Because the Survivorship Benefits are not "retiree benefits" subject to section 1114, the Motion does not establish any basis for the appointment of a retiree committee pursuant to section 1114(d) of the Bankruptcy Code. For these reasons, and as set forth in greater detail below and in the Debtors' objection to the Motion [Docket No. 609] (the "Debtors' Objection"),[3] the Motion should be denied.

---

[2]    Capitalized terms used and not defined herein shall have the meanings ascribed to such terms in the Motion.

[3]    The Ad Hoc Crossover Group hereby joins with the Debtors and adopts by reference the arguments contained in the Debtors' Objection.

## RELEVANT BACKGROUND

3.     On May 5, 2017, the movant filed the Motion which, *inter alia*, seeks: (i) a determination that the Survivorship Benefits are "retiree benefits" under section 1114(a) of the Bankruptcy Code; (ii) the immediate reinstatement of Survivorship Benefits pursuant to section 1114(e)(1) of the Bankruptcy Code; (iii) allowance of administrative expense claims for Survivorship Benefits under section 1114(e)(2) of the Bankruptcy Code; and (iv) the appointment of a retiree committee pursuant to section 1114(d) of the Bankruptcy Code. *See* Motion ¶ 10.

4.     Avaya Inc. ("Avaya") sponsors two separate pension plans, which constitute qualified plans for purposes of the Employment Retirement Income Security Act of 1974, 29 U.S.C. §§ 1001–1461 ("ERISA").[4] Avaya also sponsors the Avaya Inc. Supplemental Pension Plan (the "Supplemental Plan"), a non-qualified deferred compensation and pension plan offered to "a select group of management or highly compensated employees." "Supplemental Plan," Motion, Ex. 2, § 1. The Supplemental Plan is intended to provide certain benefits in addition to those provided under the retirees' qualified pension plan because of the limits of the provisions of the Internal Revenue Code. *See id.* Among other things, the Supplemental Plan provides certain eligible retirees and their surviving spouses certain benefits in the form of monthly annuity payments. *See id.* §§ 1, 4.2, 5.2.

5.     The Supplemental Plan "is intended to constitute both (i) an unfunded 'excess benefit plan' as defined in ERISA § 3(36), and (ii) an unfunded plan *primarily* for the purpose of providing deferred compensation and pension benefits for a select group of management or highly compensated employees for purposes of Title I of [ERISA]."

---

[4]     *See Declaration of Eric Koza (I) in Support of First Day Motions and (II) Pursuant to Local Bankruptcy Rule 1007-2* [Docket No. 22], at ¶ 49.

A-072

*Id.* § 1 (emphasis added). The Supplemental Plan explicitly states that it constitutes a "mere promise . . . to make payments, if any, in the future" and, to the extent any person acquires a right to receive benefits under the Supplemental Plan, "such right shall be no greater than the right of any unsecured general creditor of a Participating Company."[5] *Id.* § 8.2. The Supplemental Plan provides that, upon the death of certain retiree participants, a surviving spouse will be eligible to receive a single life annuity equal to a percentage of such retiree participant's annual basic pay on the last day he or she was on the active payroll. *See id.* § 4.3. Such Survivorship Benefits are equivalent to the single life annuity the deceased retiree participant would have received as a Minimum Retirement Benefit (as defined in the Supplemental Plan). *See id.* §§ 4.2, 4.3.

## ARGUMENT

6.      Section 1114(a) of the Bankruptcy Code provides that the term "'retiree benefits' means payments . . . for the purpose of providing or reimbursing payments for retired employees and their spouses and dependents for medical and related benefits." *In re A.C.E. Elevator Co., Inc.*, 347 B.R. 473, 487 (Bankr. S.D.N.Y. 2006) (quoting 11 U.S.C. § 1114(a)). Courts have been wary, however, of attempts by plan participants to "excise the specific definition of 'retiree benefits' as provided in the statute and redefine that term as analogous to 'retirement vehicle' and incorporating any payments 'for purposes of retirement.'" *In re WorldCom, Inc.*, 364 B.R. 538, 549 (Bankr. S.D.N.Y. 2007) ("As the statute makes clear . . . the fact that [a program] may be used to provide the participant with post-retirement income does not, standing alone, render payments under [such program] 'retiree benefits.'"). Courts have also specifically found that section 1114 does not apply to pension plans, deferred compensation plans or benefits due upon

---

[5]     The term "Participating Company" is defined as "[t]he Company [i.e., Avaya] and each of its subsidiaries that is a Participating Company for purposes of the applicable Qualified Plan." Supplemental Plan § 2.29.

A-073

retirement. *See, e.g.*, *McMillan v. LTV Steel, Inc.*, 555 F.3d 218, 226 (6th Cir. 2009) (stating that the claimant could not establish his claims for "defined contribution pension plan" benefits were entitled to administrative expense status because the applicable pension plan "does not provide payments for medical, surgical or hospital-care benefits as required by § 1114(a)"); *Adventure Res., Inc. v. Holland*, 137 F.3d 786, 795 (4th Cir. 1998) (determining that section 1114 has no application to claims asserted by pension trusts, which "administer only *pension* benefits for retired coal miners," because "[n]one of the[] claims are for the types of benefits enumerated in § 1114(a)"); *WorldCom*, 364 B.R. at 550 (rejecting argument that payments pursuant to a deferred compensation program were "retiree benefits" under section 1114 because the purpose of the program was to defer income and, accordingly, any subsequent alterations to the timing and method of payment upon death or disability were merely incidental to that purpose); *In re Farmland Indus. Inc.*, 294 B.R. 903, 919 (Bankr. W.D. Mo. 2003) (finding deferred compensation benefits or benefits due upon retirement are not "retiree benefits" under section 1114).

7.    The Motion argues that the Survivorship Benefits qualify as "retiree benefits" within the meaning of section 1114(a) of the Bankruptcy Code because they are "payments . . . for the purpose of providing . . . for retired employees and their spouses . . . benefits in the event of . . . death" under the Supplemental Plan.  Motion at 2.  In support of this interpretation, the Motion cites to one of several definitions of the word "benefit" set forth in Merriam-Webster's online dictionary.  *See id.* ¶ 13.  The Motion does not cite any decision of a court supporting this interpretation.  To the contrary, many courts in this Circuit and others have held that benefits similar to the Survivorship Benefits are not "retiree benefits" that are subject to section 1114 of the Bankruptcy Code.

A-074

8.      For instance, in *In re Lyondell Chemical Co.*, Judge Gerber looked to ERISA when evaluating whether survivorship benefits under a pension plan constituted "retiree benefits" for purposes of section 1114(a) of the Bankruptcy Code.  445 B.R. 296, 299 (Bankr. S.D.N.Y. 2011).  Judge Gerber held that regardless of whether a pension plan qualifies as a plan under ERISA, pension benefits cannot be considered "retiree benefits," and annuity arrangements that provide for contingency payments to beneficiaries upon the participant's death (similar to the Survivorship Benefits at issue here) do not alter that conclusion.  *Id.* at 301.  Specifically, the court found that "retiree benefits," as defined under section 1114(a), are for the purpose of providing "medical, surgical or hospital care benefits or benefits in the event of sickness, accident, disability or death," and pension benefits or benefits that provide for annual payments upon retirement are, by definition, not "retiree benefits."  *Id.*

9.      Similarly, in *In re Exide Technologies*, the court reviewed a plan that provided for a "death benefit" allowing the beneficiary of a deceased retiree participant under an executive retiree benefits plan to receive a lump sum payment equal to the present value of the remaining payments that would have otherwise been made to the participant under the plan.  378 B.R. 762 (Bankr. D. Del. 2007).   When reviewing the statutory language of section 1114(a) of the Bankruptcy Code, the court noted that the words "plan, fund or program" are not defined in the Bankruptcy Code and looked to ERISA for guidance.  *Id.* at 768.  The court found that unlike an ERISA "plan, fund, or program," the plan's payments did not arise from benefits accumulated over time and that the "death benefit" provision of the supplemental plan at issue "simply provide[d] an alternative for the timing and method of annual payments that [we]re due," rather than additional benefits upon the participant's death.  *Id.* at 769.  Accordingly, such payments could not constitute "retiree benefits" under section 1114 of the Bankruptcy Code.

A-075

10.      Here, pursuant to its explicit terms, the Supplemental Plan constitutes "(i) an unfunded 'excess benefit plan' as defined in ERISA § 3(36), and (ii) an unfunded plan *primarily* for the purpose of providing deferred compensation and pension benefits for a select group of management or highly compensated employees . . . ." Supplemental Plan § 1 (emphasis added). Since the Supplemental Plan is to be entirely unfunded for the purposes of the Internal Revenue Code and ERISA, it constitutes a mere promise to make benefit payments, if any, in the future. *See id.* § 8.2.   Accordingly, applying the reasoning set forth in *Lyondell*, the single annuity mechanism of Survivorship Benefits provided under the Supplemental Plan (similar to the annuity contract in *Lyondell*) is simply a stream of payments that is much closer in concept to a single payment triggered by a single event. *See Lyondell*, 445 B.R. at 300.  Moreover, applying the reasoning set forth in *Exide*, the Survivorship Benefits provision of the Supplemental Plan (like the "death benefit" provision of the plan at issue in *Exide*) simply provides an alternative for the timing and method of the payments to which a retiree participant was entitled to receive while alive, not an additional benefit due upon death.  Thus, the Survivorship Benefits cannot constitute "retiree benefits" under section 1114(a) of the Bankruptcy Code, and they are not entitled to administrative expense status under section 1114(e)(2) of the Bankruptcy Code.

11.      Finally, the Motion does not provide any cognizable basis for the Court to appoint a retiree committee pursuant to section 1114(d) of the Bankruptcy Code.  At this time, the Debtors have not made any indication that they are terminating or modifying any "retiree benefits" subject to section 1114 of the Bankruptcy Code, and nothing in the Motion suggests otherwise.  Moreover, appointment of a retiree committee would not further a surviving spouse's ability to enforce claims for Survivorship Benefits because they are not "retiree benefits" as defined in section 1114(a) of the Bankruptcy Code.  *See* 11 U.S.C. § 1114(b)(2) (providing that

A-076

retiree committees appointed by the court pursuant to section 1114 "shall have the power to enforce the rights of persons under this title *as they relate to retiree benefits*") (emphasis added).

## **CONCLUSION**

12. Because the Supplemental Plan does not provide "retiree benefits" under section 1114(a) of the Bankruptcy Code, Survivorship Benefits under the Supplemental Plan are not eligible for immediate reinstatement and cannot give rise to administrative expense claims under section 1114. Further, since Survivorship Benefits under the Supplemental Plan do not constitute "retiree benefits" under section 1114(a), and the Motion does not otherwise establish any justifiable reason why the Court should appoint a retiree committee, the requirements for the appointment of a retiree committee pursuant to section 1114(d) of the Bankruptcy Code have not been (and cannot be) satisfied.

Dated: May 18, 2017          Respectfully submitted,
      New York, New York

STROOCK & STROOCK & LAVAN LLP

/s/ Kristopher M. Hansen
Kristopher M. Hansen
Sayan Bhattacharyya
Gabriel E. Sasson
180 Maiden Lane
New York, New York 10038-4982
Telephone: (212) 806-5400
Facsimile:  (212) 806-6006

*Counsel to the Ad Hoc Crossover Group*

A-077

MORRISON & FOERSTER LLP
250 W 55th Street
New York, New York 10019
Lorenzo Marinuzzi
Todd M. Goren

*Counsel for the Official Committee*
*of Unsecured Creditors of Avaya Inc., et al.*

**UNITED STATES BANKRUPTCY COURT**
**SOUTHERN DISTRICT OF NEW YORK**

| | | |
|---|---|---|
| In re: | ) | Chapter 11 |
| | ) | |
| AVAYA INC., *et al.*,[1] | ) | Case No. 17-10089 (SMB) |
| | ) | |
| Debtors. | ) | (Jointly Administered) |
| | ) | |
| | ) | |

**OBJECTION OF THE OFFICIAL COMMITTEE OF UNSECURED CREDITORS TO
MARLENE CLARK'S MOTION FOR ORDER DETERMINING SURVIVORSHIP
BENEFITS UNDER SUPPLEMENTAL PLAN ARE "RETIREE BENEFITS" UNDER
BANKRUPTCY CODE SECTION 1114(a), COMPELLING COMPLIANCE WITH
SECTION 1114(e), AND APPOINTING AN OFFICIAL COMMITTEE UNDER
SECTION 1114(d)**

The Official Committee of Unsecured Creditors (the "Creditors' Committee") of Avaya

Inc. ("Avaya") and the other debtors and debtors-in-possession in the above-captioned chapter

11 cases (collectively, the "Debtors") hereby submits this objection (the "Objection") to

*Marlene Clark's Motion for Order Determining Survivorship Benefits Under Supplemental Plan*

---

[1] The Debtors in these chapter 11 cases, along with the last four digits of each Debtor's federal tax identification number, include: Avaya Inc. (3430); Avaya CALA Inc. (9365); Avaya EMEA Ltd. (9361); Avaya Federal Solutions, Inc. (4392); Avaya Holdings Corp. (9726); Avaya Holdings LLC (6959); Avaya Holdings Two, LLC (3240); Avaya Integrated Cabinet Solutions Inc. (9449); Avaya Management Services Inc. (9358); Avaya Services Inc. (9687); Avaya World Services Inc. (9364); Octel Communications LLC (5700); Sierra Asia Pacific Inc. (9362); Sierra Communication International LLC (9828); Technology Corporation of America, Inc. (9022); Ubiquity Software Corporation (6232); VPNet Technologies, Inc. (1193); and Zang, Inc. (7229). The location of Debtor Avaya Inc.'s corporate headquarters and the Debtors' service address is: 4655 Great America Parkway, Santa Clara, CA 95054.

*Are "Retiree Benefits" Under Bankruptcy Code Section 1114(a), Compelling Compliance with Section 1114(e), and Appointing an Official Committee Under Section 1114(d)* [Dkt. No. 522] (the "Motion").[2]  In support of the Objection, the Creditors' Committee respectfully states as follows:

## PRELIMINARY STATEMENT

1.     It is an unfortunate reality that chapter 11 debtors rarely have sufficient assets to satisfy all creditors in full.  As a result, creditors of chapter 11 debtors will almost inevitably be called upon to make sacrifices.  This includes not only a debtor's trade creditors and vendors, but often also includes retirees and their surviving spouses, like Ms. Clark.  In drafting the Bankruptcy Code, Congress was required to make difficult decisions regarding the relative priorities of claims in bankruptcy cases.  In the end, Congress chose to limit priority and administrative expense status to certain, specific categories of claims, including certain employee wages and retiree benefits.  Not all claims may be afforded administrative or priority status, however, and the claims of Ms. Clark and other surviving spouses to deferred compensation were not included in the categories of claims that Congress provided statutory priority.

2.     Bankruptcy Code section 1114 affords certain added protections and priority to claims of retired employees to ensure that those creditors continue receiving critical health, disability, and other insurance benefits.  The law in this Circuit is clear and unequivocal, however; claims under pension and other deferred compensation plans are not "retiree benefits" for purposes of Bankruptcy Code section 1114.  Although creative, Ms. Clark's argument that claims on account of a deferred compensation program such as the Avaya Inc.

---

[2]  Capitalized terms not otherwise defined herein have the meanings ascribed to them in the Motion.

A-079

Supplemental Pension Plan (the "ASPP") are somehow converted into retiree benefits when paid to a surviving spouse falls short. Courts in this Circuit and others have roundly and uniformly rejected similar arguments, and the Court should follow suit in this case. Periodic deferred compensation payments made under the ASPP simply do not fall into the universe of "retiree benefits" protected by Bankruptcy Code section 1114. As such, claims under the ASPP must be treated the same as all other general unsecured claims. Ms. Clark's request for different treatment should be denied.

3.    Moreover, because claims under the ASPP are not "retiree benefits," Ms. Clark's request to appoint a retiree committee is misguided and should be denied.

## BACKGROUND

### A.    The Chapter 11 Cases

4.    On January 19, 2017 (the "Petition Date"), each of the Debtors filed with the Court a voluntary petition for relief under chapter 11 of the Bankruptcy Code, commencing the above-captioned chapter 11 cases.

5.    On January 31, 2017, the United States Trustee for the Southern District of New York filed a notice of appointment of the Creditors' Committee[3] pursuant to section 1102(a)(1) of the Bankruptcy Code [Dkt. No. 100].

### B.    The Retiree Motion

6.    On May 5, 2017, Ms. Clark filed the Motion, which seeks (a) a determination that payments to surviving spouses under the ASPP are retiree benefits entitled to the protections of section 1114 of the Bankruptcy Code, (b) the reinstatement of such payments, (c) an

---

[3] The members of the Committee are:  (i) AT&T Services, Inc., (ii) Communications Workers of America, (iii) Flextronics Telecom Systems, Ltd., (iv) Network-1 Technologies, Inc., (v) the Pension Benefit Guaranty Corporation, (vi) SAE Power, Inc. and SAE Power Company, and (vii) Wistron Corporation.

ny-1283835

A-080

administrative priority claim for any payments that have accrued since the Petition Date, and (d) the appointment of an official committee of retired employees.

## ARGUMENT

### A. The ASPP Does Not Provide "Retiree Benefits"

7. Section 1114 of the Bankruptcy Code affords certain protections to the recipients of "retiree benefits" provided pursuant to a "plan, fund, or program." *See* 11 U.S.C. §§ 1114(a), (d), (e), (f), (g), (i), (j), and (l). For example, claims for retiree benefits that accrue after the Petition Date are entitled to administrative expense status. 11 U.S.C. § 1114(e)(2). Additionally, in the event that a debtor moves to modify or terminate retiree benefits, Bankruptcy Code section 1114(d) requires the Court to appoint a committee of retired employees unless such employees are already represented by a labor union or similar organization.

8. The protections afforded by Bankruptcy Code section 1114 apply to a narrowly tailored universe of benefits, however. Bankruptcy Code section 1114 defines "retiree benefits" to include only payments for the provision of "medical, surgical, or hospital care benefits, or benefits in the event of sickness, accident, disability, or death." 11 U.S.C. § 1114(a). Thus, pension and other "benefits that provide for annual payments upon retirement are not 'retiree benefits,'" and are not protected. *In re Lyondell Chem. Co.*, 445 B.R. 296, 301 (Bankr. S.D.N.Y. 2011). The purpose of such pension and retirement payments is not to provide health, disability, or death benefits, but rather "to defer income, and the requisite income taxes, until some later date." *In re WorldCom, Inc.*, 364 B.R. 538, 550 (Bankr. S.D.N.Y. 2007).

9. Amounts due under the ASPP do not qualify as retiree benefits; they are general unsecured claims. The ASPP is a deferred compensation program that provides annuity payments to former members of the Debtors' management team. ASPP, §§ 1, 4.4, and 5.3. The

A-081

ASPP does not provide health, disability, or other insurance benefits to retired employees. Courts in this jurisdiction and others have uniformly held that payments under pension and other deferred compensation plans such as the ASPP are not "retiree benefits" entitled to the additional protections provided by Bankruptcy Code section 1114. *See, e.g., WorldCom*, 364 B.R. at 550; *In re Exide Technologies*, 378 B.R. 762, 769 (Bankr. D. Del. 2007); *In re Farmland Indus., Inc.*, 294 B.R. 903, 919 (Bankr. W.D. Mo. 2003).

10. Moreover, although surviving spouses are entitled to receive ASPP payments upon the death of the primary beneficiary, the ASPP does not provide for any additional benefits at such time. The ASPP therefore does not provide "benefits . . . in the event of death," as contemplated by section 1114(a) of the Bankruptcy Code. That benefits may transfer to a spouse upon the death of a beneficiary does not alter this fact.

11. In *In re Lyondell Chemical Company*, this Court considered allegations similar to those raised by Ms. Clark and concluded that the benefits at issue were not "retiree benefits." In *Lyondell*, a surviving spouse contended that annuity payments she was receiving under a deferred compensation agreement were retiree benefits under Bankruptcy Code section 1114. 445 B.R. at 297-98. The *Lyondell* court disagreed, concluding that pension and other annuity benefits are not retiree benefits when due to the primary beneficiary, and "the feature of the annuity arrangement to provide contingency payments to [a surviving spouse] upon death does not change that." *Id.* at 300-301. This is so because a death benefit feature like the one contained in the ASPP "simply provides an alternative for the timing and method of the annual payments that are due; it does not provide for additional benefits due upon the participant's death." *Exide Technologies*, 378 B.R. at 769. Any such change in the "timing and method of payment" upon the beneficiary's death is "merely incidental" to the primary purpose of the

ASPP: to defer income, and the taxation thereof, to a later date.  *See In re WorldCom, Inc.*, 364 B.R. at 550.

12.    In short, Congress was very explicit in specifying the types of payments covered under the "protective umbrella of § 1114," health benefits and those provided in the event of "accident, disability, or death."  *IUE-CWA v. Visteon Corporation (In re Visteon Corp.)*, 612 F.3d 210, 220 (3d Cir. 2010).   Deferred compensation payments for high income employees were <u>not</u> included.  *Id.*  Thus, those obligations are general unsecured claims.

**B.    The ASPP Is Not a "Plan, Fund, or Program" Under Section 1114(a)**

13.    Even if the ASPP payments were retiree benefits (which they are not), the ASPP is not a "plan, fund, or program," as that term is used in section 1114 of the Bankruptcy Code.

14.    Under Second Circuit law, contracts and plans providing ordinary annuity payments such as those provided by the ASPP are not "plan[s], fund[s], or program[s]," for the purposes of Bankruptcy Code section 1114.  *Lyondell*, 445 B.R. at 300 (citing *Kosakow v. New Rochelle Radiology Assocs., P.C.*, 274 F.3d 706 (2d Cir. 2001)).  Because the Bankruptcy Code does not define the terms "plan," "fund," or "program," courts look to the meaning of the similar phrase used in ERISA.  An administrative program may qualify as a plan, fund, or program for purposes of ERISA (and, correspondingly, Bankruptcy Code section 1114) only where (a) it involves ongoing managerial discretion and administrative analysis, (b) a reasonable employee would perceive that their employer retains an ongoing commitment to provide benefits, and (c) the employer was required to undertake an individualized analysis of each employee's termination according to various enumerated factors.  *See Kosakow*, 274 F.3d at 737.

15.    At a minimum, the ASPP fails to meet two of the three criteria set forth in *Kosakow*.  First, the ASPP provides a fixed annual benefit established at the time of the

6

A-083

beneficiary's retirement. ASPP, §§ 2.18, 3.5, 4.4, and 5.3. It requires no more managerial oversight than the insurance plan determined by the *Lyondell* court not to qualify as a plan, fund, or program. *See Lyondell*, 445 B.R. at 300. Additionally, beneficiaries could not reasonably perceive an ongoing commitment by the employer to provide benefits under the ASPP. As explained by the *Lyondell* court, no ongoing commitment exists where "the only interaction between employer and employee is the distribution of checks." *Lyondell*, 445 B.R. at 300. Like the deferred compensation agreement in *Lyondell*, Avaya's obligations to retirees under the ASPP are limited to making regularly scheduled payments. For this reason as well, the ASPP is not a plan, fund, or program

## C. The Court Should Not Appoint a Retiree Committee

16. Bankruptcy Code section 1114 provides that the Court "shall order the appointment of a committee of retired employees if the debtor seeks to modify or not pay the retiree benefits," or if the Court determines that a retiree committee is appropriate to represent the interests of those receiving retiree benefits. 11 U.S.C. § 1114(d). As demonstrated above, payments made under the ASPP are not retiree benefits. Ms. Clark and other ASPP beneficiaries are general unsecured creditors of the Debtors, whose interests are already represented by the Creditors' Committee. Consequently, no retiree committee is necessary in these cases.

## CONCLUSION

17. For the foregoing reasons, the Creditors' Committee respectfully requests that the Court deny the Motion.

*[Signature page follows]*

ny-1283835

A-084

Dated: May 18, 2017
     New York, New York

Respectfully submitted,

*/s/* Lorenzo Marinuzzi
MORRISON & FOERSTER LLP
Lorenzo Marinuzzi
Todd M. Goren
250 W 55th Street
New York, NY 10019
Telephone: (212) 468-8000
Facsimile: (212) 468-7900

*Counsel for the Official Committee*
*of Unsecured Creditors of Avaya Inc., et al.*

8

A-085

Jeffrey Chubak
STORCH AMINI PC
140 East 45th Street, 25th Floor
New York, New York 10017
(212) 490-4100

*Attorneys for Marlene Clark*

**UNITED STATES BANKRUPTCY COURT**
**SOUTHERN DISTRICT OF NEW YORK**

| | |
|---|---|
| In re: | Chapter 11 Case No. 17-10089-smb |
| AVAYA INC., *et al.*,[1] | Jointly Administered |
| Debtors. | **Re: ECF Nos. 522, 609, 612, 614, 616** |

**REPLY IN SUPPORT OF MARLENE CLARK'S MOTION FOR**
**ORDER DETERMINING SURVIVORSHIP BENEFITS UNDER SUPPLEMENTAL**
**PLAN ARE "RETIREE BENEFITS" UNDER BANKRUPTCY CODE SECTION 1114(a),**
**COMPELLING COMPLIANCE WITH SECTION 1114(e), AND APPOINTING**
**AN OFFICIAL COMMITTEE UNDER SECTION 1114(d)**

---

[1] The Debtors in these chapter 11 cases, along with the last four digits of their federal tax ID number, are: Avaya Inc. (3430); Avaya CALA Inc. (9365); Avaya EMEA Ltd. (9361); Avaya Federal Solutions, Inc. (4392); Avaya Holdings Corp. (9726); Avaya Holdings LLC (6959); Avaya Holdings Two, LLC (3240); Avaya Integrated Cabinet Solutions Inc. (9449); Avaya Management Services Inc. (9358); Avaya Services Inc. (9687); Avaya World Services Inc. (9364); Octel Communications LLC (5700); Sierra Asia Pacific Inc. (9362); Sierra Communication International LLC (9828); Technology Corporation of America, Inc. (9022); Ubiquity Software Corporation (6232); VPNet Technologies, Inc. (1193); and Zang, Inc. (7229). Their address is: 4655 Great America Parkway, Santa Clara, California 95054.

A-086

# TABLE OF CONTENTS

Page

PRELIMINARY STATEMENT ............................................................... 1

ARGUMENT ......................................................................................... 2

I.  SURVIVORSHIP BENEFITS UNDER THE SUPPLEMENTAL PLAN ARE
    DEATH BENEFITS UNDER SECTION 1114(a) ....................................... 2

    A.  This Court Should Look to ERISA's Definition of Welfare Plan to Interpret
        the Scope of Section 1114(a) ................................................... 2

    B.  The Objectors are Precluded under the Doctrines of Judicial and Collateral
        Estoppel from Arguing Survivorship Benefits are Pension Benefits, Not Death
        Benefits ......................................................................... 3

        1.  Welfare Benefits under ERISA Include Lump Sum Death Benefits
            Provided under the Supplemental Plan's Predecessor ................... 3

        2.  Judicial Estoppel ........................................................ 5

        3.  Collateral Estoppel ...................................................... 6

    C.  Survivorship Benefits are Death Benefits under the Statute's Plain
        Language, and Nonprecedential Decisions Cited by Objectors are Inapposite
        and/or Incorrect ............................................................... 7

II. THE SUPPLEMENTAL PLAN IS A QUALIFYING PLAN, FUND, OR PROGRAM
    UNDER SECTION 1114(a) ........................................................... 10

III. THE OBJECTORS' REMAINING ARGUMENTS ARE WITHOUT MERIT ............. 11

    A.  The Unsecured Status of Survivorship Benefits under the Supplemental Plan Has
        No Effect On their Postpetition Priority Status under Section 1114(e)(2) ........... 11

    B.  Section 1114 was Intended to Cover Death Benefits............................. 12

    C.  The Result Sought by Mrs. Clark is Consistent with Section 1114's Purpose ..... 12

    D.  Mrs. Clark Has Constitutional and Prudential Standing to Seek the Relief
        Sought in Her Motion ........................................................... 13

    E.  The Supplemental Plan's Termination at Will Clause Has No Bearing on
        Section 1114's Application ...................................................... 13

CONCLUSION ...................................................................................... 16

i

# TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*Adventure Res. Inc. v. Holland,*
137 F.3d 786 (4th Cir. 1998) ..................................................8

*In re AMR Corp.,*
508 B.R. 296 (Bankr. S.D.N.Y. 2014) ..................................................15

*In re Arclin U.S. Holding, Inc.,*
416 B.R. 117 (Bankr. D. Del. 2009) ..................................................3, 12

*Butner v. United States,*
440 U.S. 48 (1979) ..................................................11

*In re Certified Air Techs., Inc.,*
300 B.R. 355 (Bankr. C.D. Cal. 2003) ..................................................3

*In re Chemtura Corp.,*
No. 09-bk-11233, 2011 WL 1344573 (Bankr. S.D.N.Y. Apr. 8, 2011) ............................14, 15

*In re Delphi Corp.,*
No. 05-bk-44481, 2009 WL 637315 (Bankr. S.D.N.Y. Mar. 10, 2009) ............................14, 15

*DeRosa v. Nat'l Envelope Corp.,*
595 F.3d 99 (2d Cir. 2010) ..................................................5

*In re Exide Techs.,*
378 B.R. 762 (Bankr. D. Del. 2007) ..................................................8, 9, 10

*In re Farmland Indus., Inc.,*
294 B.R. 903 (Bankr. W.D. Mo. 2003) ..................................................8

*Foss v. Lucent Techs. Inc.,*
No. 03-cv-5017, 2006 WL 3437586 (D. N.J. Nov. 27, 2006) ..................................................3

*In re Freuehauf Trailer Corp.,*
444 F.3d 203 (3d Cir. 2006) ..................................................7

*IUE-CWA v. Visteon Corp. (In re Visteon Corp.),*
612 F.3d 210 (3d Cir. 2010) .................................................. passim

*Kosakow v. New Rochelle Radiology Associates, P.C.,*
274 F.3d 706 (2d Cir. 2001) ..................................................10

A-088

*Leather v. Eyck,*
    180 F.3d 420 (2d Cir. 1999)........................................................................6

*In re Lucent Death Benefits ERISA Litig.,*
    541 F.3d 250 (3d Cir. 2008)................................................ passim

*In re Lyondell Chem. Co.,*
    445 B.R. 296 (Bankr. S.D.N.Y. 2011)................................ passim

*McMillan v. LTV Steel, Inc.,*
    555 F.3d 218 (6th Cir. 2009) ..............................................7

*In re N.Y. Trap Rock Corp.,*
    126 B.R. 19 (Bankr. S.D.N.Y. 1991)................................3

*Rombach v. Nestle USA, Inc.,*
    211 F.3d 190 (2d Cir. 2000)..............................................4, 10

*Rubin v. United States,*
    449 U.S. 424 (1981) ..........................................................14

*In re WorldCom, Inc.,*
    364 B.R. 538 (Bankr. S.D.N.Y. 2007)..............................8, 9

## <u>Statutes</u>

11 U.S.C. § 507(a) ......................................................................11

11 U.S.C. § 1114................................................................ passim

29 U.S.C. § 1002................................................................ passim

29 U.S.C. § 1054(g) ................................................................6, 7

A-089

Marlene Clark submits this reply in in support of her motion[1] and in response to the objections of the Debtors, the Ad Hoc First Lien and Crossover Groups, and the Official Committee of Unsecured Creditors (together, the "Objectors"), and states:

## PRELIMINARY STATEMENT

The irony of the Objectors' position is that a decade ago the Debtors' predecessor argued that lump-sum death benefits payable to eligible retirees' surviving spouses under the Lucent Technologies Inc. Management Pension Plan (the "Lucent Plan"), which is the predecessor to the Supplemental Plan,[2] were welfare benefits, not pension benefits, under ERISA, and prevailed before the Third Circuit. There, Judge Ambro held death benefits provided under the Lucent Plan were not pension benefits, even though they were provided under a pension plan and had characteristics consistent with a pension benefit. Because the parties agree that this Court should look to ERISA to determine the scope of section 1114(a), and section 1114(a) tracks the definition of "welfare plan" under ERISA, the Objectors are now precluded from arguing survivorship benefits under the Supplemental Plan are not death benefits under section 1114(a). Moreover, the Objectors are precluded from arguing the Supplemental Plan is not an eligible plan, fund, or program under section 1114(a), as Judge Ambro expressly held the Lucent Plan was a welfare plan under ERISA to the extent it provided death benefits, and thus a "plan" under ERISA. The Objectors remaining arguments are without merit and are addressed below.

---

[1] Capitalized terms used but not defined herein have the meanings ascribed to them in the motion.

[2] *See* Schedule 14A Information, filed Oct. 26, 2001 (an excerpt is attached as Exhibit 5) (emphasis added) ("Prior to our separation from Lucent, most of our U.S. salaried employees, including Executive Officers, were participants in the Lucent Technologies Inc. Management Pension Plan. Effective September 30, 2000, we established a non-contributory pension plan which covers salaried employees, including the Executive Officers. We have also adopted a non-contributory supplemental pension plan … Participants were given full credit under our pension plan for service and compensation accrued prior to the separation under the Lucent pension plan").

A-090

# ARGUMENT

## I. SURVIVORSHIP BENEFITS UNDER THE SUPPLEMENTAL PLAN ARE DEATH BENEFITS UNDER SECTION 1114(a)

1.      In her motion, Mrs. Clark argued that her entitlement to monthly payments under the Supplemental Plan ("Survivorship Benefit") constitutes a death benefit under section 1114(a). The Objectors argue the Survivorship Benefit is a pension benefit, not a death benefit, notwithstanding the fact that it was triggered by the death of Mrs. Clark's husband, Stephan Clark, because the Supplemental Plan merely transfers her husband's pension benefit to her upon his death.  (*See*, *e.g.*, Debtor Obj. ¶¶13, 15; Committee Obj. ¶¶9-10.)  Putting aside that the Objectors do not dispute the Survivorship Benefit is a benefit payable upon the death of a Supplemental Plan participant, the Objectors are precluded under the doctrines of judicial and collateral estoppel from arguing Survivorship Benefits are pension, not welfare, benefits.

### A.      This Court Should Look to ERISA's Definition of Welfare Plan to Interpret the Scope of Section 1114(a)

2.      The parties are in agreement that this Court should look to ERISA to determine the scope of the definition of "retiree benefits" under section 1114(a) (*see*, *e.g.*, Debtor Obj. ¶17; Committee Obj. ¶14), and specifically, ERISA's definition of "welfare plan" under 29 U.S.C. § 1002(1)(A), as the language of section 1114(a) tracks that of section 1002(1)(A).[3] *See also In re Lyondell Chem. Co.*, 445 B.R. 296, 299 n. 13-14 (Bankr. S.D.N.Y. 2011) (courts "have looked to … ERISA" and "in particular, 29 U.S.C. § 1002(1)" to interpret the scope

---

[3] Compare 11 U.S.C. § 1114(a) (defining "retiree benefits" as "payments to any entity or person for the purpose of providing … payments for retired employees and their spouses and dependents, for medical, surgical, or hospital care benefits, or benefits in the event of sickness, accident, disability, or death under any plan, fund or program (through the purchase of insurance or otherwise) maintained or established … by the debtor") with 29 U.S.C. § 1002(1) (defining "welfare plan" as "any plan, fund, or program … established or maintained by an employer … to the extent that such plan, fund, or program was established or is maintained for the purpose of providing for its participants or their beneficiaries, through the purchase of insurance or otherwise, (A) medical, surgical, or hospital care or benefits, or benefits in the event of sickness, accident, disability, death or unemployment")

A-091

of section 1114(a), citing *In re N.Y. Trap Rock Corp.*, 126 B.R. 19, 22 (Bankr. S.D.N.Y. 1991) and

*In re Certified Air Techs., Inc.,* 300 B.R. 355, 371 (Bankr. C.D. Cal. 2003)); *In re Arclin U.S.*

*Holding, Inc.*, 416 B.R. 117, 120 n.7 (Bankr. D. Del. 2009) (courts have looked to section 1002(1)

to interpret the scope of section 1114(a)).

> **B.     The Objectors are Precluded under the Doctrines of Judicial and Collateral Estoppel from Arguing Survivorship Benefits are Pension Benefits, Not Death Benefits**
>
>> 1.     <u>Welfare Benefits under ERISA Include Lump Sum Death Benefits Provided under the Supplemental Plan's Predecessor</u>

3.      In *In re Lucent Death Benefits ERISA Litig.*, 541 F.3d 250 (3d Cir. 2008), the Third

Circuit held that a lump sum payment due on the death of a Lucent Plan participant was a welfare

benefit, not a pension benefit, under ERISA.  There, Lucent amended the Lucent Plan to eliminate

a "<u>pensioner death benefit</u>," a lump sum payment due on a plan participant's death.  *Id*. at 252-53.

Several pensioners filed a class action alleging the termination of the pensioner death benefit was

unlawful because it was an accrued pension benefit under ERISA.  Lucent argued the pensioner

death benefit was an unvested welfare benefit that can be terminated unilaterally.  *Id*. at 254.  The

District Court agreed with Lucent.  *Foss v. Lucent Techs. Inc.*, No. 03-cv-5017, 2006 WL 3437586

(D. N.J. Nov. 27, 2006).

4.      On appeal, the Third Circuit affirmed.   The Third Circuit noted "ERISA defines

pension and welfare benefits" by reference to the definition of "welfare plan" and "pension plan"

in 29 U.S.C. § 1002(1)-(2)(A),[4] 541 F.3d at 254, and held the pensioner death benefit plainly falls

within the definition of the former, not the latter:

---

[4] As noted above, 29 U.S.C. § 1002(1) defines "welfare plan" as "any plan, fund, or program … established or maintained by an employer … to the extent that such plan, fund, or program was established or is maintained for the purpose of providing for its participants or their beneficiaries, through the purchase of insurance or otherwise, (A) medical, surgical, or hospital care or benefits, or benefits in the event of sickness, accident, disability, death or unemployment").  29 U.S.C. § 1002(2)(A) defines "pension plan" as "any plan, fund, or program … established or maintained by an employer … to the extent that [it] (i) provides retirement income to employees, or (ii) results in a deferral of income by employees for periods extending to the termination of covered employment or beyond [in each

A-092

The pensioner death benefit neither provides retirement income to employees nor results in a deferral of income by employees.  *See* 29 U.S.C. § 1002(2)(A) …

Instead, the pensioner death benefit provides "benefits in the event of … death."  *See* 29 U.S.C. § 1002(1) (defining welfare plan).  This fits readily within the definition of a welfare benefit.  As the Second Circuit Court of Appeals has explained, the fact that a welfare benefit appears in a larger plan that also provides pension benefits does not change the character of that welfare benefit.  *See Rombach v. Nestle USA, Inc.*, 211 F.3d 190, 193-94 (2d Cir. 2000) … As in *Rombach*, the "meaning and function" of the pensioner death benefit "remain clear" despite surrounding benefits or the use of the word "Pensioner" to describe the benefit."  *See id*. at 194.  The … plan language thus identifies the plan as a welfare benefit plan to the extent that it provides the pensioner death benefit.  *See generally* 29 U.S.C. § 1002(1) …

Nor does the asserted fact that the pensioner death benefit has characteristics "consistent with" or "not inconsistent with" a pension benefit change its character.  The amount and calculation method of the pensioner death benefit, the identity of the recipient of payment, and the treatment of the pensioner death benefit for tax, accounting, and plan termination purposes, are relevant details for administrators of the plan, but they do not change the fundamental character of the benefit.  The type of benefit provided, not other considerations, determines whether a plan is a pension plan or a welfare plan …

The Lucent plan is thus a welfare plan to the extent that it provides for the pensioner death benefits at issue in this case.

*Id*. at 255-56 (emphasis added).

5.    Significantly, the Third Circuit relied on *Rombach v. Nestle USA, Inc.*, 211 F.3d 190 (2d Cir. 2000) in reaching the foregoing conclusion, which rejected an employee's argument that the "disability retirement pension" portion of her pension plan should be considered a pension plan under ERISA because the employer-sponsor described the benefit as a pension benefit and included it a part of its master pension plan:

We are unpersuaded by Rombach's arguments and find the disability provisions of Nestle's Pension Plan to be a welfare plan under § 1002(1).  As the language of the statute makes clear, "to the extent" that a plan provides "benefits in the event of … disability," it is a welfare plan.  *Id*. § 1002(1).  For this reason, the Sixth Circuit in *McBarron v. S&T Indus., Inc.*, 771 F.2d 94 (6th Cir. 1985), held that the disability

---

case] regardless of the method of calculating the contributions made to the plan, the method of calculating the benefits under the plan or the method of distributing benefits from the plan").

provisions in the "Masterly Hourly Retirement Plan" constituted a welfare plan even though they were part of a comprehensive retirement plan …

Much like the plan in *McBarron*, one portion of Nestle's Pension program before us provides a disability retirement pension for employees who have served the company for over ten years and have become permanently disabled, while other parts grant benefits that relate to retirement generally.  In our view, it does not matter that Nestle called the disability retirement pension portion of its plan a "pension benefit" and made it part of its master "pension plan."  <u>Its meaning and function remained clear; it was a benefit triggered by disability. And, under the plain language of the statute, "to the extent" that Nestle's Pension Plan provides benefits that are triggered by disability, that portion of the plan is a welfare plan under § 1002(1).</u>

*Id*. at 193-94 (emphasis added).

### 2.   <u>Judicial Estoppel</u>

6.    Judicial estoppel applies where "1) a party's later position is 'clearly inconsistent' with its earlier position; 2) the party's former position has been adopted in some way by the court in the earlier proceeding; and 3) the party asserting the two positions would derive an unfair advantage against the party seeking estoppel."  *DeRosa v. Nat'l Envelope Corp.*, 595 F.3d 99, 103 (2d Cir. 2010).

7.    <u>The Debtors' Position Herein is Clearly Inconsistent with Lucent's Position in the ERISA Death Benefits Litigation</u>.  In the prior litigation, "Lucent … argue[d] that the pensioner death benefit is an unvested welfare benefit" under ERISA.  541 F.3d at 254.  Moreover, as noted above, the parties are in agreement this Court should look to ERISA's definition of "welfare plan" to interpret the scope of section 1114(a).  Now, the Debtors argue the Survivorship Benefit is not a death benefit under section 1114(a) or ERISA's definition of welfare plan, but is instead a pension benefit under ERISA.   (Debtors Obj. ¶13.)

8.    <u>The Debtors' Position in the Prior Litigation was Adopted by the Third Circuit</u>.  Both the District Court and Third Circuit agreed with Lucent's position that the pensioner death

5

benefit was a welfare benefit and dismissed the pensioners' putative class action challenging Lucent's modification of the same.

9.    <u>Adopting the Debtors' Position Would Result in a Double Recovery</u>.  The Third Circuit's conclusion that pensioner death benefits were "death benefits" within ERISA's definition of "welfare plan" permitted Lucent to unilaterally modify the pensioner death benefit without running afoul of ERISA's anti-cutback provision for pension benefits (29 U.S.C. § 1054(g)), which it did.  Now the Debtors argue substantially similar Survivorship Benefits are not death benefits under section 1114(a) but are instead pension benefits in order to reduce administrative expense obligations to surviving spouses.  Accepting the Debtors' position would result in a double recovery for the Debtors, at the expense of surviving spouses.

### 3.    <u>Collateral Estoppel</u>

10.    Collateral estoppel bars relitigation in the following circumstances:

(1) the issues of both proceedings must be identical, (2) the relevant issues [must have been] litigated and decided in the prior proceeding, (3) there must have been "full and fair opportunity" for litigation of the issues in the prior proceeding, and (4) the issues [must have been] necessary to support a valid and final judgment on the merits.

*Leather v. Eyck*, 180 F.3d 420, 426 (2d Cir. 1999).

11.    <u>The Issue in the ERISA Death Benefits Litigation is Identical to the Issue Herein</u>. The issue in the prior litigation was whether the pensioner death benefit was a death benefit that fell within the definition of "welfare plan" under ERISA or whether the pensioner death benefit fell within definition of "pension plan" under ERISA.  The issue herein is whether the Survivorship Benefit is a death benefit under section 1114(a), and the parties are in agreement this Court should look to how courts have interpreted the definition of "welfare plan" under ERISA to interpret the scope of section 1114(a) given that the language of the former tracks that of the latter.

6

12.  <u>The Relevant Issue Was Litigated and Decided</u>.  The issue in the prior litigation was decided by the District Court on a motion to dismiss, which decision was affirmed by the Third Circuit.

13.  <u>Full and Fair Opportunity Existed for Litigation of the Issue in the Prior Action</u>. The pensioners in the prior litigation briefed and argued the issue which was the subject thereof both in the District Court and the Third Circuit.

14.  <u>The Issue of Whether the Pensioner Death Benefit was a Welfare or Pension Benefit was Necessary to the Prior Decision</u>.  Indeed, that was the threshold issue in the prior litigation, as a determination the pensioner death benefit fell within ERISA's definition of "pension plan" would have rendered the benefit protected from modification under ERISA's anti-cutback provision.  541 F.3d at 253 (citing 29 U.S.C. § 1054(g) and *In re Freuehauf Trailer Corp.*, 444 F.3d 203, 212 (3d Cir. 2006)).  The prior litigation also addressed the ancillary question of whether the pensioner death benefit vested (the Third Circuit concluded that it had not), but that issue was only addressed because the Third Circuit concluded the pensioner death benefit fell within ERISA's definition of "welfare plan."  541 F.3d at 256 ("Having concluded that the pensioner death benefit is a welfare benefit, we must decide if that benefit had vested prior to its termination").

C.  **Survivorship Benefits are Death Benefits under the Statute's Plain Language, and Nonprecedential Decisions Cited by Objectors are Inapposite and/or Incorrect**

15.  Pension payments to retirees are not considered retiree benefits because such payments do not fall within a category of benefit specified in section 1114(a) ("medical, surgical, or hospital care benefits" or "benefits in the event of sickness, accident, disability or death"). *See*, *e.g.*, *McMillan v. LTV Steel, Inc.*, 555 F.3d 218, 226 (6th Cir. 2009) ("While the pension program was 'maintained or established … by [LTV Steel] prior to filing' its bankruptcy petition, the program does not provide for medical, surgical, or hospital-care benefits … Thus, § 1114 does

7

not apply to LTV Steel's benefit program directed at administering pensions"); *Adventure Res. Inc. v. Holland*, 137 F.3d 786, 795 (4th Cir. 1998) ("The term 'retiree benefits' is limited to [quoting section 1114(a)]. True to their designation, the Pension Trusts administer only *pension* benefits for retired coal miners. None of their claims are for the types of benefits enumerated in § 1114(a)").

16. However, a surviving spouse's entitlement to payments under a plan that is triggered on her retiree-husband's death, plainly <u>does</u> qualify as a death benefit under the statute. *See In re Farmland Indus., Inc.*, 294 B.R. 903, 921 (Bankr. W.D. Mo. 2003) ("Because these plans and programs provide benefits in the event of death, they constitute 'retiree benefits' within the meaning of § 1114(a) and are therefore governed by the provisions of § 1114"). Accordingly, it does not matter whether the amount due to the surviving spouse each month is equal to what her retiree-husband would have received under the plan had he not died, or whether her monthly payment amount is calculated using some other methodology. In either case, she is entitled to retiree benefits, even though pension payments to retirees under the same plan are not retiree benefits.

17. The Debtors argue monthly payments due to a surviving spouse on her retiree-husband's death under the Supplemental Plan are not retiree benefits, citing *Lyondell*, 445 B.R. at 296, *In re Exide Techs.*, 378 B.R. 762 (Bankr. D. Del. 2007), and *In re WorldCom, Inc.*, 364 B.R. 538, 549-50 (Bankr. S.D.N.Y. 2007).

18. The Debtors' argument fails for several reasons. At the outset, only one of the foregoing decisions, *Lyondell*, involved a surviving spouse seeking priority treatment for monthly payments due to her. In both *Exide* and *WorldCom* a retiree argued his or her own pension benefit was a retiree benefit because the underlying plan provided for the award of a death benefit to a designated beneficiary. However, in both cases the death benefit belonged not to the retiree but to

8

the designated beneficiary, and of course such benefit remained contingent as the retiree had not yet died. Here, in contrast, the designated beneficiary is asserting her own entitlement to monthly payments is a retiree benefit, and there is no contingency.

19. In addition, *Lyondell* relied solely on *Exide* for its conclusion, which in turn relied solely on *WorldCom*. *WorldCom* held that deferred compensation payments to a retiree were not retiree benefits under section 1114(a), notwithstanding the fact that the underlying plan provided for the award of death benefits, because the plan's <u>principal</u> purpose was to provide monthly payments to the retiree, not death benefits to his or her surviving spouse. 364 B.R. at 550 ("The purpose of the Deferred Compensation Plan was to defer income, and the requisite income taxes, until some later date. That the timing and method of payment of the deferred income may have been altered in the event of death … is merely incidental to that purpose"). Judge Gonzalez cited no authority in support of his conclusion that it is the principal purpose of a plan that determines whether benefits provided thereunder are retiree benefits, and indeed, that is not what section 1114(a) provides.

20. Moreover, it is readily apparent from the Bankruptcy Code itself that if Congress wanted to limit the scope of section 1114(a) in the manner described by Judge Gonzalez it could have easily done so by specifying that to qualify as a retiree benefit, the applicable plan, fund, or program's <u>principal</u> purpose must be to provide a qualifying benefit (*e.g.*, death benefits). Compare 11 U.S.C. § 1114(a) (retiree benefits means "payments to any … person for <u>the purpose</u> of providing or reimbursing payments") with 11 U.S.C. § 1129(d) (plan not confirmable "if <u>the principal purpose</u> of the plan is the avoidance of taxes").

21. Further, *Exide* and *WorldCom* preceded the Third Circuit's decision in *Lucent Death Benefits ERISA Litig.*, and none of the persons owed benefits in *Exide, WorldCom,* or

9

*Lyondell* argued, as Mrs. Clark does herein, that whether a benefit is a retiree benefit is linked to the definition of welfare plan under ERISA.[5]

22.    Finally, the conclusion in *Lyondell and Exide* relied upon by the Debtors was dicta, as both decisions denied relief, in the first instance, on the grounds that the death benefit at issue was not provided under a qualifying plan, fund, or program under section 1114(a).  *Exide*, 378 B.R. at 768 (benefits not provided under qualifying plan, fund, or program since "the SERP payments do not arise from benefits which accumulated over a period of time"); *Lyondell*, 445 B.R. at 300 ("Applying these factors to the Contract [the "private contract" under which death benefit was provided], I must conclude that the Contract cannot be construed as a 'plan, fund, or program' under ERISA").   Here, there can be no dispute the Supplemental Plan is a qualifying plan under section 1114(a), as described below.

## II.    THE SUPPLEMENTAL PLAN IS A QUALIFYING PLAN, FUND, OR PROGRAM UNDER SECTION 1114(a)

23.    The Objectors argue the Supplemental Plan is not a qualified plan, fund, or program under section 1114(a) because it does not qualify as a plan under ERISA under the three-part test utilized in *Kosakow v. New Rochelle Radiology Associates, P.C.*, 274 F.3d 706 (2d Cir. 2001), which concerned whether an employer's a written severance program constituted a "plan" under ERISA.

24.    Mrs. Clark agrees this Court should look to ERISA to determine whether the Supplemental Plan is a qualifying plan under section 1114(a), but submits consideration of the factors set forth in *Kosakow* is unnecessary and inappropriate given that the definition of "plan" under ERISA set forth in 29 U.S.C. § 1001(3) includes welfare plans, pension plans, and plans

---

[5] As noted above, Judge Gerber held courts consider "in particular, 29 U.S.C. § 1002(1)" in interpreting section 1114(a)'s scope (445 B.R. at 299 n.13), but did not consider circuit-level authority actually interpreting that provision, namely, *Lucent Death Benefits ERISA Litig.* or *Rombach*.

A-099

which qualify as both, and the Third Circuit agreed with Lucent's position that the pensioner death benefit under the Lucent Plan was a welfare plan under ERISA (notwithstanding the fact that the pensioner death benefit is even easier to administer than monthly annuity payments). Because the Survivorship Benefit is likewise a welfare plan located within a pension plan, it is a plan under the statutory definition, and hence, managerial discretion, employee expectations, and administrative burden are irrelevant to the inquiry at hand.

### III. THE OBJECTORS' REMAINING ARGUMENTS ARE WITHOUT MERIT

#### A. The Unsecured Status of Survivorship Benefits under the Supplemental Plan Has No Effect On their Postpetition Priority Status under Section 1114(e)(2)

25. The Objectors argue that Survivorship Benefits are not entitled to priority under section 1114(e)(2) because the Supplemental Plan provides that such benefits are unsecured, and that surviving spouses are pari passu in right to payment with other general unsecured creditors. (Debtors Obj. ¶¶1, 8, 16, 21; Committee Obj. ¶¶2, 9, 12; Crossover Obj. ¶5.)

26. Mrs. Clark does not dispute that outside of bankruptcy, her Survivorship Benefits are unsecured, and pari passu in right to payment with that of other unsecured creditors. However, upon the petition date her entitlement to Survivorship Benefits was elevated to priority status by operation of section 1114(e)(2), notwithstanding the fact that the Supplemental Plan characterizes her right to payment as unsecured. This is not unusual, as every claim entitled to priority under Bankruptcy Code section 507(a)(1)-(10) is by definition unsecured. Were they secured, or otherwise entitled to priority status under nonbankruptcy law it would be unnecessary to provide them special treatment under the Bankruptcy Code. Accordingly, it does not matter that the Supplemental Plan provides Mrs. Clark's claim is unsecured as her death benefit was afforded priority under section 1114(e)(2). *See also IUE-CWA v. Visteon Corp. (In re Visteon Corp.)*, 612 F.3d 210, 220 n.9 (3d Cir. 2010) (citing *Butner v. United States*, 440 U.S. 48, 55 (1979)) ("although property interests are usually defined by non-bankruptcy law, a 'federal interest [may] require a

11

different result," and further noting that "Section 1114 unambiguously states that federal bankruptcy law compels a 'different result' here").

**B.** **Section 1114 was Intended to Cover Death Benefits**

27.    The Objectors argue the motion should be denied because section 1114 was only intended to cover "health and life insurance benefits" (Debtors. Obj. ¶4, citing *Arclin*, 416 B.R. at 119 n.6, which states the statute was enacted in response to the termination of health and life insurance benefits in LTV Corp.'s bankruptcy) or "health, disability, and other insurance benefits" (Committee Obj. ¶2).

28.    Respectfully, this argument reads the phrase death benefit out of the statute, and ignores the statute's history.  As noted in *Visteon*, 612 F.3d at 220 n.9, section 1114 is the product of "twice renewed stop-gap legislation" enacted in response to LTV Corporation's termination of health and life insurance benefits of 78,000 retirees during its 1986 chapter 11 case without prior notice.  Nevertheless, the first piece of stop-gap legislation covered "benefits … to retired former employees under a plan, fund, or program maintained … for the purpose of providing … benefits in the event of … death." *Id*.  When section 1114 was formally codified by the Retiree Benefits Bankruptcy Protection Act of 1988, the statute clarified that it was intended to cover qualifying benefits "for spouses and dependents" in addition to retirees.  Moreover, that the statute was intended to cover spouses' death benefits is evident from the body of case law Objectors rely upon stating courts should look to ERISA's definition of welfare plan to interpret section 1114(a).

**C.** **The Result Sought by Mrs. Clark is Consistent with Section 1114's Purpose**

29.    The Objectors argue that it would be inappropriate for this Court to confer priority on surviving spouses' death benefits under the Supplemental Plan when the pension benefits of retirees under the same plan are not entitled to priority.  (*See*, *e.g.*, Ad Hoc First Lien Group Obj.

¶¶4-5, describing priority treatment for surviving spouses but non-priority treatment for retirees as an "incongruous result.")

30.     Significantly, no Objector provides any support for their conclusion that the result sought by Mrs. Clark is incongruous.  Mrs. Clark submits this result is not only mandated by the statute, which expressly affords priority to surviving spouses' death benefits but not to retirees' pension benefits, it is consistent with the statute's purpose.  As noted above, section 1114 was enacted in response to the loss of retirees' life insurance benefits without prior notice in the chapter 11 case of LTV Corp., which benefits would only be payable to spouses and dependents, not retirees.  Moreover, it makes practical sense that Congress wished to protect surviving spouses' death benefits, but not retirees' pension benefits, given that the former often sacrifice their careers to raise children while permitting the latter to advance in their respective careers with the debtor. That is, because as a group retirees are far more likely than surviving spouses to have a skillset that would permit them to obtain gainful employment if a debtor terminated monthly payments post-bankruptcy, terminating payment of monthly death benefits to surviving spouses would likely be catastrophic, as compared to terminating monthly pension payments to retirees.

**D.     Mrs. Clark Has Constitutional and Prudential Standing to Seek the Relief Sought in Her Motion**

31.     The Ad Hoc First Lien Group argues (in Paragraph 6 of its Objection) Mrs. Clark lacks Article III and prudential standing because her Survivorship Benefit does not fall within the scope of section 1114(a).  That argument fails for reasons described above.

**E.     The Supplemental Plan's Termination at Will Clause Has No Bearing on Section 1114's Application**

32.     The Ad Hoc First Lien Group argues (in Paragraph 7 of its Objection) the relief sought in the motion is unavailable because the Supplemental Plan provides in Section 10.1 the Debtors "may from time to time amend, suspend or terminate the Plan at any time," citing two

13

unreported bench decisions, *In re Chemtura Corp.*, No. 09-bk-11233, 2011 WL 1344573 (Bankr.

S.D.N.Y. Apr. 8, 2011); *In re Delphi Corp.*, No. 05-bk-44481, 2009 WL 637315 (Bankr. S.D.N.Y.

Mar. 10, 2009).

33.    In *Visteon*, however, the Third Circuit held the opposite, based on the statute's plain

language:

> Section 1114 could hardly be clearer. It restricts a debtor's ability to modify any
> payments to any entity or person under any plan, fund, or program in existence
> when the debtor filed for chapter 11 bankruptcy, and it does so notwithstanding any
> other provision of the bankruptcy code.  There is therefore no ambiguity as to
> whether § 1114 applies here … Benefits that the debtor *could* have terminated
> outside of bankruptcy, but which it was nonetheless providing at the time of its
> Chapter 11 filing, are plainly included in the phrase, "payments to any entity or
> person … under any plan, fund, or program."

612 F.3d at 220.

34.    In determining section 1114 to be unambiguous, the Third Circuit, relied upon,

among other things, section 1114(*l*) which was added in 2005 and restricts a debtor's ability to

modify or terminate retiree benefits in the six months preceding the petition date.  The Third

Circuit observed the subsection would be meaningless if not applied to retiree benefits terminable

at will, and held because section 1114(*l*) must apply to such benefits, section 1114 as a whole must

as well.   *Id*. at 225.  The Third Circuit also considered and rejected the manner in which Judge

Drain addressed the consequences of section 1114(*l*) in *Delphi*:

> This analysis exemplifies a fundamental flaw of many of the cases which have
> failed to afford § 1114 its plain meaning. Rather than beginning with the language
> of § § 1114(a) or (e), and the language of the related provisions of § § 1114(*l*) or §
> 1129(a)(13), the *Delphi* court began with its own assumptions of why § 1114 could
> not prohibit a debtor from doing in bankruptcy what it could do outside of
> bankruptcy. It then found statutory language, such as subsection (*l*), insufficiently
> persuasive to alter its view of what would be an appropriate result under Chapter
> 11. Statutory interpretation "should be made of sterner stuff" than that. The
> language Congress chose when crafting a statute must be considered first and
> foremost, and if plain and unambiguous, it must be credited, except in "rare and
> exceptional circumstances." *Rubin v. United States,* 449 U.S. 424, 430… (1981).

*Id*. at 226.

14

35.     After analyzing the statute's legislative history and determining its conclusion was consistent with the same (*id*. at 227-31), the Third Circuit addressed (and rejected) the debtors' argument that a plain language interpretation would yield an absurd result because it would contradict the bankruptcy principle that prepetition contractual rights should not be enhanced by the Bankruptcy Code.  The Third Circuit held the absurdity argument "reflects a major source of confusion about § 1114, and … is the primary reason that courts have failed to give effect to the statute as written." *Id*. at 231.  It explained that while property interests are generally defined by nonbankruptcy law, the Bankruptcy Code creates a federal interest that can modify those property interests for bankruptcy purposes.  The Third Circuit then explained that while ERISA was designed to give employers flexibility to provide and terminate welfare plans, the focus instead should be on the policy reasons behind section 1114's enactment, which was to remedy "the social problems that had resulted from the exclusion of retiree welfare benefits from ERISA's protections." *Id*. at 232-33.  The Third Circuit held those courts refusing to apply section 1114 to at-will retiree benefits (*e.g.*, *Delphi*) fail to recognize that section 1114 does not unequivocally prohibit retiree benefit termination, but rather, it "creates an equitable procedure through which the debtor can argue the economic necessity of doing so, and the [authorized representative] can counter with their own arguments about economics, fairness, and equity." *Id*. at 235.

36.     Significantly, the *Chemtura* decision cited by the Ad Hoc First Lien Group did not consider *Visteon*, and in *In re AMR Corp.*, 508 B.R. 296, 313 n.13 (Bankr. S.D.N.Y. 2014) Judge Lane acknowledged the decision's persuasiveness.  Accordingly, the Supplemental Plan's termination at will clause should have no bearing on section 1114's application.

## CONCLUSION

37.    Given Mrs. Clark's case on the merits, it is astonishing that the Objectors and their advisors thought it advisable to terminate Surviving Spouses' death benefits under the Supplemental Plan postpetition without prior Court authorization.  Mrs. Clark respectfully requests an order compelling compliance with section 1114(e)(1) and awarding her an administrative claim for postpetition payments the Debtors have failed to make to date under section 1114(e)(2). Finally, it is <u>critical</u> that an Official Committee promptly be appointed under section 1114(d) to represent the interests of those persons receiving retiree benefits and ensure the continuation of those benefits post-confirmation pursuant to a chapter 11 plan, given that section 1114's protections terminate on confirmation (*Visteon*, 612 F.3d at 236) and the Debtors' proposed solicitation procedures contemplate an August 10, 2017 confirmation hearing [ECF No. 390, ¶1.ix].

Dated: May 21, 2017
      New York, New York

STORCH AMINI PC

/s/ Jeffrey Chubak
Jeffrey Chubak
140 East 45th Street, 25th Floor
New York, New York 10017
(212) 490-4100

*Attorneys for Marlene Clark*

A-105

# EXHIBIT 5

**Schedule 14A Information**

```
<SEC-DOCUMENT>0000912057-01-536780.txt : 20011030
<SEC-HEADER>0000912057-01-536780.hdr.sgml : 20011030
ACCESSION NUMBER:              0000912057-01-536780
CONFORMED SUBMISSION TYPE:     PRE 14A
PUBLIC DOCUMENT COUNT:         1
CONFORMED PERIOD OF REPORT:    20020226
FILED AS OF DATE:              20011026

FILER:

        COMPANY DATA:
                COMPANY CONFORMED NAME:           AVAYA INC
                CENTRAL INDEX KEY:                0001116521
                STANDARD INDUSTRIAL CLASSIFICATION: TELEPHONE & TELEGRAPH APPARATUS [3661]
                IRS NUMBER:                       223713430
                STATE OF INCORPORATION:           DE
                FISCAL YEAR END:                  0930

        FILING VALUES:
                FORM TYPE:                        PRE 14A
                SEC ACT:                          1934 Act
                SEC FILE NUMBER:                  001-15951
                FILM NUMBER:                      1767957

        BUSINESS ADDRESS:
                STREET 1:                         211 MOUNT AIRY RD
                CITY:                             BASKING RIDGE
                STATE:                            NJ
                ZIP:                              07920
                BUSINESS PHONE:                   9089536000

        MAIL ADDRESS:
                STREET 1:                         211 MOUNT AIRY ROAD
                CITY:                             BASKING RIDGE
                STATE:                            NJ
                ZIP:                              07920

        FORMER COMPANY:
                FORMER CONFORMED NAME:  LUCENT EN CORP
                DATE OF NAME CHANGE:    20000612
</SEC-HEADER>
<DOCUMENT>
<TYPE>PRE 14A
<SEQUENCE>1
<FILENAME>a2061986zpre14a.txt
<DESCRIPTION>PRE 14A
<TEXT>
<Page>
                        SCHEDULE 14A INFORMATION

             Proxy Statement Pursuant to Section 14(a) of
         the Securities Exchange Act of 1934 (Amendment No.    )


    Filed by the Registrant /X/
    Filed by a party other than the Registrant / /

    Check the appropriate box:
    /X/ Preliminary Proxy Statement
    / /  CONFIDENTIAL, FOR USE OF THE COMMISSION ONLY (AS PERMITTED BY RULE
         14a-6(e)(2))
    / / Definitive Proxy Statement
    / / Definitive Additional Materials
    / / Soliciting Material Pursuant to Section 240.14a-12
```

A-107

&lt;Page&gt;

Corporate Governance and Compensation Committee

Jeffrey A. Harris    Mark Leslie Daniel    C. Stanzione    Franklin A. Thomas

&lt;Page&gt;

PERFORMANCE GRAPH

COMPARISON OF FIVE-YEAR CUMULATIVE TOTAL RETURN*
AMONG AVAYA INC., S&P 500 INDEX
AND S&P INFORMATION TECHNOLOGY INDEX

[CHART GOES HERE]

&lt;Table&gt;
&lt;Caption&gt;

|  | 9/30/00 | 12/31/00 | 3/31/01 | 6/30/01 | 9/30/01 |
|---|---|---|---|---|---|
| &lt;S&gt; | &lt;C&gt; | &lt;C&gt; | &lt;C&gt; | &lt;C&gt; | &lt;C&gt; |
| Avaya Inc. .............. | $100.00 | $44.96 | $56.68 | $59.73 | $43.16 |
| S&P 500 ................. | $100.00 | $91.91 | $80.77 | $85.24 | $72.46 |
| S&P Information ........ Technology | $100.00 | $66.59 | $49.33 | $55.45 | $36.55 |

&lt;/Table&gt;

----------
o    Assumes $100 invested on September 30, 2000 in each referenced group with
     reinvestment of dividends.

     The Performance Graph is presented for the one-year period beginning the
time at which Avaya became a publicly traded company and ending on September 30,
2001. Historical stock performance during this period may not be indicative of
future stock performance.

PENSION PLANS

     Prior to our separation from Lucent, most of our U.S. salaried employees,
including Executive Officers, were participants in the Lucent Technologies Inc.
Management Pension Plan. Effective September 30, 2000, we established a
non-contributory pension plan which covers salaried employees, including the
Executive Officers. We have also adopted a non-contributory supplemental pension
plan. The following is a summary description of the terms of our pension plan
and our supplemental pension plan.

     Participants were given full credit under our pension plan for service
and compensation accrued prior to the separation under the Lucent pension plan.
Under our pension plan, annual pensions are computed on a modified career
average pay basis. A participant's modified career average pay will be equal to
1.4% of the sum of the individual's:

     o    average annual pay for the five years ending December 31, 1998,
          excluding the annual bonus award paid in December 1997, times the
          number of years of service prior to January 1, 1999;

A-108

o    pay subsequent to December 31, 1998; and

o    annual bonus award paid in December 1997.

For the fiscal year ended September 30, 2001, the normal retirement age under
our pension plan was 65. However, employees who were at least age 50 with at
least 15 years of service could retire with reduced benefits. If an employee's
age was at least 50 and, when added to years of service, was equal to or greater
than 75, the employee could retire with unreduced pension benefits. If an
employee retired on or prior to September 30, 2001, a reduction equal to 3% will
be made for each year in which that employee's age plus service is less than 75.
Effective October 1, 2001, employees must be at lest age 55 with at least 15
years of service to become eligible for retirement. Furthermore, if the sum of
an employee's age and service is not at least equal to 80 years, a 3% reduction
per year will be applied to the pension amount.

     Pension amounts under our pension plan are not subject to reductions for
social security benefits or other offset amounts. Average annual pay includes
base salary and annual bonus awards. However, federal laws place

<Page>

limitations on compensation amounts that may be included under this plan. In
2001, up to $170,000 in eligible base salary and annual bonus could be included
in the calculation under this plan.

     Pension amounts based on our pension plan formula which exceed the
applicable limitations are paid under our supplemental pension plan.
Compensation and benefit amounts which exceed the applicable federal
limitations, including amounts related to bonus awards, are taken into account
under our supplemental pension plan. This plan is a non-contributory plan, and
will use the same modified career average pay formula and eligibility rules as
our pension plan to provide supplemental pension benefits to our salaried
employees, including our Executive Officers.

     Our supplemental pension plan will provide Executive Officers and other
of our eligible employees with minimum pensions. Eligible retired Executive
Officers and surviving spouses may receive an annual minimum pension equal to
15% of the sum of final base salary plus annual bonus awards. This minimum
pension is offset by amounts received by plan participants as pensions under all
our pension plans.

     Pursuant to the terms of an arrangement provided by AT&T and assumed by
Lucent and, at the time of our separation from Lucent, by Avaya, Mr. Peterson is
also entitled to a supplemental pension benefit under our supplemental pension
plan. This benefit is available to certain salaried employees who were hired
generally at or over age 35 and who terminate with at least five years service
at an employment level defined in the supplemental plan. This plan provides
additional pension credits equal to the difference between age 35 and the
maximum possible years of service attainable at age 65, but not to exceed actual
net credited service, at one-half the rate in our pension plan.

     It is anticipated that some of our non-qualified executive benefit plans
will be supported by a benefits protection trust, the assets of which will be
subject to the claims of our creditors. In the event of a change in control or a
potential change in control of Avaya, certain additional funds might be required
to be contributed to such trust to support benefits under such plans.


          EMPLOYMENT CONTRACTS AND CHANGE IN CONTROL ARRANGEMENTS


EMPLOYMENT AGREEMENT WITH MR. PETERSON

The employment agreement entered into with Mr. Peterson in 1995, and subsequently assumed by Lucent, required Lucent to establish a special deferred compensation account in the amount of $190,000. In connection with our separation from Lucent, we assumed Lucent's obligations under Mr. Peterson's employment agreement. Interest is compounded as of the end of each calendar quarter for as long as any sums remain in the account, and the quarterly rate of interest applied at the end of any calendar quarter is one-quarter of the average 30-year Treasury note rate for the previous quarter. The amounts credited to the account vested in October 1999, and will be paid out following Mr. Peterson's termination of employment with us.

AVAYA INC. 2000 LONG TERM INCENTIVE PLAN

        Avaya's 2000 Long Term Incentive Plan generally provides that, unless our Corporate Governance and Compensation Committee determines otherwise at the time of grant with respect to a particular award, in the event of a "change in control": (i) any options and stock appreciation rights outstanding as of the date the change in control is determined to have occurred will become fully exercisable and vested; (ii) the restrictions and deferral limitations applicable to any restricted stock awards will lapse; (iii) all performance awards will be considered to be earned and payable in full, and any deferral or other restriction will lapse and such performance awards will be immediately settled or distributed; and (iv) the restrictions and deferral limitations and other conditions applicable to any other stock unit awards or any other awards will lapse, and such other stock unit awards or other awards will become free of all restrictions, limitations or conditions and become fully vested and transferable.

<Page>

        The plan defines "change in control" to mean, generally: (i) an acquisition by any individual, entity or group of beneficial ownership of 20% or more of either the then outstanding shares of our Common Stock or the combined voting power of our then outstanding voting securities entitled to vote generally in the election of Directors; (ii) a change in the composition of a majority of our Board of Directors which is not supported by our current Board of Directors; (iii) the approval by the shareholders of a merger, reorganization or consolidation or sale or other disposition of all or substantially all of our assets or, if consummation of such corporate transaction is subject, at the time of such approval by shareholders, to the consent of any government or governmental agency, the obtaining of such consent either explicitly or implicitly by consummation; or (iv) the approval of the shareholders of our complete liquidation or dissolution.

AVAYA INC. DEFERRED COMPENSATION PLAN

        Unless a contrary advance election is made, amounts deferred by an Executive Officer under the Avaya Inc. Deferred Compensation Plan will be paid in a lump sum as soon as practicable following a "change in control." The definition of "change in control" for the purposes of the Deferred Compensation Plan is substantially similar to the definition used for the 2000 Long Term Incentive Plan. See "- Avaya Inc. 2000 Long Term Incentive Plan."

SEVERANCE AGREEMENTS

        Effective September 1, 2001, Avaya entered into agreements with each of Messrs. Peterson, McGuire, Dennis and Johnson and Ms. Mashima providing for certain severance benefits in the event of the termination of such Executive Officer following a change in control. Under the agreements, severance is payable upon a company-initiated termination or a termination initiated by an Executive Officer with good reason within two years following a change in control. The definition of "good reason" includes a reduction in the Executive Officer's compensation, substantial change in the Executive Officer's work location or a material reduction in the Executive Officer's duties and responsibilities. The definition of change in control is substantially similar

A-110

to the definition used for the purposes of the Long Term Incentive Plan.
See "- Avaya Inc. 2000 Long Term Incentive Plan."

The agreements provide that Mr. Peterson shall be entitled to a severance
benefit equal to three times the sum of his annual base salary and target bonus,
while each of the other Executive Officers shall be entitled to two times the
sum of their respective annual base salaries and target bonuses. In addition,
the Executive Officers are entitled to continuation of medical and life
insurance and a pension enhancement payment for the period of severance. The
company will also generally pay to the Executive Officers an amount covering any
excise tax on that payment.

Each of the agreements has an initial term of two years and will renew
automatically each year thereafter unless terminated by our Board of Directors.

SUMMARY COMPENSATION TABLE

The following table sets forth the compensation paid by us for services
rendered in all capacities during the last fiscal year(1) to our Chief Executive
Officer and our other four most highly compensated Executive Officers.

<Page>

<Table>
<Caption>

|  | | | ANNUAL COMPENSATION | | | LONG-TERM COMPENSATION AWARDS | | |
| --- | --- | --- | --- | --- | --- | --- | --- | --- |
|  | | | | | | AWARDS | | |
|  | | | | | OTHER ANNUAL | RESTRICTED STOCK | SECURITIES UNDERLYING | ALL OTHER |
|  | | SALARY | BONUS | COMPENSATION | AWARD(S) | OPTIONS | LTIP PAYOUTS($) | COMPENSATION ($) |
|  | YEAR | ($) | ($) | ($) | ($)(2) | (#) | | |
| <S> | <C> | <C> | <C> | <C> | <C> | <C> | <C> | <C> |
| Donald K. Peterson......- (4) President and Chief Executive Officer | 2001 | 900,000 | | | 2,910,938 | 3,000,000 | | |
| Garry K. McGuire Sr.....- Chief Financial Officer | 2001 | 425,000 | | | 691,179 | 900,000 | | |
| David P. Johnson........ 200,000(3) Vice President of Worldwide Sales | 2001 | 350,000 | | | 582,188 | 900,000 | | |
| Karyn Mashima..........- Vice President of Global Strategy and Technology | 2001 | 350,000 | | | 582,188 | 900,000 | | |

A-111

Michael A. Dennis.......    2008 .......    582,188    900,000
-
   Vice President of
   Worldwide Operations
   and Services
&lt;/Table&gt;

----------

(1)    Prior to September 30, 2000, Avaya operated as a division of Lucent.
    Although certain of the individuals who serve as our Executive Officers
    were performing services in connection with Avaya's businesses prior to
    September 30, 2000, those individuals were employed by Lucent during such
    period, were not dedicated exclusively to our businesses, and, in fact,
    devoted substantial time and effort to other Lucent businesses or to the
    Lucent organization in general. Accordingly, no information on the
    compensation of Executive Officers for periods prior to September 30,
    2000 is reported.

(2)    The number of shares of restricted stock units held by Messrs. Peterson,
    McGuire and Johnson, Ms. Mashima and Mr. Dennis on September 30, 2001 was
    1,260,146, 156,797, 169,778, 194,506 and 179,100, respectively. The value
    of these restricted stock holdings on September 28, 2001 was $12,475,445,
    $1,552,290, $1,680,802, $1,925,609 and $1,773,090, respectively, based
    upon the closing price of the Common Stock on the NYSE on September 28,
    2001, which was $9.90. Each award of restricted stock vests in three
    equal annual installments beginning on the day after the first
    anniversary of the date of grant. Holders of these restricted stock units
    are not entitled to receive dividends on their restricted stock.

    Of the amounts shown above, Messrs. Peterson, McGuire and Johnson and Ms.
    Mashima and Mr. Dennis received 259,618, 70,805, 83,786, 88,801 and
    93,108 restricted stock units, respectively, on July 31, 2001 in
    connection with an offer to exchange outstanding stock options for
    restricted stock units (the "Offer"). Under the terms of the Offer,
    Messrs. Peterson, McGuire and Johnson and Ms. Mashima and Mr. Dennis
    tendered 1,668,040, 454,920, 538,322, 561,068 and 571,682 stock options,
    respectively, in exchange for the restricted stock units.

(3)    Represents early payment of a long term incentive bonus awarded by Lucent
    relating to the performance period of October 1999 through September 2001
    for which liability to make payment was assigned to Avaya at the
    separation from Lucent.

(4)    Includes $15,026 of interest earned on the special deferred compensation
    account established in connection with Mr. Peterson's employment
    agreement that has been assumed by Avaya. See "- Employment Contracts and
    Change in Control Arrangements - Employment Agreement with Mr. Peterson"
    for more information.

&lt;Page&gt;

       OPTION GRANTS FOR SERVICES RENDERED DURING FISCAL 2001

      The following table sets forth information concerning individual grants
of stock options made under Avaya's 2000 Long Term Incentive Plan for services
rendered during fiscal 2001 by each of the Executive Officers listed in the
Summary Compensation Table.

&lt;Table&gt;
&lt;Caption&gt;

REALIZABLE VALUE

ANNUAL RATES OF

                                      POTENTIAL

                                      AT ASSUMED

                                    STOCK PRICE

A-112

APPRECIATION FOR

OPTION TERM (2)

INDIVIDUAL GRANTS

| NAME | NUMBER OF SECURITIES UNDERLYING OPTIONS GRANTED (1) (#) | % OF TOTAL OPTIONS GRANTED TO EMPLOYEES FOR SERVICES RENDERED DURING FISCAL 2001 | EXERCISE OR BASE PRICE ($/SH) | EXPIRATION DATE | 5% | 10% |
|------|------|------|------|------|------|------|
| ---- | ----------- | --------------- | ----------- | ----------- | ----------- | |
| <S> | <C> | <C> | <C> | <C>    <C> | <C> | <C> |
| Donald K. Peterson.... 67,323,744 | 3,000,000 | 9.5 | 14.8438 | 10/03/2010 | 25,714,681 | |
| Garry K. McGuire, Sr. 20,197,123 | 900,000 | 2.9 | 14.8438 | 10/03/2010 | 7,714,404 | |
| David P. Johnson...... 20,197,123 | 900,000 | 2.9 | 14.8438 | 10/03/2010 | 7,714,404 | |
| Karyn Mashima......... 20,197,123 | 900,000 | 2.9 | 14.8438 | 10/03/2010 | 7,714,404 | |
| Michael A. Dennis..... 20,197,123 | 900,000 | 2.9 | 14.8438 | 10/03/2010 | 7,714,404 | |

</Table>

----------

(1)    Options have a ten-year term and vest in three equal annual installments beginning on the first anniversary of the date of grant. Vesting will, in certain cases, be accelerated upon the occurrence of a "change in control." See "- Employment Contracts, Termination of Employment and Change in Control Arrangements."

(2)    The potential realizable value uses the hypothetical rates specified by the SEC and is not intended to forecast future appreciation, if any, of Avaya's Common Stock price.

     AGGREGATE OPTION EXERCISES IN FISCAL 2001 AND VALUES AS OF SEPTEMBER 30, 2001

     The following table sets forth information concerning each exercise of stock options during fiscal 2001 by each of the Executive Officers listed in the Summary Compensation Table and the value of unexercised options as of September 30, 2001.

<Page>

<Table>
<Caption>

| NAME | SHARES ACQUIRED ON EXERCISE (#) | VALUE REALIZED ($) | NUMBER OF SECURITIES UNDERLYING UNEXERCISED OPTIONS (#) | | VALUE OF IN-THE- MONEY OPTIONS ($) | |
|------|------|------|------|------|------|------|
| | | | EXERCISABLE | UNEXERCISABLE | EXERCISABLE | UNEXERCISABLE |
| ---- | ------------ | -------- | ----------- | ------------- | ------------- | ------------- |

A-113

```
<S>                                                                    <C>            <C>
<C>
Donald K. Peterson......        -            -           -       3,667,216       -

Garry K. McGuire,  Sr...        -            -           -         900,000
-

David P. Johnson........        -            -           -         960,656
-

Karyn Mashima..........         -            -           -         900,000
-

Michael A. Dennis.......        -            -           -         900,000
-
</Table>
```

By Order of the Board of Directors


PAMELA F. CRAVEN
VICE PRESIDENT, GENERAL COUNSEL AND SECRETARY


January [8], 2002

<Page>

PRELIMINARY COPY

APPENDIX A


AUDIT COMMITTEE CHARTER
OF THE AUDIT AND FINANCE COMMITTEE
OF THE BOARD OF DIRECTORS

APPROVED NOVEMBER 2, 2000


PURPOSE

1.1    The Audit and Finance Committee (the "Committee") is appointed by the
       Board of Directors of the Company (the "Board") to assist the Board in
       fulfilling its oversight responsibilities.

1.2    The Committee's primary audit committee duties and responsibilities are
       to assist the Board with respect to:

       o    The adequacy of the Company's internal controls and financial
            reporting process and the reliability of the Company's financial
            reports to the public.

       o    The independence and performance of the Company's internal
            auditors (the "Internal Auditor") and external independent auditor
            ("Independent Auditor").

       o    The Company's compliance with certain legal and regulatory
            requirements.

1.3    The Committee shall have the authority, in its discretion, to conduct
       investigations and retain, at the Company's expense, special legal,
       accounting or other consultants or experts to advise the Committee.

A-114

James H.M. Sprayregen, P.C.
Jonathan S. Henes, P.C.
KIRKLAND & ELLIS LLP
KIRKLAND & ELLIS INTERNATIONAL LLP
601 Lexington Avenue
New York, New York 10022
Telephone:     (212) 446-4800
Facsimile:     (212) 446-4900

- and -

Patrick J. Nash, Jr., P.C. (admitted *pro hac vice*)
Ryan Preston Dahl (admitted *pro hac vice*)
Bradley Thomas Giordano (admitted *pro hac vice*)
KIRKLAND & ELLIS LLP
KIRKLAND & ELLIS INTERNATIONAL LLP
300 North LaSalle Street
Chicago, Illinois 60654
Telephone:     (312) 862-2000
Facsimile:     (312) 862-2200

*Counsel to the Debtors and Debtors in Possession*

**UNITED STATES BANKRUPTCY COURT**
**SOUTHERN DISTRICT OF NEW YORK**

| | | |
|---|---|---|
| In re: | ) | Chapter 11 |
| | ) | |
| AVAYA INC., *et al.*[1] | ) | Case No. 17-10089 (SMB) |
| | ) | |
| Debtors. | ) | (Jointly Administered) |
| | ) | |

---

[1]    The Debtors in these chapter 11 cases, along with the last four digits of each Debtor's federal tax identification number, include: Avaya Inc. (3430); Avaya CALA Inc. (9365); Avaya EMEA Ltd. (9361); Avaya Federal Solutions, Inc. (4392); Avaya Holdings Corp. (9726); Avaya Holdings LLC (6959); Avaya Holdings Two, LLC (3240); Avaya Integrated Cabinet Solutions Inc. (9449); Avaya Management Services Inc. (9358); Avaya Services Inc. (9687); Avaya World Services Inc. (9364); Octel Communications LLC (5700); Sierra Asia Pacific Inc. (9362); Sierra Communication International LLC (9828); Technology Corporation of America, Inc. (9022); Ubiquity Software Corporation (6232); VPNet Technologies, Inc. (1193); and Zang, Inc. (7229).  The location of Debtor Avaya Inc.'s corporate headquarters and the Debtors' service address is:  4655 Great America Parkway, Santa Clara, CA 95054.

**DEBTORS' SUR-REPLY**
**TO MARLENE CLARK'S REPLY IN SUPPORT THE MOTION**
**FOR ORDER COMPELLING COMPLIANCE WITH 11 U.S.C. § 1114(e)**
**AND APPOINTING AN OFFICIAL COMMITTEE UNDER 11 U.S.C. § 1114(d)**

The above captioned debtors and debtors in possession respectfully submit this sur-reply in response to the Movant's reply filed at [Docket No. 635] (the "Reply") and in further opposition to the Motion.[2]

**Sur-Reply**

I. **Mrs. Clarke's New Arguments—Raised for the First Time in the Reply—Are Improper and Should be Stricken**[3]

1. Until the Reply was filed on May 21, 2017, the Movant's sole authority for the contention that survivorship benefits arising under the Avaya Inc. Supplemental Pension Plan (the "ASPP") are "retiree benefits" per section 1114(a) was a citation to the definition of "benefit" in an online dictionary.[4] Movant cited neither statutory law nor caselaw in support of this proposition.[5] By the Reply, the Movant now raises two new arguments and introduces new sources of law that effect. First, Movant now asserts that the Third Circuit's construction of a "Death Benefit" arising under a plan maintained by Lucent Technologies Inc. ("Lucent") in In re Lucent Death Benefits ERISA Litigation[6] compels the determination that survivorship benefits under the ASPP are also "retiree benefits" per section 1114.[7] Second, Movant asserts that the

---

[2] Capitalized terms used but not immediately defined herein have the meanings set forth in the *Debtors' Objection to Marlene Clark's Motion for Order Compelling Compliance Under 11 U.S.C. § 1114(e) and Appoint an Official Committee Under 11 U.S.C. § 1114(d)* [Docket No. 609] (the "Objection").

[3] The Debtors respectfully reserve all rights to supplement this sur-reply and present further argument and evidence in opposition to the Motion.

[4] See Mot. ¶ 13.

[5] See generally id.

[6] 541 F.3d 250 (3d Cir. 2008)

[7] See Reply ¶¶ 3–5.

1

Debtors are both judicially and collaterally estopped from objecting to the Motion as a result of the <u>Lucent Death Benefits</u> opinion.[8]  To be clear, the <u>Lucent Death Benefits</u> case and its application to questions of administrative priority, as well as assertions of judicial and collateral estoppel, were raised for the first time by the Reply.

2.  Bankruptcy Rule 9013 provides that a motion shall "state with particularity the grounds therefor."  Local Bankruptcy Rule 9013-1 similarly provides "each Motion shall specify the rules and statutory provisions upon which it is predicated and the legal authorities that support the requested relief."  These rules reflects the more general proposition that adversaries should have a full and fair opportunity to review the bases for asserted relief, as opposed to being required to engage in "trial by surprise"—which is certainly the case here.  And, while the Debtors believe the Movant's new arguments fail on their merits, the Debtors submit they should be stricken under Bankruptcy Rule 9013 and Local Bankruptcy Rule 9013-1 given the lack of any adequate notice provided by the Movant.[9]

## II. <u>Lucent Death Benefits</u> and the Movant's Newly-Raised Theories Have No Application Here

3.  The Debtors were spun off from Lucent in 2000.[10]  The litigation underlying the Third Circuit's opinion in <u>Lucent Death Benefits</u> commenced in October 2003,[11] in response to certain acts taken by Lucent to modify employee death benefits (as the name suggests) in

---

[8]  <u>Id.</u> ¶¶ 6–14.

[9]  In the interest of judicial economy, the Debtors have sought to identify certain of the manifest errors raised by such new arguments by this Sur-Reply, but the Debtors respectfully request the opportunity for additional briefing and fact-finding should the Court be inclined not to deny the Motion at this time.

[10]  <u>See</u> *Declaration of Eric Koza (I) in Support of First Day Motions and (II) Pursuant to Local Bankruptcy Rule 1007-2* [Docket No. 22] ¶ 18 (discussing October 2000 Lucent spin-off); Avaya Inc., at Nov. 23, 2015 (Form 10-K), at 44 (same).

[11]  <u>See</u> *Complaint*, <u>Foss v. Lucent Techs. Inc.</u>, Case No. 03-05017 (D.N.J. Oct. 23, 2003) [Docket No. 1].

February 2003[12]. The Third Circuit ultimately ruled on the appellate litigation arising in that matter in August 2008.[13] No Debtor-entity appears to have ever been party to that litigation.[14] In other words, the benefit plan at issue in the <u>Lucent Death Benefits</u> case was maintained by a separate company when that matter was litigated between 2003, and that litigation was defended by parties other than the Debtors.

4.      Moreover, the Reply's blanket assertion that "the Lucent Technologies Inc. Management Pension Plan (the 'Lucent Plan') [] is the predecessor to the [ASPP]"[15] is without support in the Reply. The Movant does not identify a single connection between the "Lucent Plan" identified in the <u>Lucent Death Benefits</u> case and the ASPP. Rather, the Reply only makes reference to Avaya financial statements referencing the "Lucent Technologies Inc. Management Plan" without any specific connection to the ASPP.

5.      Yet the assertion that the ASPP is somehow a "successor" —even if true[16]—is a red herring. Again, the Debtors were not parties to <u>Lucent Death Benefits</u> litigation (which, again, was commenced <u>three years</u> after the Debtors were spun off from Lucent). As discussed below, whatever construction <u>Lucent Death Benefits</u> may have adopted for a <u>Lucent</u> plan cannot be binding on the Debtors. Nor does the ASPP even contain the same "Death Benefit" that was the actual subject matter of the <u>Lucent Death Benefits</u> analysis. Movant therefore has no

---

12    <u>See</u> 541 F.3d at 253.

13    <u>See id.</u> at 250 (noting opinion filed on August 28, 2008).

14    <u>See, e.g.</u>, <u>Lucent Death Benefits</u>, 541 F.3d at 253 (identifying defendant); <em>Amended Complaint</em>, <u>In Lucent Death Benefits ERISA Litigation</u>, Case No. 03-05017 (D.N.J. Nov. 10, 2005), ¶¶ 21–24 (same).

15    Reply at p.1.

16    It appears that the "Lucent Technologies Inc. Management Pension Plan," construed in <u>Lucent Death Benefits</u> may also be a different plan than the ASPP. The ASPP states "The Plan is a successor to the <u>Lucent Technologies Inc. Supplemental Pension Plan in effect as of September 30, 2000</u>," (ASPP p.1.), whereas the plan sub judice in <u>Lucent Death Benefits</u> was the "Lucent Technologies Inc. Management Pension Plan," 541 F.3d at 252. The ASPP was also amended and restated as of January 1, 2009. (ASPP p.1.)

reasonable basis to assert that <u>Lucent Death Benefits</u> raises issues that are "identical" to those raised by the present Motion—separate and apart from the fact that <u>Lucent Death Benefits</u> in no way considered application of of section 1114,[17] questions of administrative priority, and the Bankruptcy Code's more fundamental concern with the preservation of estate assets and creditor priorities.

6.     Consequently, the Movant's new argument that <u>Lucent Death Benefits</u> somehow precludes the Debtors from challenging the Motion fails to satisfy even basic standards of plausibility.     In terms of judicial estoppel, that doctrine applies only in limited circumstances where the <u>same party</u> is, among other things, making inconsistent statements before a tribunal.[18] Here, the Movant simply ignores the basic fact that the Debtors were not party to the <u>Lucent Death Benefits</u> litigation.[19]  The Movant's recourse to collateral estoppel similarly fails.  <u>First</u>, there is no reasonable argument that the Debtors had a "full and fair" opportunity to litigate in the <u>Lucent Death Benefits</u> case, since (a) the Debtors were never a party to that case, (b) that case involved litigation on a benefit plan that was not maintained by the Debtors, and (c) that litigation related to actions undertaken by Lucent (not the Debtors) <u>three years</u> after the Debtors were spun off from Lucent.[20]

---

[17]  For example, and as discussed more fully below, the <u>ERISA Death Benefits</u> case did not consider whether section 1114 of the Bankruptcy Code was actually intended to apply to pension programs.

[18]  <u>See generally</u> <u>New Hampshire v. Maine</u>, 532 U.S. 742, 750 (2001).

[19]  <u>See, e.g.</u>, Reply at ¶ 7 ("The Debtors' Position Herein is Clearly Inconsistent with Lucent's Position in the ERISA Death Benefits Litigation.").

[20]  <u>See</u> <u>LaFleur v. Whitman</u>, 300 F.3d 256, 274 (2d Cir. 2002) ("Our inquiry with regard to the 'full and fair opportunity' prong of the collateral estoppel doctrine is whether [the party] was fully able to raise the same factual or legal issues [asserted in the prior proceeding].")

7.    Second, Lucent Death Benefits involved facts and issues distinct from the treatment of supplemental pension benefits under the Bankruptcy Code here.  In that case, the program at issue was a specific "Death Benefit" that provided a form of life insurance benefit upon a participating employee's death.[21]  No such "Death Benefit" exists under the ASPP. Lucent Death Benefits also did not address whether the survivorship provision of a supplemental pension had the effect of causing that benefit to become a "welfare benefit" for purposes of ERISA—let alone whether such a payment should be entitled to administrative priority via section 1114.  Indeed, the Third Circuit's decision in Lucent Death Benefits was specifically predicated on the Third Circuit's finding that "the pensioner death benefit neither provides retirement income to employees nor results in a deferral of income by employees.  Nor does the pensioner death benefit directly relate to an accrued benefit by paying out an accumulated amount of accrued benefits."[22]

8.    By contrast, the ASPP is—by its terms—a form of deferred compensation: "The Avaya Inc. Supplemental Pension Plan ('the Plan') is intended to constitute both (i) an unfunded excess benefit plan . . . and (ii) an unfunded plan primarily for the purposes of providing deferred compensation and pension benefits."[23]  Put another way, the ASPP is precisely the sort of plan distinguished by the Lucent Death Benefits court when it found that the plan at issue "neither provides retirement income to employees nor results in a deferral of income."  This distinction

---

[21]  See 541 F.3d at 254.

[22]  Id. at 255 (internal citations omitted).  Movant's reliance on Rombach v. Nestle USA, Inc., 211 F.3d 190 (2d Cir. 2000) is similarly misplaced.  Nestle stands for the unremarkable proposition that a disability payment—a lump sum triggered by the employee's departure because of a back injury—is a disability benefit (and not a pension) because the benefit was triggered by a workplace injury.  Nestle in no way addressed whether a deferred compensation plan such as the ASPP could somehow be deemed a "welfare plan" because of a survivorship provision.

[23]  ASPP p.1.

between the ASPP and that plan construed in <u>Lucent Death Benefits</u> also carries into the plan description addressed in <u>Lucent Death Benefits</u>. That is, the Lucent Technologies Inc. Management Pension Plan classified itself as <u>both</u> a pension plan and welfare plan, thus allowing for both pension benefits and welfare benefits to arise under the same plan.[24] Conversely, the ASPP's own description identifies the ASPP as being a deferred compensation plan.[25] Thus, Movant's 11th hour recourse to collateral estoppel fails because the plan subject to analysis in <u>Lucent Death Benefits</u> was in no ways "identical" (or even relevant) to the matter under consideration here.

9.     Nor could <u>Lucent Death Benefits</u> decide the "same issue" as a matter of collateral estoppel since, as noted above, consideration of administrative priority, section 1114(a), or the intent and purpose of Bankruptcy Code's priority scheme as a whole were simply inapplicable in that non-bankruptcy litigation.   The Debtors in fact dispute the Movant's contention that ERISA—and not the Bankruptcy Code—somehow controls here.   While caselaw interpreting ERISA may assist in the present inquiry, <u>Howard Delivery Service, Inc. v. Zurich American Ins. Co.</u>[26] and its progeny are clear that such analysis must ultimately be directed by the more fundamental principles of the Bankruptcy Code.[27]

10.     In this regard, it is hornbook law that administrative priorities are narrowly construed.[28]   This rule applies with full force to questions of priority with respect to putative

---

[24]   541 F.3d at 255 ("The Plan is classified as both a pension plan and a welfare plan under [ERISA]." (quoting plan)).

[25]   ASPP p.1.

[26]   547 U.S. 651 (2006).

[27]   <u>See</u> <u>Zurich Am.</u>, 547 U.S. at 662, 667; <u>see, e.g.</u>, <u>In re Delphi Corp.</u>, Case No. 05-44481, 2009 WL 637315, at *3 (Bankr. S.D.N.Y. March 10, 2009).

[28]   <u>See</u> <u>Trs. of Amalgamated Pension Funds v. McFarlin's, Inc.</u>, 789 F.2d 98, 100 (2d Cir. 1986) ("Because the

A-121

employee benefit plans, where the Supreme Court has said: "[W]e are guided in reaching our decision by the equal distribution objective underlying the Bankruptcy Code, and the corollary principle that provisions allowing preferences must be tightly construed. Every claim granted priority status reduces the funds available to general unsecured creditors and may diminish the recovery of other claimants qualifying for equal or lesser priorities."[29] This rule similarly applies to questions of asserted priority under section 1114.[30]

11. The Movant has failed to meet this burden here—and <u>Lucent Death Benefits</u> does not prove otherwise (nor could it). In fact, the Movant has not identified a single case in which a court has determined that a pension plan's survivorship provision causes such benefits to be "retiree benefits" per section 1114(a) of the Bankruptcy Code. Instead, the Reply either mischaracterizes the relevant opinions or attempts to distinguish such case law by recourse to irrelevant or non-existent distinctions.

12. Movant's approach with respect to <u>In re Farmland Industries, Inc.</u>[31] is instructive this regard. In the Reply, Movant cites <u>Farmland Industries</u> as follows:

> However, a spouse's entitlement to payments under a plan that is triggered on her retiree-husband's death, plainly <u>does</u> qualify as a death benefit under the statute. <u>See</u> <u>In re Farmland Indus., Inc.</u>, 294 B.R. 903, 921 (Bankr. W.D. Mo. 2003) ("Because these plans and programs provide benefits in the event of death, they constitute 'retiree benefits' within the meaning of § 1114(a) and are therefore governed by the provisions of § 1114.")[32]

---

presumption in bankruptcy cases is that the debtor's limited resources will be equally distributed among his creditors, statutory priorities are narrowly construed.").

[29] <u>Howard Delivery Serv., Inc. v. Zurich Am. Ins. Co.</u>, 547 U.S. 651, 667 (2006) (citations omitted).

[30] <u>See</u> <u>Delphi</u>, 2009 WL 637315, at *3.

[31] 294 B.R. 903 (Bankr. W.D. Mo. 2003).

[32] Reply ¶ 16.

7

A-122

This statement is seriously misleading. The "plans and programs" referenced by the excerpted <u>Farmland</u> passage were three separate executive life insurance programs that, by their terms, were, as the names suggests, plainly life insurance policies.[33] By contrast, the <u>Farmland</u> court determined deferred compensation plans, as opposed to life insurance plans, "are not encompassed within § 1114."[34] Read correctly, then, the cited passage from <u>Farmland</u> supports only the argument that a "spouse's entitlement to payments under a <u>life insurance</u> plan" are covered by section 1114 but in no way supports Movant's assertion that a survivorship provision in a deferred compensation program causes that plan to 'qualify as a death benefit.'

13. The Movant's efforts to distinguish <u>Lyondell</u>, <u>Exide</u>, and <u>WorldCom</u> plays similarly fast and loose with the analysis undertaken by those courts. With regard to <u>Exide</u> and <u>WorldCom</u>, Movant attempts to distinguish those cases on the basis that "the death benefit belonged not to the retiree but to the designated beneficiary," as opposed to a situation where (as here) the beneficiary is actually prosecuting a claim.[35] But <u>Exide</u> and <u>WorldCom</u>'s determination that a survivorship provision did not create a "retiree benefit" was unrelated to any determination that the individual retiree (rather a beneficiary) was the moving party.[36] In this regard, both courts rightly determined that the survivorship provision built into a supplemental pension does not provide an "additional benefit" to the survivor; rather, such a survivorship

---

[33] See <u>Farmland</u>, 294 B.R. at 909–11 (discussing life insurance plans). The un-excerpted passage reads in full: "<u>Under the Director Life Plan, the Supplemental Life Plan, and the Executive Life Plan</u>, the Debtors have provided varying amounts of life insurance benefits under various arrangements to Farmland's directors and top executives. Because <u>these plans and programs</u> provide benefits in the event of death, they constitute "retiree benefits" within the meaning of § 1114(a) and are therefore governed by the provisions of § 1114 that have been set out above." <u>Farmland</u>, 294 B.R. at 921 (emphasis added).

[34] <u>Id.</u> at 921.

[35] Reply ¶ 18.

[36] See <u>WorldCom</u>, 364 B.R. at 549–50; <u>Exide</u>, 378 B.R. at 768–69.

provision simply changes the timing and method by which deferred income or pensions are ultimately distributed.[37]   And, of course, this precise question was addressed in <u>Lyondell</u>, in which (as here) the beneficiary in question was the party prosecuting the relevant motion.[38]

### III.   Movant's Argument Would Result In a Limitless and Unwarranted Expansion of Section 1114(a).

14.   At core, the Movant's argument is that the survivorship provisions of a pension program necessarily cause that program to be a "retiree benefit" entitled to administrative priority under section 1114—even if the pension benefits payable to an individual retiree were not, in themselves, entitled to such priority.   In the Movant's words, section 1114 "expressly affords priority to surviving spouses' death benefits but not to retiree's pension benefits."[39]

15.   But this response would result in a practically unlimited expansion of the administrative priority provisions of section 1114.   By law, every qualified single employer pension plan must provide survivor rights to beneficiaries.[40]   And, as a matter of practice, non-qualified, supplemental pension plans (like the ASPP) will include similar survivorship provisions such as those addressed by each of <u>Exide</u>, <u>WorldCom</u>, and <u>Lyondell</u>.   Under Movant's argument, however, such survivorship rights must be afforded administrative priority since they would then constitute a "death benefit" for purposes of section 1114.   Movant's proposed construction would then cause a radical expansion of administrative liability with respect to any pension plan.

16.   When Congress amends the Bankruptcy Code (as it did to enact section 1114),

---

[37]   <u>See, e.g.</u>, <u>WorldCom</u>, 364 B.R. at 550.

[38]   <u>See</u> 445 B.R. at 301.

[39]   Reply ¶ 30.

[40]   <u>See</u> 29 U.S.C. §§ 1055(a)(1), (c)(1)(A)(i), (c)(2)(A).

Congress is presumed to know that it does not write on a blank slate—including with respect to the narrow construction afforded to administrative priorities.[41]   Thus, a departure from established practice—particularly where questions of statutory priority are concerned—require a clear indicia of Congressional intent.  As the Supreme Court has recently said:  "The importance of the priority system leads us to expect more than simple statutory silence if, and when, Congress were to intend a major departure."[42]  Thus, by arguing that Congress actually intended for all pensions to contain a latent "death benefit" subject to section 1114, Movant must also be able to identify some clear indicia that Congress actually intended such a radical growth of administrative liability.

17.     Of course, no such indicia is found in the statute, and the Movant has not identified a single opinion reaching that conclusion, either.  In fact, the opposite is true.  The legislative history to section 1114 makes clear that Congress did <u>not</u> intend such a revolutionary expansion of administrative priority to all pension survivor benefits:  "This bill is not intended to affect current law treatment of pension benefits in Chapter 11 proceedings."[43]  In this regard, then, <u>Lyondell</u>, <u>Farmland</u>, <u>WorldCom</u>, and <u>Exide</u> all "got it right" in refusing to expand the definition of section 1114 in so broad a fashion as to encompass a customary pension survivorship provision.

*[Remainder of Page Intentionally Left Blank]*

---

[41]   See <u>Delphi</u>, 2009 WL 637315, at *3; <u>see also</u> <u>Dewsnup v. Tim</u>, 502 U.S. 410, 419 (1992).

[42]   <u>Czyzewski v. Jevic Holding Corp.</u>, 137 S. Ct. 973, 984 (2017).

[43]   S. Rep. No. 100-119, at 4 (1987), <u>reprinted in</u> 1988 U.S.C.C.A.N. 683, 685.  The legislative history of the final version of section 1114 consists primarily of the Senate Report and various statements by Senators and Members of Congress during passage of S. 548 and H.R. 2969.  <u>Collier on Bankruptcy</u> ¶ 1114.LH.

A-125

## Conclusion

WHEREFORE, for the foregoing reasons and as set forth in the Objection, the Debtors

request that the Court enter an Order denying the Motion.

| | |
|---|---|
| Dated: May 24, 2017<br>New York, New York | */s/ Jonathan S. Henes, P.C.* |
| | James H.M. Sprayregen, P.C. |
| | Jonathan S. Henes, P.C. |
| | KIRKLAND & ELLIS LLP |
| | KIRKLAND & ELLIS INTERNATIONAL LLP |
| | 601 Lexington Avenue |
| | New York, New York 10022 |
| | Telephone:    (212) 446-4800 |
| | Facsimile:    (212) 446-4900 |
| | - and - |
| | Patrick J. Nash, Jr., P.C. (admitted *pro hac vice*) |
| | Ryan Preston Dahl (admitted *pro hac vice*) |
| | Bradley Thomas Giordano (admitted *pro hac vice*) |
| | KIRKLAND & ELLIS LLP |
| | KIRKLAND & ELLIS INTERNATIONAL LLP |
| | 300 North LaSalle Street |
| | Chicago, Illinois 60654 |
| | Telephone:    (312) 862-2000 |
| | Facsimile:    (312) 862-2200 |
| | *Counsel to the Debtors and Debtors in Possession* |

# STORCH AMINI PC

**Jeffrey Chubak**
MEMBER NY & NJ BARS

212.497.8247
jchubak@storchamini.com

May 24, 2017

**Via ECF and E-mail**

Honorable Stuart J. Bernstein
U.S. Bankruptcy Court for the Southern District of New York
One Bowling Green
New York, New York 10004

Re:     *In re Avaya Inc., et al.*, Ch. 11 Case No. 17-10089, Section 1114 Motion

Dear Judge Bernstein:

I am counsel to Marlene Clark in the above-referenced case. I write to briefly respond to the Debtors' Sur-Reply [ECF No. 653], filed without my consent and without prior Court authorization, and which is not permitted by this Court's Local Rules or the Debtors' own Case Management Order [ECF No. 160].

The Reply Should Not be Stricken

The Debtors' request to strike the Reply to the extent that it relies on *In re Lucent Death Benefits ERISA Litig.*, 541 F.3d 250 (3d Cir. 2008) should be denied.

The decision and related argument were raised in response to the Debtors' argument that survivorship benefits are pension, not death, benefits. Moreover, the decision and related argument was not a necessary part of Mrs. Clark's motion; the motion satisfies the requirements of Rules 9013 and 9013-1 by specifying the relief sought therein is predicated on a plain language interpretation of section 1114. In any event, Debtors responded to *Lucent Death Benefits* in their "brief" (as described in the Agenda) ten-page Sur-Reply.

The Debtors Remain Precluded by Collateral Estoppel

The Debtors' argument that collateral estoppel is inapplicable because the spin-off was completed before the *Lucent Death Benefits* litigation commenced ignores that the doctrine can be used offensively against nonparties to the prior litigation.

The Supreme Court stated in *Taylor v. Sturgell*, 553 U.S. 880 (2008) "the rule against nonparty preclusion is subject to exceptions," two of which are relevant herein. First, a nonparty may be bound if it was adequately represented in the prior litigation. *Id.* at 894. The Debtors' position herein—that payments to surviving spouses triggered by the death of their retiree-spouse are pension benefits, not death benefits—is identical to that of the plaintiffs in the prior litigation.

2 GRAND CENTRAL TOWER · 140 EAST 45TH STREET, 25TH FLOOR · NEW YORK, NY 10017
P 212.490.4100 · F 212.490.4208 · www.storchamini.com

A-127

Honorable Stuart J. Bernstein
May 24, 2017
Page 2

Those plaintiffs, in turn, were represented by four different law firms which fully litigated the issue before the District Court and the Third Circuit. Second, a nonparty may be bound where a "preexisting 'substantive legal relationship' between the person to be bound and a party to the judgment exists." *Id.* The Supreme Court held "the substantive legal relationships justifying preclusion are sometimes collectively referred to as 'privity.' … The term 'privity,' however, has also come to be used more broadly, as a way to express the conclusion that nonparty preclusion is appropriate on any ground." *Id.* at 894 n.8. *See also* Wright & Miller, 18A Fed. Prac. & Proc. Juris. § 4449 (2d ed.)  Here, a substantive legal relationship existed as the employees covered by the Supplemental Plan were all covered by the plan which was the subject of the prior litigation,[1] and Lucent and Avaya plainly had a "substantive legal relationship" as a result of the spin-off.

Significantly, even if collateral estoppel did not apply, this Court is bound by *Rombach v. Nestle USA, Inc.*, 211 F.3d 190 (2d Cir. 2000), which was the basis for the Third Circuit's decision and held welfare benefits (*e.g.*, death benefits) provided under a pension plan fall within the definition of "welfare plan" under ERISA. Accordingly, this Court should still find survivorship benefits under the Supplemental Plan are welfare benefits under ERISA, and thus death benefits under section 1114(a).

Survivorship Benefits are Death Benefits Notwithstanding the Fact That the Supplemental Plan's Stated Purpose is to Provide Deferred Compensation and Pension Benefits to Retirees

The Debtors argue the survivorship benefit herein is not a welfare benefit under ERISA because the Supplemental Plan states in Article 1 that its purpose is to provide deferred compensation and pension benefits to retirees, and the Third Circuit decision was "predicated on [its] finding that 'the pensioner death benefit neither provides retirement income to employees nor results in a deferral of income to employees." (Sur-Reply ¶7.)

That argument fails for several reasons. First, payments to Mrs. Clark are linked primarily to her husband's annual salary. The Debtors previously stated that she is entitled to receive a "Minimum Retirement Benefit" pursuant to Sections 4.2-4.3 of the Supplemental Plan (Debtor Obj. ¶13), a term defined as 15% of the participant's "Annual Basic Pay," which in turn is equal to the participant's "annual base salary rate" plus an amount awarded annually under the Avaya Short Term Incentive Plan (which amount includes deferred compensation). At a minimum, a major portion, if not the overwhelming majority, of her monthly payments do not constitute deferred compensation. Second, Article 1 of the Supplemental Plan makes no reference to survivorship benefits (except to note Mrs. Clark's benefit was eliminated in 2004) notwithstanding the fact that the Supplemental Plan expressly provides for payment of the same.

---

[1] The Supplemental Plan states in Article 1 that it credits accrued benefits under the "Lucent Technologies Inc. Supplemental Pension Plan in effect as of September 30, 2000" for eligible Avaya employees. Lucent, in turn, stated in SEC filings (enclosed), that it adopted that plan "to provide benefits which may not be provided under the Lucent Technologies Inc. Management Pension Plan," which was the subject of the *Lucent Death Benefits* litigation.  In other words, the plan which was the subject of the prior litigation was the qualified plan for salaried employees, whereas this contested matter addresses the supplemental plan for participants in such plan who were employed by the Debtors as a result of the spin-off.

Honorable Stuart J. Bernstein
May 24, 2017
Page 3

Third, the Third Circuit stated that the operative question is whether the payments are due upon death, not whether the payments are monthly or lump sum or are linked to base salary or are deferred compensation. 541 F.3d at 255 ("The pensioner death benefit neither provides retirement income to employees nor results in a deferral of income by employees ... Instead, the pensioner death benefit provides 'benefits in the event of ... death.' *See* 29 U.S.C. § 1002(1) (defining welfare plan). This fits readily within the definition of a welfare benefit").

## That the Supplemental Plan Does Not Self-Identify as a Welfare Plan is Irrelevant

The Debtors also play up the fact that the plan in *Lucent Death Benefits* styled itself a welfare and pension plan (Sur-Reply ¶8 n.24), whereas the Supplemental Plan does not self-identify as welfare plan.

This is irrelevant. *Rombach* confirmed that it does not matter how a plan is described; all that matters is whether a benefit provided therein falls within the statutory definition of welfare plan. 211 F.3d at 193 (rejecting argument that disability benefit "should be considered a pension plan under § 1002(2)(A) because Nestle called it a 'pension benefit' and made it a part of its master pension plan that included a number of different types of pensions").

## This Court Should Look to ERISA to Interpret Section 1114(a)

The Debtors suggest that this Court not look ERISA to interpret section 1114(a), citing *Howard Delivery Serv., Inc. v. Zurich Am. Ins. Co.*, 547 U.S. 651 (2006). (Sur-Reply ¶9.)

Significantly, however, this is at odds with the Debtors' prior position. (Debtor Obj. ¶17, stating "Courts ... look to ... ERISA when asked to determine whether a pension or other retiree program qualifies ... under section 1114"). Further, Judge Gerber looked to ERISA to interpret section 1114 notwithstanding *Howard Delivery Serv.*, stating "I see no reason to reject the assistance from ERISA, or other bankruptcy case law that has looked to ERISA as well." *In re Lyondell Chem. Co.*, 445 B.R. 296, 299 (Bankr. S.D.N.Y. 2011).

## The Relief Sought Would Not Result in an Unlimited Expansion of Section 1114

The Debtors state Mrs. Clark's position, if accepted, "would result in a practically unlimited expansion of ... section 1114." (Sur-Reply ¶15.)

That is not true. What it would do is require the Debtors (and other debtors) to pay and not modify survivorship benefits under non-qualified supplemental plans, which the Debtors do not dispute do not require the payment of survivorship benefits as a matter of law in the first instance, except pursuant to section 1114(f)-(g). It is unclear why this would cause a radical expansion of administrative liability, as the Debtors are presently paying retirees and surviving spouses amounts due each month under the Avaya Pension Plan for Salaried Employees, which covers approximately 6,900 retirees [ECF No. 22, ¶49], whereas the Debtors' Supplemental Plan only covers "approximately 830 individuals" (Debtor Obj. ¶8), only a portion of whom are surviving spouses. Finally, it is relatively unusual for an employer to offer supplemental pension benefits on top of pension benefits offered under a qualified plan to begin with.

Honorable Stuart J. Bernstein
May 24, 2017
Page 4

Respectfully submitted,

Jeffrey Chubak

cc:    counsel of record via ECF

Enclosure

**SEC Info**    Home    Search    My Interests    Help    Sign In    *Please Sign In*

# Alcatel-Lucent USA Inc. – '10-K' for 9/30/98 – EX-10.III.A.13

*As of:* Tuesday, 12/22/98  ·  For: **9/30/98**  ·  *Accession #:* 950123-98-10816  ·  *File #:*  1-11639

*Previous '10-K':* '10-K' on 12/30/96 for 9/30/96  ·  Next: '10-K/A' on 5/17/99 for 9/30/98  ·  Latest: '10-K' on 12/14/06 for 9/30/06

| Find |  | in | this entire Filing. ▼ | Show | Docs searched ▼ | and | every "hit". ▼ |

Help...   Wildcards: ? (any letter), * (many). Logic: for Docs: & (and), | (or); for Text: | (anywhere), "(&)" (near).   ↓ B. ттом

| As Of | Filer | Filing | For·On·As | Docs:Size | Issuer | Agent |
|---|---|---|---|---|---|---|
| 12/22/98 | Alcatel_Lucent USA Inc. | **10-K** | 9/30/98 | 13:402K |  | RR Donnelley/FA |

---

## Annual Report  —  Form 10-K
## Filing Table of Contents

| Document/Exhibit | Description | Pages | Size |
|---|---|---|---|
| 1: 10-K | Lucent Technologies Inc. | 32 | 198K |
| 2: EX-10.I.5 | Amendment to Rights Agreement | 1 | 7K |
| 5: **EX-10.III.A.13** | **Description of Supplemental Pension Plan** | **1** | **10K** |
| 6: EX-10.III.A.14 | 1999 Stock Compensation Plan | 9 | 37K |
| 7: EX-10.III.A.15 | Voluntary Life Insurance Plan | 13 | 46K |
| 3: EX-10.III.A.3 | Deferred Compensation Plan | 18 | 65K |
| 4: EX-10.III.A.5 | Stock Retainer Plan | 3 | 19K |
| 8: EX-12 | Computation of Ratio of Earnings to Fixed Charges | 1 | 10K |
| 9: EX-13 | Portions of the Annual Report to Shareholders | 50 | 264K |
| 10: EX-21 | List of Subsidiaries of Lucent Technologies Inc. | 5 | 24K |
| 11: EX-23 | Consent of Pricewaterhousecoopers LLP | 1 | 9K |
| 12: EX-24 | Powers of Attorney | 3 | 17K |
| 13: EX-27 | Financial Data Schedule | 1 | 10K |

---

### EX-10.III.A.13  —  Description of Supplemental Pension Plan

Exhibit 10 (iii)(A) 13

Description of the Lucent Technologies Inc. Supplemental Pension Plan

The Company has adopted, effective for employees retiring on or after January 1, 1998, the Lucent Technologies Inc. Supplemental Pension Plan (the "Plan"). The Plan will replace the Lucent Technologies Inc. Non-Qualified Pension Plan, the Lucent Technologies Inc. Excess Benefit and Compensation Plan and the Lucent Technologies Inc. Officer Long-Term Disability and Survivor Protection Plan. The Plan is intended to provide benefits which may not be provided under the Lucent Technologies Inc. Management Pension Plan (the "MPP") because of limitations in the Internal Revenue Code of 1986. The Plan also provides for a minimum pension for executive officers and supplemental pension benefits for certain management employees.

The Plan is a non-qualified, non-contributory plan and benefits paid under the Plan are paid from the Company's general assets. Annual pension benefits are computed on an adjusted career average pay basis. For retirements on or after January 1 , 1999, a participant's adjusted career average pay is equal to 1.4% of the sum of the individual's (a) average annual pay for the five years ending December 31, 1998 (excluding the annual bonus award paid in December 1997), times the number of years of service prior to January 1, 1999, plus (b) pay subsequent to December 31, 1998 (including the annual bonus paid in December 1997), plus (c) annual bonus award paid in December 1997. Under the Plan, pay consists of base salary and annual bonus awards, to the extent that such amounts are not considered for purposes of determining benefits under the MPP.

The normal retirement age under the Plan is 65; however, retirement before age 65 can be elected. Employees who are at least age 50 with at least 15 years of service are eligible to retire with reduced benefits. If an employee's age (must be 50 or older) plus years of service, when added together, is equal to or greater than 75, the employee may retire with unreduced pension benefits. A reduction equal to 3% is made for each year age plus service is less than 75.

The Plan also provides executive officers with minimum pension benefits. Eligible retired executive officers and surviving spouses may receive an annual minimum pension equal to 15% of the sum of final base salary plus annual bonus awards, subject to reduction for pensions paid under other Company plans.

The Plan also provides a supplemental pension benefit to certain management employees who were hired at age 35 or over at specified levels and who terminate with at least five years service at such level. The plan provides additional pension credits equal to the difference between age 35 and the maximum possible years of service attainable at age 65, but not to exceed actual net credited service, at one-half the rate in the Management Pension Plan.

**Dates Referenced Herein**  and  **Documents Incorporated by Refere**nce

| *This '10-K' Filing* | Date | *Other Filings* |
|---|---|---|
| | ▲ | |
| | 1/1/99 | |
| | 12/31/98 | 10-Q |
| Filed on: | 12/22/98 | DEF 14A |
| For Period End: | 9/30/98 | 10-K/A |
| | 1/1/98 | |
| | | List all Filings |
| | ↑Top | |

Filing Submission 0000950123-98-010816   –   Alternative Formats (Word / Rich Text, HTML, Plain Text, et al.)

Copyright © 2017 *Fran Finnegan & Company*.  All Rights Reserved.
About – Privacy – Redactions – Help — *Wed, 24 May 21:31:06.0 GMT*

1    UNITED STATES BANKRUPTCY COURT

2    SOUTHERN DISTRICT OF NEW YORK

3    Case No. 17-10089-smb

4    - - - - - - - - - - - - - - - - - - - - - - - - - - - x

5    In the Matter of:

6

7    AVAYA INC.,

8              Debtor.

9    - - - - - - - - - - - - - - - - - - - - - - - - - - - x

10

11                   U.S. Bankruptcy Court

12                   One Bowling Green

13                   New York, NY  10004

14

15                   May 25, 2017

16                   10:24 AM

17

18

19

20

21   B E F O R E :

22   HON STUART M. BERNSTEIN

23   U.S. BANKRUPTCY JUDGE

24

25   ECRO:  KAREN

1   Hearing re:  Debtors Motion Seeking Entry of an Order (I)

2   Extending the Debtors Exclusive Periods to File a Chapter 11

3   Plan and Solicit Acceptances Thereof Pursuant to Section

4   1121 of the Bankruptcy Code and (11) Granting Related Relief

5

6   Hearing re:  Marlene Clark's Motion For Order Determining

7   Survivorship Benefits Under Supplemental Plan Are "Retiree

8   Benefits" Under Bankruptcy Code Section 1114(a), Compelling

9   Compliance With Section 1114(e), and Appointing an Official

10   Committee Under Section 1114(d)

11

12   Hearing re:  Case Conference

13

14   Hearing re:  Blackberry Corporation's Motion for Relief from

15   Stay

16

17   Hearing re:  Debtors' Motion Seeking Entry of (I) an Order

18   (A) Approving Bidding Procedures in Connection with the Sale

19   of the Debtors Networking Business, (B) Approving the Form

20   and Manner of Notice, (C) Scheduling an Auction and a Sale

21   Hearing, (D) Approving Procedures for Determining Cure

22   Amounts, and (E) Extending the Deadline to Assume or Reject

23   the Billerica Lease, and (11) an Order Authorizing and

24   Approving the Sale of the Debtors Networking Business [Sale

25   Hearing]

```
 1   A P P E A R A N C E S :

 2

 3   KIRKLAND & ELLIS LLP

 4        Attorneys for the Debtors

 5        300 North LaSalle

 6        Chicago, IL 60654

 7

 8   BY:  RYAN PRESTON DAHL

 9        JONATHAN S. HENES

10        BRADLEY T. GIORDANO

11

12   AKIN GUMP STRAUSS HAUER & FELD LLP

13        Attorneys for the Ad Hoc First Lien Group

14        One Bryant Park

15        Bank of America Tower

16        New York, NY 10036

17

18   BY:  NAOMI MOSS

19        PHILIP DUBLIN

20

21

22

23

24

25
```

```
 1    QUINN EMANUEL URQUHART & SULLIVAN, LLP

 2         Attorneys for Blackberry

 3         51 Madison, 22nd Floor

 4         New York, NY 10010

 5

 6    BY:  KATE SCHERLING

 7

 8    MORRISON & FOERSTER LLP

 9         Attorneys for Office Committee of Unsecured Creditors

10         250 West 55th Street

11         New York, NY 10019

12

13    BY:  LORENZO MARINUZZI

14

15    STORCH AMINI PC

16         Attorneys for Marlene Clark

17         2 Grand Central Tower

18         140 East 45th Street, 25th Floor

19         New York, NY 10017

20

21    BY:  MARLENE CLARK

22         JEFFREY CHUBAK

23

24

25
```

```
 1    MCGUIRE WOODS LLP

 2         Attorneys for Westion

 3         1345 Avenue of the Americas, 7th Floor

 4         New York, NY 10105

 5

 6    BY:  SHAWN R. FOX

 7

 8    STROOCK & STROOCK & LAVAN LLP

 9         Attorneys for Ad Hoc Crossover Group

10         180 Maiden Lane

11         New York, NY 10038

12

13    BY:  GABRIEL B. SASSON

14         SAYAN BHATTACHARYYA

15

16    LATHAM & WATKINS LLP

17         Attorneys Extreme Networks

18         885 Third Avenue

19         New York, NY 10122

20

21    BY:  MARC A. ZELINA

22

23

24

25
```

```
 1    LATHAM & WATKINS LLP

 2          Attorneys for Extreme Networks

 3          355 South Grand Avenue

 4          Los Angeles, CA 90071

 5

 6    BY:  KIMBERLY A. POSIN

 7

 8    KELLEY DRYE & WARREN LLP

 9          Committee Conflicts Counsel

10          101 Park Avenue

11          New York, NY 10178

12

13    BY:  GILBERT R. SAYDAH JR.

14

15    PENSION BENEFIT GUARANTY CORPORATION

16          1200 K Street NW, Suite 340

17          Washington DC 20005

18

19    BY:  CASSANDRA BURTON CAVERLY

20

21

22

23

24

25
```

```
 1    ALSO PRESENT TELEPHONICALLY:

 2

 3    ROB BEATSON

 4    PHILIP BRENDEL

 5    GEORGE BRICKFIELD

 6    RAHMAN CONNELLY

 7    WILLIAM L. HALLAM

 8    TAYLOR B. HARRISON

 9    BRIAN HOCKETT

10    NICK KALUK

11    CHRISTOPHER J. KOCHMAN

12    JEFFREY A. LATOV

13    TERESA LII

14    CHRISTOPHER MAYFIELD

15    DAVID J. MAYO

16    FRED NEUFELD

17    JASON M. PIERCE

18    CRAIG RASLLE

19    LUKE A. SIZEMORE

20    ANDREW M. THAU

21

22

23

24

25
```

```
 1                  P R O C E E D I N G S

 2            MR. HENES:  Good morning, Your Honor.

 3            THE COURT:  Good morning.

 4            MR. HENES: Jonathan Henes, Kirkland & Ellis on

 5    behalf of Avaya.  I'm here with my partners Ryan Preston

 6    Dahl and Brad Giordano, who you'll hear from later.  Your

 7    Honor, we have a number of matters on the agenda.  Most of

 8    them uncontested.  If I may, I'd like to go out of order.

 9            THE COURT:  Okay.

10            MR. HENES: I'll take the exclusivity motion first.

11    It's Item Number 3, I believe, on the uncontested matters.

12            THE COURT:  Okay.  I have a question about the

13    motion.  Yeah, you've already filed the plan, so you don't

14    need to extend exclusivity to file a plan.  You just need an

15    extension of that 180-day period to solicit acceptances to a

16    plan, not necessarily the plan you filed, right?

17            MR. HENES:  Right.  I think if we allow the

18    exclusive period of time to lapse on the plan filing, then

19    any party can file a plan, even if they couldn't seek...

20            THE COURT:  I don't think that's what it says.  We

21    have...  I just wondered about this in other cases.  You now

22    have the exclusive right for 180 days from the petition

23    date...

24            MR. HENES:  Correct.

25            THE COURT:  ...to solicit acceptances to a plan.
```

1           MR. HENES:  That's right.

2           THE COURT:  Not necessarily the plan you filed.

3    But you've locked in the exclusive right to solicit.

4           MR. HENES:  Correct.

5           THE COURT:  So you're afraid someone's going to

6    file a plan but can't solicit?

7           MR. HENES:  I would not -- yes, I would not want

8    somebody to take that position or do the -- on that.  I

9    think it's safer to --

10          THE COURT:  Yeah, there were some objections.

11   Have they been resolved?

12          MR. HENES:  Yes, we've resolved everything.  And

13   just to give very high level color and more, just

14   appreciation for everybody's good faith efforts on this.  We

15   had sat down with the Creditors Committee and the crossover

16   lenders and had agreed to reduce the extension request to 60

17   days.  The first lien group, as you know, filed an

18   objection.  We sat down with them as well and agreed on 60

19   days.

20          And I think the reason that everybody's agreed on

21   that is the plan that we did file, as we've always stated,

22   was what the Debtors believed was a reasonable plan but was

23   also what we believed would start to get negotiated around.

24   Those negotiations are now moving forward and moving forward

25   in good faith, and moving forward well.  All the parties are

1    talking.   A number of the principals are under NDA so we can

2    actually have principal to principal discussions, and we're

3    hopeful that things will move forward quickly.

4           We know that the parties, at least the first lien

5    group and the crossover group, are not in favor of the plan

6    on file.   But I think everybody agreeing to an extension of

7    60 days to provide more time to work on negotiations

8    obviously makes a lot of sense for these cases and I'm

9    hopeful that we'll get to a resolution, at least with some

10   of the parties, if not all.   And, of course, we reserve the

11   right to file a further extension before the end of that 60-

12   day period.

13          THE COURT:   Does anyone want to be heard relating

14   to the proposal for an extension of both periods, I guess,

15   for 60 days?

16          MR. BHATTACHARYYA:   Good morning, Your Honor.

17   Sayan Bhattacharyya, Stroock & Stroock & Lavan on behalf of

18   the ad hoc crossover group.   Your Honor, as Mr. Henes

19   indicated, the crossover group doesn't oppose the Debtor's

20   request based on the modified request for a 60-day

21   extension.   But as Mr. Henes also indicated, the crossover

22   group is not in support of the Debtor's plan that's on file.

23          THE COURT:   So far you've agreed with everything

24   he said.

25          MR. BHATTACHARYYA: But while we're hopeful that

1    the additional time will allow for the negotiation of a plan

2    that we can support, we do reserve the right, which I

3    believe is expressly provided for in the modified proposed

4    order, to seek to challenge any further extension of

5    exclusivity or to seek to terminate exclusivity based on the

6    circumstances as things progress.  Thank you.

7            THE COURT:  Thank you.  Does anyone else want to

8    be heard?  All right, the application to settle is granted.

9    You can submit an order.

10           MR. HENES:  Thank you, Your Honor.  And I'm glad

11   that the crossover group and the Debtors agree on so much.

12   I will turn it over to Mr. Giordano.  Thank you, Your Honor.

13           MR. GIORDANO:  Good morning, Your Honor.  Brad

14   Giordano of Kirkland & Ellis on behalf of the Debtors.

15   Going to Item Number 1 on the agenda, which was listed as a

16   status conference...

17           THE COURT:  Yes.

18           MR. GIORDANO:  We've agreed with counsel to

19   Blackberry to adjourn that matter to the July 25th omnibus

20   hearing.  As Your Honor guessed, there isn't a lot to note

21   about the matter at the current time so we're going to see

22   how it plays out in the Texas court and come back before you

23   in a couple of months.

24           THE COURT:  Okay.  Thank you.

25           MR. GIORDANO:  Item Number 2 is the omnibus claims

1    objection procedures, which I believe you already entered an

2    order for.

3            THE COURT:  Yes, I did that yesterday.

4            MR. GIORDANO:  Okay.  So, unless Your Honor has

5    any more questions, we can move on to the next item which is

6    the sale of the Debtor's networking business.  Docket Number

7    223 on the agenda -- or on the docket.  Your Honor, the

8    Debtors are seeking entry of a sale order, a revised version

9    of which was file yesterday, Docket Number 657.  Exhibit B

10   to that filing has a red line to the last version that we

11   filed.  And we're seeking authorization and approval of our

12   entry and performance under the stalking horse APA.

13           THE COURT:  I'm sorry, what's the docket number

14   for the revised order?

15           MR. GIORDANO:  657.

16           THE COURT:  Okay.

17           MR. GIORDANO:  So we're seeking entry of the order

18   authorizing performance and entry into the stalking horse

19   APA.  Sale of the Debtor's assets comprising the networking

20   business free and clear of liens, claims, encumbrances, and

21   interests, and authorizing the assumption and assignment of

22   the transferred contracts and assumed leases.

23           THE COURT:  Yeah.  You're selling both debtor and

24   non-debtor.

25           MR. GIORDANO:  That's correct, Your Honor.  The

1    order will address --

2            THE COURT: All right, because when I looked at the

3    order it didn't make that distinction to the extent the

4    buyer is buying non-debtor assets, they don't get the

5    protections afforded by 363 of the Bankruptcy Code.

6            MR. GIORDANO:  I agree, Your Honor.  We added some

7    additional language to kind of try and make that clear, but

8    if you'd like us to make it even --

9            THE COURT:  What I've had in other cases they just

10   drop a footnote that says that this only applies to the sale

11   of the debtor's assets or property of the estate, however

12   you can say it.

13           MR. GIORDANO:  We're happy to do that.

14           THE COURT:  Yeah.

15           MR. GIORDANO:  So, as Your Honor's probably aware,

16   we received several limited objections, reservations of

17   rights.  And I believe we stand here today uncontested

18   having resolved those objections with the various --

19           THE COURT:  Did you resolve Oracle's objection?

20           MR. GIORDANO:  Yes, Your Honor.  We included

21   language in the sale order to address their concerns.  So, I

22   believe we're uncontested standing here today.  I'd also

23   like to note that we filed a revised contract assumption

24   list, took some contracts off, put some on, but we're going

25   to provide a new objection deadline.  So any contract

1    counterparties that were added can come before Your Honor at

2    the June omnibus.

3         At the outset I'd like to also note the

4    declaration of John Bisacco, the supplemental declaration,

5    Docket Number 650.  Mr. Bisacco's in the courtroom today and

6    we'd ask that Your Honor move that declaration into

7    evidence.

8         THE COURT:  Does anybody object -- both

9    declarations?  His original moving declaration and this

10   declaration?

11        MR. GIORDANO:  The supplemental declaration.  I

12   believe Your Honor entered the original into evidence at the

13   bid procedures hearing but --

14        THE COURT:  Does anybody object to the receipt of

15   the supplemental declaration or want to cross-examine the

16   witness?  Hearing no response, I'll receive the supplemental

17   declaration.

18        MR. GIORDANO:  Thank you, Your Honor.  As the

19   supplemental declaration states, since the bidding

20   procedures hearing, the Debtors and their advisors have been

21   very busy working through a post-petition marketing process

22   for the assets.  This came on the heels of an already robust

23   prepetition marketing process.  And despite some interest

24   from potential bidders, standing here today, we did not

25   receive any qualified bids for the networking business.  So

1   we canceled the auction and we are seeking to approve the

2   stalking horse APA with Extreme Networks, Inc., which we

3   consider the highest and best offer for the networking

4   business.

5          Your Honor, I'm happy to walk through any of the

6   changes to the sale order that we --

7          THE COURT:  Well...  Go ahead.

8          MR. GIORDANO:  I'm happy to walk through any of

9   the changes to the sale order that we made to address

10  various counterparties' concerns at this time, otherwise I

11  can keep the presentation fairly short, knowing --

12         THE COURT:  Well, let me ask if anybody opposes

13  the sale or anyone who's raised an objection wants to seek a

14  sale order in order to figure out whether they oppose the

15  transaction.  Hearing no response, go ahead.

16         MR. GIORDANO:  Thank you, Your Honor.  We believe

17  the transaction is in the best interests of the Debtor's

18  estates and represents a fair and reasonable sale value.

19  Therefore, we ask that Your Honor enter the proposed form of

20  sale order.

21         THE COURT:  All right, does anyone want to be

22  heard with respect to the sale order?  I went through the

23  sale order, which was Docket 223-5 and you have a lot of

24  findings in here that I didn't see any evidence in the

25  record to support.  For example, you have a finding, the

1   successful bidder has complied more respects with the

2   bidding procedures.  How do I know that?

3           MR. GIORDANO:  If Your Honor would like --

4           THE COURT:  I'm just asking you.  You want me to

5   make that finding.  Where's the evidence that supports it?

6           MR. GIORDANO:  Well, Your Honor, I'm happy to

7   represent that to you or if you'd like a supplemental

8   declaration to that effect, I'm happy to file --

9           THE COURT:  You also have a finding that the

10  successful bidder or its affiliates, etc.  are not an

11  insider of the Debtor.  I have no evidence of that.  I mean

12  it's typical with these sale orders.  You just load them up

13  with findings but there's no evidence of it.

14          MR. GIORDANO:  Your Honor, would you prefer that

15  we present the evidence or would you prefer we remove those

16  findings?

17          THE COURT:  Look, if you want me to make findings

18  I have to have evidence to make findings.  So if you really

19  think you need them...  This shows up a couple of times.

20  Mr. Giordano?  It shows up a couple of times that the

21  successful bidder would not consummate the sale unless --

22  and there's certain things, I have no evidence of that.

23  Sometimes a supporting affidavit will say this was a

24  requirement, but I looked at the original declaration, it

25  didn't say that.

1           It says the successful bidder has provided

2  adequate assurance of its future performance.  I have no

3  evidence of that.

4           MR. GIORDANO:  Well, Your Honor --

5           THE COURT:  Those are my only points.

6           MR. GIORDANO:  -- the various contract

7  counterparties, you know, did not object on that basis.

8           THE COURT:  So why don't you say the successful

9  bidder represents that he's done it and none of the

10  counterparties have objected?  It's different from my making

11  a finding that they provide adequate assurance of future

12  performance.

13           MR. GIORDANO:  That's fine, Your Honor.  Happy to

14  do so.

15           THE COURT:  All right.  And I mean I'm just going

16  to -- there are a lot of provisions in the order itself that

17  are redundant and I'm just going to strike them.

18           MR. GIORDANO:  Okay.

19           THE COURT:  All right?

20           MR. GIORDANO:  Thank you, Your Honor.  Other than

21  those changes and submitting the revised order --

22           THE COURT:  Well, there will be a lot of changes

23  but it's easier to just do them...

24           MR. GIORDANO:  We'll confer with --

25           THE COURT:  Oh, I had a question, by the way.  You

1   have -- let me see if I can find it.  There's a capitalized

2   word Claims, which I assume was a defined term but I didn't

3   see the definition.  And then you have a lower case claims

4   also in other spots.  Is that different from the capitalized

5   claims?

6          MR. GIORDANO:  It's probably a typo, Your Honor.

7   We're happy to fix that.

8          THE COURT:  Well, is there a capitalized term

9   Claims?  Is it defined?

10         MR. GIORDANO:  Maybe defined in the purchase

11  agreement.

12         THE COURT:  I don't have to look at the purchase

13  agreement to figure out what I'm approving.

14         MR. GIORDANO:  Okay.  Well, we're happy to move

15  the definition into the order.

16         THE COURT:  Okay.  All right, anything else?  All

17  right, I'll approve the proposed sale.  I'm satisfied from

18  the evidence that the asset was adequately marketed and, in

19  fact, there was a pre-filing auction process which, I guess,

20  extended over to the post-petition period.  And based upon

21  the way the process was conducted, I'm satisfied that the

22  price is a fairly reasonable price.

23         I know there's this allocation issue coming up.

24  What is the Debtor -- what are the Debtors actually getting

25  out of this?

1          MR. GIORDANO:  Well, Your Honor, we're working

2     through that, you know, right now and we're not going to

3     distribute proceeds to various parties until we've worked

4     through that.  I can say that, you know, our initial feeling

5     was that it would be close to 50/50 between debtors and non-

6     debtors in allocations of proceeds.

7          THE COURT:  All right.  I'm sure the Creditors

8     Committee will chime in if they think too little is being

9     allocated to the estate.

10          MR. GIORDANO:  I'm sure they won't be shy.

11          THE COURT:  All right.  Next.

12          MR. GIORDANO:  Thank you, Your Honor.  I'm going

13     to cede the podium to Ryan Dahl.

14          MR. DAHL:  Good morning, Your Honor.  That takes

15     us to the contested item on the agenda today, which is Ms.

16     Clark's 11-14 motion.  And I'll cede the podium to the

17     counsel to Mr. Clark and I'll respond.

18          THE COURT:  Okay, thanks.

19          MR. DAHL:  Thank you.

20          MR. CHUBAK:  Thank you, Your Honor.  Jeffrey

21     Chubak from Storch Amini PC on behalf of Marlene Clark.  At

22     the outside I just wanted to note that the Debtors filed a

23     sur-reply yesterday.  We put in a brief letter in response.

24     The agenda indicated it was going to be a short sur-reply.

25     It was 10 pages.  So I felt the need -- it appropriate to

 1  put in a short letter.  I'm happy to -- if Your Honor hasn't
 2  had the opportunity to consider these documents, I'm happy
 3  to punt on this contested matter for a short while so that
 4  Your Honor has the opportunity to consider the documents.
 5  Otherwise, I'm happy to move forward.
 6      THE COURT:  First of all, I didn't authorize a
 7  sur-reply or a sur sur-letter reply.  The Debtor's principal
 8  argument for the sur-reply is that you raise this issue of
 9  judicial estoppel for the first time in your reply.  So
10  what's your response to that?
11      MR. CHUBAK:  My response is that it wasn't a
12  necessary element of the claim for relief in the first
13  instance.  Our analysis in the motion was based on a plain
14  language interpretation of Section 11-14, which is --
15      THE COURT:  And you wouldn't think to say in the
16  motion, oh, by the way, they are judicially estopped from
17  arguing the contrary?
18      MR. CHUBAK:  Well, even if you put aside the
19  judicial estoppel argument, the 2nd and 3rd Circuit's
20  argument in Rombach and Lucent death benefits decision were
21  both premised on a plain language interpretation.  The same
22  plain language interpretation that I'm stating should apply
23  here.
24      THE COURT:  Can I ask you a question?  First of
25  all, I don't know any of the factual background.  Is Mr.

```
1     Clark alive and collecting his minimum retirement benefits?

2               MR. CHUBAK:  No, he passed away.  That's why --

3               THE COURT:  Before he ever retired?  See, I don't

4     know what happened here.

5               MR. CHUBAK:  After he retired he was collecting

6     pension benefits.

7               THE COURT:  And then Mrs. Clark collected 100

8     percent of those benefits pursuant to the letter I think I

9     saw attached to one of the (indiscernible) or maybe your

10    submission.

11              MR. CHUBAK:  The minimum retirement benefit under

12    the supplemental plan transferred to her.

13              THE COURT:  When Mr. Clark was collecting the

14    benefits, were they pension benefits or welfare benefits?

15              MR. CHUBAK:  They were pension benefits.

16              THE COURT:  Okay, so the only thing that makes

17    them retiree benefits within the language of 11-14 is that

18    the fact that she's now collecting this because of his

19    death, right?

20              MR. CHUBAK:  Correct.  Her entitlement was

21    triggered by his death.

22              THE COURT:  All right.  And I've read the cases

23    that everybody supplied relating to 11-14, but are there any

24    ERISA cases which stand for the proposition or don't stand

25    for the proposition that the triggering of the transfer of
```

1    the pension benefits from the husband -- from one spouse to

2    the other upon the death of the retiree transforms the

3    benefit from a pension benefit to a welfare benefit?

4    Because that's essentially what you're arguing.

5            MR. CHUBAK:  That's correct.

6            THE COURT:  Is there any -- have you found any

7    cases on that?

8            MR. CHUBAK:  No.  Lucent death benefits decision

9    said that a payment triggered by a death is a welfare

10   benefit.

11           THE COURT:  But this payment was triggered by his

12   retirement.  It's just the payee is different.

13           MR. CHUBAK:  No, that benefit was triggered by

14   death.  It was a lump sum death benefit.  And the decision

15   referred to it as a --

16           THE COURT:  But all I'm saying is if Mr. Clark was

17   still living, he would be getting the same benefit and it

18   would be a pension benefit.

19           MR. CHUBAK:  That's correct.

20           THE COURT:  All right.  You know, I've read the

21   Lucent case but it sounds like a different kind of benefit

22   anyway so...

23           MR. CHUBAK:  Well, it was described as a pension

24   or death benefit.  It's a lump sum death benefit.  Yeah,

25   that's the only difference.

```
 1              THE COURT:  I don't know that.  I don't have the

 2    plan, I don't know anything about that other than what I

 3    read in the case.  It looks like a different benefit and,

 4    oh, by the way, the case arose because they were terminating

 5    that benefit.  So this must be different.

 6              MR. CHUBAK:  The pension or death benefit in

 7    Lucent was a lump sum benefit triggered by the death of the

 8    retiree.

 9              THE COURT:  But this is not a lump sum benefit.

10              MR. CHUBAK:  This is a monthly payment in the form

11    of an annuity for --

12              THE COURT:  It's the same benefit he was getting.

13              MR. CHUBAK:  That's correct.

14              THE COURT:  And to come back to the same argument,

15    you're saying that because his death triggered the payment

16    to her rather than him, obviously, that makes it a death

17    benefit.

18              MR. CHUBAK:  That's correct.

19              THE COURT:  I understand the argument.

20              MR. CHUBAK:  So, I'd like to spend my argument

21    discussing -- I don't know if you had the opportunity to

22    consider the sur-reply or our letter.  I'm happy to --

23              THE COURT:  Well, the Lucent case is just a

24    different -- it's a different plan.  So judicial estoppel

25    wouldn't apply.  It might be persuasive if they're
```

1    interpreting a term but...

2          MR. CHUBAK:  The Debtors raised the point that

3    technically the Lucent litigation commenced after the

4    spinoff was completed.  So the argument is actually

5    offensive collateral estoppel that --

6          THE COURT:  It's a different plan, though.  You

7    know, you spend a lot of time on it, but it just looks like

8    a different plan.

9          MR. CHUBAK:  But the logic underpinning the

10   decision is that it's a benefit payable upon death.

11         THE COURT:  I understand that.

12         MR. CHUBAK:  But that's the definition of death

13   benefit.  That's all you need to have --

14         THE COURT:  But that wasn't -- in that case, the

15   Court didn't say this was a pension benefit that became a

16   death benefit because it was triggered by death.

17         MR. CHUBAK:  But the 2nd Circuit and the 3rd

18   Circuit said, look, in determining whether something is a

19   welfare benefit or a pension benefit, you look to whether --

20         THE COURT:  You look to the triggering event.

21         MR. CHUBAK:  Yes, exactly.  And here the

22   triggering event is death.  That's what resulted in the

23   transfer --

24         THE COURT:  Well, you say that and they say the

25   triggering event was his retirement.

1           MR. CHUBAK:  No.  I mean, the triggering -- his

2    retirement triggered his entitlement to pension payments;

3    but her entitlement, which is different, was triggered by

4    his death.  That's her death benefit.

5           THE COURT:  I understand the argument.

6           MR. CHUBAK:  So, we state in our letter that we

7    thought the Debtors were collaterally estopped from taking a

8    contrary position based on the substantial legal

9    relationship that existed -- substantive legal relationship

10   that existed between Avaya and Lucent.

11          THE COURT:  I guess I just don't understand the

12   argument because it's a different plan with a different

13   provision.

14          MR. CHUBAK:  It's a different provision but the

15   underlying logic is that this benefit is triggered by death,

16   therefore, it's a death benefit.  That's true under ERISA --

17          THE COURT:  I don't see them arguing that if Mrs.

18   Clark became entitled to a lump sum benefit upon the death

19   of Mr. Clark that would be a pension.  They're not making

20   that argument.  They're making a different argument.

21   They're saying he was getting a pension, he dies, now it's

22   payable to her.  And it doesn't transform a pension into a

23   retiree benefit.  That's what they're arguing.

24          MR. CHUBAK:  Except that it wasn't her pension

25   before, and now it's her pension and it's triggered by his

1   death.  That's why it's a death benefit and not a pension

2   benefit.

3           THE COURT:  Okay, we're repeating ourselves.  I

4   get it.

5           MR. CHUBAK:  And if your conclusion is that it's

6   not it's not a death benefit, then I mean, that's a pure

7   legal question -- but -- and then if, in fact, that's

8   correct, then she wouldn't be entitled to relief under 11-

9   14.  Our position is to the contrary.

10          THE COURT:  Let me ask you something about the

11  committee you contemplate.  It wouldn't represent retirees

12  who are still receiving their pension payments in their own

13  right, right?  Because those are -- you've just told me

14  those pension payments, they're not --

15          MR. CHUBAK:  It would be -- they would be

16  representing retiree benefit recipients, and that includes

17  current retirees because many current retirees are married

18  and want to see benefits confer upon their spouses.

19          THE COURT:  But they don't have standing.  I mean,

20  right now those benefits -- well, I guess they can be

21  terminated.

22          MR. CHUBAK:  Yeah.

23          THE COURT:  And if they pass after this bankruptcy

24  is over, maybe they can terminate those rights.

25          MR. CHUBAK:  That's correct.  And that's why moved

1   for a committee.

2          THE COURT:  But you want to represent people who

3   are not receiving retiree benefits?  That's my question.

4          MR. CHUBAK:  No.  We believe surviving spouses are

5   receiving retiree benefits.  They're death benefit

6   recipients.

7          THE COURT:  Well, I understand that people

8   similarly situated to Mrs. Clark -- I said similarly

9   situated; obviously they're in the same position, and under

10  your theory they would be receiving retiree benefits.  But

11  the people who are receiving -- the participants who are

12  receiving retiree benefits wouldn't be represented by that

13  committee.

14         MR. CHUBAK:  Well, the participants would not --

15  participants are -- by participants you're referring to

16  retirees?

17         THE COURT:  People who were employed and receiving

18  a pension, so they wouldn't be represented by that

19  committee.

20         MR. CHUBAK:  Well, the committee would be

21  comprised of retirees, and they would be seeking --

22         THE COURT:  But why?

23         MR. CHUBAK:  I'm sorry?

24         THE COURT:  But why?  They're not receiving

25  retiree benefits.

1          MR. CHUBAK:  That's how 11-14D operates.  It would

2     not be a committee of spouses; it would be a committee of

3     retirees.  But we still need this relief in order to ensure

4     that retiree benefits are preserved.

5          THE COURT:  Can I ask you -- if a retiree is not

6     receiving retiree benefits, do they have a right to a

7     committee?

8          MR. CHUBAK:  We submit that their spouses hold a

9     contingent death benefit and that they would want to -- it's

10    likely they would want to see those benefits preserved.

11         THE COURT:  All right.  Let me hear from the

12    Debtor.

13         MR. DAHL:  For the record, Ryan Preston Dahl for -

14    - on behalf of the Debtors, Your Honor.  There are obviously

15    a number of points we disagree with that were raised in the

16    reply in terms of collateral estoppel or judicial estoppel,

17    Your Honor.  I thought it might be more helpful really just

18    to get to the merits of the question, which is whether a

19    pension survivorship provision causes that pension to be a

20    retiree benefit rather than a pension.

21         THE COURT:  Well, that's the issue.

22         MR. DAHL:  That's exactly the issue, Your Honor.

23    And we think the answer is clearly no.  I mean, it's

24    certainly the conclusion reached by every case that's

25    addressed this issue.  We cite in our papers Farmland,

1    Exide, WorldCom, Lyondell.  They've all drawn this

2    conclusion.  And, Your Honor, I recognize that it's more

3    than simply counting noses but I do think it's telling,

4    though, that all of these courts have reached the same

5    conclusion because, Your Honor, it's the right conclusion.

6           THE COURT:  What about the 2nd Circuit case that

7    says that if a benefit is triggered by death -- well, in

8    that case they're talking about welfare benefits -- but if

9    it's triggered by the death of somebody, then the recipient

10   is receiving a death benefit?

11          MR. DAHL:  Sure, Your Honor.  I think -- a couple

12   things to that.  First, as a general matter, every pension

13   benefit, every qualified pension benefit by law has a

14   survivorship provision built into it.  ERISA requires the

15   pension to have a survivor benefit.  So there's nothing

16   novel about the concept that a pension or a supplemental

17   pension would have this provision in it.

18          The question Your Honor asked, whether the death

19   or the payment of a benefit, or more specifically, the

20   transfer of a benefit on death causes that to be something

21   other than a pension, I think the answer is no.  Because the

22   distinction that counsel is trying to make is really trying

23   to draw a distinction between life insurance and between

24   supplemental pension plan.  And life insurance is exactly

25   that, Your Honor.  The triggering event is death; that

1    payment is made to the beneficiary of the life insurance

2    policy.  Whereas in a pension, there is embedded within a

3    pension of course a survivor rate, but that's true of any

4    pension and that doesn't make it something other than a

5    pension.

6            And, Your Honor, that's exactly the issue the

7    Farmland court looked at.  In the Farmland court opinion,

8    the court was addressing a number of different plans

9    presented by the debtor in connection with their case.

10   Three of those plans were life insurance plans.  I think it

11   was executive life insurance, supplemental executive life

12   insurance, split dollar on the one hand; and then there were

13   a series of supplemental pensions on the other hand.

14           And the Farmland court I think rightly concluded

15   that all of these life insurance plans are payments

16   triggered by death -- are death benefits, frankly,

17   consistent with the LTV problem that Congress responded to

18   in enacting 11-14.  But at the same time, I think Farmland

19   rightly concluded that the string of payments or the benefit

20   provided under a pension is reflecting a deferral of income,

21   a retirement income.  And the death certainly transfers that

22   payment, but it's not creating a new benefit or an

23   incremental benefit to the party.

24           And, again, Worldcom reached the same conclusion,

25   Lyondell reached the same conclusion.

```
 1              THE COURT:  Would your argument be the same if the
 2    benefit that the surviving spouse received was different
 3    from the pension that the participant was receiving prior to
 4    his death?  Because the surviving spouse only gets the
 5    minimum benefit, right?  Whereas the participant could've
 6    had a different or a larger benefit?
 7              MR. DAHL:  It depends, Your Honor.  I think if
 8    there is --
 9              THE COURT:  I know those aren't the facts of this
10    case but I'm asking.
11              MR. DAHL:  Yeah, I understand.  I think it
12    depends.  If there is an incremental benefit or a benefit
13    arising solely in the event of death, I think that's one
14    thing, and effectively, that's life insurance.  If there's a
15    modification to the annuity in the event of death because
16    there's a change on the mortality table or something else in
17    the calculation of the annuity, I don't think that creates a
18    death benefit; that's just part of the pension.
19              And, Your Honor, in effect, that's the same
20    conclusion reached by the Worldcom case.  I mean, it said
21    that the purpose of the deferred compensation plan was to
22    defer income and the requisite income taxes until a later
23    date.  That the timing and method of payment changed or had
24    been altered in the event of disability is incidental to
25    that purpose.  And that's 364BR550, Your Honor.  And I think
```

1    that captures that same distinction identified by the

2    Farmland -- which is that the purpose of here a deferred

3    retirement plan is simply that -- deferral retirement plan

4    or deferred income.  That's precisely what the Avaya plan

5    says in its recitals.  That's what the plan is intended to

6    do.

7            To Your Honor's question, that's very different

8    than saying in addition to this pension, in effect, we're

9    going to create a sort of employer response or life

10   insurance where you will have -- or your beneficiaries, I

11   should say, will have an additional benefit that arises only

12   in the event of death or only upon the event of death.

13           And I think more broadly, Your Honor, that's

14   really the right answer under the Bankruptcy Code, which is

15   that as a general principle the administrative priorities

16   being argued here by the movant are narrowly construed and

17   there's nothing unique about employee benefits which changes

18   that construction.  I think that's the lesson we learned

19   from the Supreme Court in Zurich; it's certainly the 2nd

20   Circuit's opinion in Farmlands.  And Judge Strain obviously

21   went through that rationale in the context of 11-14 in his

22   Delphi opinion.

23           But what's being argued here is really taking what

24   is at best out of the movant's argument the question of

25   ambiguity in the statute.  We disagree that the statute is

1    ambiguous but --

2              THE COURT:  Well, it does say death.

3              MR. DAHL:  It does say death benefit but then it's

4    drawing a distinction as to what death benefit means.

5              THE COURT:  Is there any legislative history

6    either in ERISA or under the Bankruptcy Code regarding what

7    that was supposed to mean?

8              MR. DAHL:  There is legislative history on 11-14,

9    Your Honor.  It's limited primarily to a Senate report.  But

10   what the Senate report says is very clearly that 11-14 or

11   rather the enactment of 11-14 was not intended to change the

12   treatment of pensions in Chapter 11.  And what's being

13   advocated here would substantially change the treatment of

14   pensions in Chapter 11.  Because creating a distinction

15   between a pension benefit paid to the retiree and becoming a

16   retiree benefit paid to the spouse in the event of death

17   would radically change the treatment of pensions.

18             We heard from counsel today they would foresee

19   there being a committee of contingent retiree benefit

20   holders held by spouses whose spouses are still alive.  That

21   would be obviously a huge department from Chapter 11

22   practice -- certainly the way pensions are handled in

23   Chapter 11.  There is a mechanism for addressing pensions in

24   Chapter 11, none of which contemplates a sort of automatic

25   11-14 process.  But, in effect, that would be what would be

1    required here under this construction of 11-14, Your Honor.

2         Your question, though, I think if Congress meant

3    to expand the pool of death benefits by effectively creating

4    a contingent death benefit on account of every pension,

5    because again the survivorship provision is required by

6    ERISA for a qualified pension plan -- I think Congress

7    would've said so.

8         THE COURT:  So you'd have to have a committee in

9    every case.

10        MR. DAHL:  You would have to have a committee in

11   every case, Your Honor.  And I think if Congress meant to do

12   that, they would've said so, and the legislatively history

13   conversely would not have said that Congress was not trying

14   to change the treatment of pensions in Chapter 11.

15        So, for these reasons, Your Honor, we do think

16   Worldcom, Lyondell, Farmland, Exide all got it right in

17   saying transferring the beneficiary the payment upon death

18   does not create a death benefit.  That would turn the

19   Bankruptcy Code on its head, that would really turn 11-14 on

20   its head, and it's not appropriate here.

21        THE COURT:  Okay, thank you.

22        MR. DAHL:  Thank you, Your Honor.

23        THE COURT:  Anything further?

24        MR. CHUBAK:  Yes.  Debtor's counsel raised a

25   number of points and I'd like to address them in turn.

1    First, it's not true that every plan has survivorship

2    rights.  Debtor's counsel doesn't dispute that supplemental

3    plans are not required by law to include a survivorship

4    right.  It's not necessarily true that a ruling in our favor

5    would have broader implications.  Right now the Debtors are

6    continuing to make payments under the underlying qualified

7    plan, so this isn't an issue.

8         As to the body of case law cited, Farmland

9    acknowledged that a payment due upon death, an insurance

10   policy plan albeit, is a death benefit.  It didn't address

11   the specific issue herein, which is a surviving spouse

12   coming to court and saying, "I'm entitled to monthly

13   payments that I'm not getting."

14        As for the other cases, they all looked to

15   Worldcom and Worldcom said, yeah, this isn't the primary

16   purpose of the plan, therefore, it's not a death benefit.

17   But that's not consistent with the language of the statute.

18   The statute doesn't make the distinction between primary

19   purpose and other purposes.

20        THE COURT:  Would you agree the statute is

21   ambiguous in this particular situation?

22        MR. CHUBAK:  The statute specifies death benefit;

23   it doesn't speak to purpose.  It says for the purpose of

24   providing --

25        THE COURT:  It doesn't say what a death benefit

1    is, does it?

2          MR. CHUBAK:  It says for the purpose of providing

3    death benefit.  I think a plain language interpretation of

4    the statute means that if the statute means a death benefit,

5    then that's protected by 11-14.  It doesn't need to be the

6    primary purpose of the plan.  That's not a word that's

7    included in the statute.

8          As to the legislative history and changing the

9    treatment of pensions and representing a huge departure from

10   prior law, I don't think that's true.  This issue rarely

11   comes up.  And I don't think -- it rarely comes up for a

12   number of reasons.  First, it's really unusual for debtors

13   to offer a supplemental plan on top of a qualified pension

14   plan that typically gets paid in a Chapter 11 case on an

15   ongoing basis.

16         And also it wouldn't upset the dynamic in Chapter

17   11 because if a retiree committee is appointed, they'd be

18   required to represent retiree benefits including surviving

19   spouses whose husbands -- whose husbands and wives have

20   passed away.

21         I think that the broader implications of this are

22   overstated.  The size of the supplemental plan is tiny

23   compared to the size of the plan -- the size of the

24   qualified plan for which the Debtors are making monthly

25   payments on an ongoing basis.

```
 1            So, I think that the threat is overstated, the

 2    general implications for Chapter 11 practice are overstated,

 3    and the plain language says this is a death benefit.  And --

 4            THE COURT:  Is Mrs. Clark receiving payments under

 5    the qualified plan?

 6            MR. CHUBAK:  Yes, she is.

 7            THE COURT:  Okay.

 8            MR. CHUBAK:  Thank you, Your Honor.

 9            THE COURT:  Thank you.  I'll reserve decision.  We

10    haven't really dealt with the status of the case conference.

11    Other than what we've discussed today, is there anything you

12    want to add?

13            MR. DAHL:  No, Your Honor.  I think Mr. Henes

14    covered it in terms of --

15            THE COURT:  All right, I'll adjourn.  What's the

16    next date in June?

17            MR. DAHL:  I believe June 29th, Your Honor.

18            THE COURT:  I'll adjourn the status conference to

19    June 29th.  Thank you.

20            MR. DAHL:  Thank you.

21            THE COURT:  I believe that's it, right?

22            MR. DAHL:  Thank you, Your Honor.

23            THE COURT:  Thank you.

24    (Whereupon these proceedings were concluded at 10:59 AM.)

25
```

```
 1                  C E R T I F I C A T I O N

 2

 3     I, Sonya Ledanski Hyde, certified that the foregoing

 4     transcript is a true and accurate record of the proceedings.

 5

 6

 7

 8     Sonya Ledanski Hyde

 9

10

11

12

13

14

15

16

17

18

19

20     Veritext Legal Solutions

21     330 Old Country Road

22     Suite 300

23     Mineola, NY 11501

24

25     Date:  May 26, 2017
```

UNITED STATES BANKRUPTCY COURT
SOUTHERN DISTRICT OF NEW YORK
------------------------------------------------X
                                                :
In re:                                          :        Case No. 17-10089 (SMB)
                                                :
AVAYA INC., *et al.*[1]                         :        Chapter 11
                                                :
            Debtors.                            :        (Jointly Administered)
------------------------------------------------X

**MEMORANDUM DECISION REGARDING DETERMINATION OF
SURVIVORSHIP BENEFITS AS "RETIREE BENEFITS"**

**A P P E A R A N C E S :**

STORCH AMINI PC
*Attorneys for Marlene Clark*
140 East 45th Street, 25th Floor
New York, New York 10017

        Jeffrey Chubak, Esq.
            Of Counsel

KIRKLAND & ELLIS LLP
*Counsel for the Debtors and
  Debtors-in-Possession*
601 Lexington Avenue
New York, New York 10022

        James H.M. Sprayregen, P.C., Esq.
        Jonathan S. Henes, P.C., Esq.
        Patrick J. Nash, Jr., P.C., Esq.
        Ryan Preston Dahl, Esq.
        Bradley Thomas Giordano, Esq.
            Of Counsel

AKIN GUMP STRAUSS HAUER & FELD LLP
*Counsel to the Ad Hoc First Lien Group*
One Bryant Park
New York, New York 10036

---

[1]        The Debtors in these chapter 11 cases include Avaya Inc.; Avaya CALA Inc.; Avaya EMEA Ltd.;
Avaya Federal Solutions, Inc.; Avaya Holdings Corp.; Avaya Holdings LLC; Avaya Holdings Two, LLC;
Avaya Integrated Cabinet Solutions Inc.; Avaya Management Services Inc.; Avaya Services Inc.; Avaya
World Services Inc.; Octel Communications LLC; Sierra Asia Pacific Inc.; Sierra Communication
International LLC; Technology Corporation of America, Inc.; Ubiquity Software Corporation; VPNet
Technologies, Inc.; and Zang, Inc.

Ira S. Dizengoff, Esq.
Philip C. Dublin, Esq.
Abid Qureshi, Esq.
        Of Counsel

STROOCK & STROOCK & LAVAN LLP
*Counsel to the Ad Hoc Crossover Group*
180 Maiden Lane
New York, New York 10038

        Kristopher M. Hansen, Esq.
        Sayan Bhattacharyya, Esq.
        Gabriel E. Sasson, Esq.
                Of Counsel

MORRISON & FOERSTER LLP
*Counsel for the Official Committee
  Of Unsecured Creditors*
250 W 55th Street
New York, New York 10019

        Lorenzo Marinuzzi, Esq.
        Todd M. Goren, Esq.
                Of Counsel


**STUART M. BERNSTEIN**
**United States Bankruptcy Judge:**

Marlene Clark ("Clark") is the surviving spouse of Stephan Clark, a former employee/retiree of the Debtors.  Following his retirement from Avaya, Mr. Clark was receiving deferred compensation in the form of monthly pension benefits under a supplemental pension plan, and after his death, those benefits became payable to Clark. Clark seeks a determination that these payments are "retiree benefits" within the meaning of 11 U.S.C. § 1114.  (*Marlene Clark's Motion for Order Determining Survivorship Benefits Under Supplemental Plan Are "Retiree Benefits" Under Bankruptcy Code Section 1114(a), Compelling Compliance with Section 1114(e), and Appointing an Official Committee Under Section 1114(d)*, dated May 5, 2017 (the "*Motion*") (ECF Doc. # 522).)  The Debtors and various creditor groups oppose the

- 2 -

A-173

*Motion*, and argue that the surviving obligation to Clark is an unsecured debt not subject to the requirements of Bankruptcy Code § 1114. For the reasons that follow, the Court concludes that the benefits payable to Clark are not "retiree benefits," and the *Motion* is denied.

## BACKGROUND

### A. The Debtors' Supplemental Pension Plan

The Debtors are parties to a certain supplemental pension plan (the "Supplemental Plan"),[2] effective January 1, 2009.[3] The Supplemental Plan "is intended to constitute both (i) an unfunded 'excess benefit plan' as defined in ERISA § 3(36), and (ii) an unfunded plan primarily for the purpose of providing deferred compensation and pension benefits for a select group of management or highly compensated employees . . . ." (Supplemental Plan at Art. 1.) The benefits include a "Minimum Retirement Benefit" payable to eligible former officers of Avaya ("Retirees") in the form of a single life annuity paid monthly to Retirees upon retirement. The Minimum Retirement Benefit amount is calculated based upon the Retiree's salary on his or her last day of employment, minus certain offsets based on other Avaya retirement payments. (Supplemental Plan at § 4.2.)

The Supplemental Plan includes a "Survivor Benefit" payable to the Retiree's surviving spouse. (Supplemental Plan at § 4.3.) The Survivor Benefit, like the

---

[2] A copy of the Supplemental Plan is annexed to the *Motion* as Exhibit 2.

[3] The Supplemental Plan is the successor to a certain "Lucent Technologies Inc. Supplemental Pension Plan" (the "Lucent Plan") previously offered by Lucent Technologies Inc. ("Lucent"). When Lucent spun off Avaya as a separate business in October 2000, the Supplemental Plan assumed Lucent Plan liabilities to certain "Avaya Individuals" that had accrued as of September 30, 2000. (Supplemental Plan at Arts. 1 & 2.)

- 3 -

A-174

Minimum Retirement Benefit, is a single life annuity, paid monthly, calculated using the same formula as the Minimum Retirement Benefit. (Supplemental Plan at § 4.3.) Clark became eligible to receive the Survivor Benefit on July 1, 2014, at which point she began receiving annuity payments in the same amount that her husband had been receiving under the Supplemental Plan before he passed away. (*See Motion*, Ex. 3.)

Upon filing for chapter 11, the Debtors suspended all payments under the Supplemental Plan, including Clark's Survivor Benefit, (*see Motion*, at ¶ 7 & Ex. 4), and their Schedules of Assets and Liabilities listed a single $90.21 million unsecured non-priority claim on account of unpaid amounts under the Supplemental Plan.[4] (*Schedule E/F* at 439 of 500 (ECF Doc. # 337).)[5] Under the currently proposed plan, the Debtors estimate that they will distribute approximately 19.7% to unsecured creditors on account of the allowed amount of their claims. (*See Disclosure Statement for the First Amended Joint Chapter 11 Plan of Reorganization of Avaya Inc. and Its Debtor Affiliates*, dated Sept. 8, 2017, at iii (ECF Doc. # 1106).)

## B. Clark's Motion

Clark filed the *Motion* on May 5, 2017, requesting that the Court determine that the Survivor Benefit constitutes a "retiree benefit" within the meaning of Bankruptcy Code § 1114 because her right to receive it was triggered by the death of her husband. (*Motion* at ¶¶ 12-13.) She argues that the Debtors must reinstate her Survivor Benefit

---

[4]    Clark argues that because the Supplemental Plan benefits are payable from the Debtors' general assets, the Schedules should list separate claims for each individual beneficiary. The resolution of this issue does not affect the disposition of the *Motion*.

[5]    "# of #" refers to the page number and total number of pages placed by the CM/ECF filing system at the top of every page of a filed document.

payments and treat any unpaid postpetition amounts as administrative expenses in accordance with Bankruptcy Code § 1114.  (*Motion* at ¶¶ 14-15.)  In addition, Clark contends that an official committee should be appointed under § 1114(d) to represent the surviving spouses.  (*Motion* at ¶¶ 16-18.)

The Debtors, an *ad hoc* group of lenders holding first lien debt (the "First Lien Group"),[6] a separate *ad hoc* "crossover" group of lenders holding both first lien and second lien debt (the "Crossover Group")[7] and the Official Committee of Unsecured Creditors (the "Committee" and, together with the Debtors, the First Lien Group and the Crossover Group, the "Objectors") opposed the *Motion*.[8]  In the main, they contend that Bankruptcy Code § 1114 applies only to "medical, surgical, or hospital care" and "sickness, accident, disability" benefits and "benefits in the event of death," and does not encompass retirement income or deferred compensation.  (*Debtors' Objection* at ¶¶ 12-14; *First Lien Objection* at ¶ 3; *Crossover Objection* at ¶¶ 6-8; *Committee Objection* at

---

[6]     Members of the Ad Hoc First Lien Group are listed in the *Eighth Amended Verified Statement Pursuant to Bankruptcy Rule 2019*, dated Sept. 12, 2017 (ECF Doc. # 1146).

[7]     Members of the Ad Hoc Crossover Group are listed in the *Eighth Supplemental Verified Statement of the Ad Hoc Crossover Group Pursuant to Bankruptcy Rule 2019*, dated Sept. 11, 2017 (ECF Doc. # 1132).

[8]     *See Debtors' Objection to Marlene Clark's Motion for Order Compelling Compliance with 11 U.S.C. § 1114(e) and Appointing an Official Committee Under 11 U.S.C. § 1114(d)*, dated May 18, 2017 ("*Debtors' Objection*") (ECF Doc. # 609); *Objection of the Ad Hoc First Lien Group to Marlene Clark's Motion for Order Determining Survivorship Benefits Under Supplemental Plan are "Retiree Benefits" Under Bankruptcy Code Section 1114(a), Compelling Compliance with Section 1114(e), and Appointing an Official Committee Under Section 1114(d)*, dated May 18, 2017 ("*First Lien Objection*") (ECF Doc. # 612); *Objection of the Ad Hoc Crossover Group to Marlene Clark's Motion for Order Determining Survivorship Benefits Under Supplemental Plan are "Retiree Benefits" Under Bankruptcy Code Section 1114(a), Compelling Compliance with Section 1114(e), and Appointing an Official Committee Under Section 1114(d)*, dated May 18, 2017 ("*Crossover Objection*") (ECF Doc. # 614); *Objection of the Official Committee of Unsecured Creditors to Marlene Clark's Motion for Order Determining Survivorship Benefits Under Supplemental Plan are "Retiree Benefits" Under Bankruptcy Code Section 1114(a), Compelling Compliance with Section 1114(e), and Appointing an Official Committee Under Section 1114(d)*, dated May 18, 2017 ("*Committee Objection*") (ECF Doc. # 616).

¶¶ 8-9.)  Further, they argue that the Survivor Benefit cannot be a "benefit in the event of death" because a Retiree's death does not give rise to the benefit; it merely transfers an existing pension benefit to the surviving spouse.  (*Debtors' Objection* at ¶¶ 14-15; *First Lien Objection* at ¶¶ 4-5; *Crossover Objection* at ¶¶ 9-10; *Committee Objection* at ¶ 10.)  In addition, the First Lien Group claims that § 1114 does not apply to a plan like the Supplemental Plan that is terminable at will, (*First Lien Objection* at ¶ 7), and the Debtors and the Committee submit that the Supplemental Plan is not a "plan, fund, or program" under § 1114, which the parties agree parallels the definition of "welfare plan" under the Employee Retirement Income Security Act of 1974, 29 U.S.C. §§ 1001, *et al.* ("ERISA").  (*Debtors' Objection* at ¶¶ 17-20; *Committee Objection* at ¶¶ 14-15; *Reply In Support of Marlene Clark's Motion for Order Determining Survivorship Benefits Under Supplemental Plan Are "Retiree Benefits" Under Bankruptcy Code Section 1114(a), Compelling Compliance with Section 1114(e), and Appointing an Official Committee Under Section 1114(d)*, dated May 21, 2017 ("*Clark's Reply*"), at ¶ 2 (ECF Doc. # 635).)  Moreover, the appointment of an official committee of retired employees is not warranted, (*Debtors' Objection* at ¶¶ 21-22; *First Lien Objection* at ¶ 6; *Crossover Objection* at ¶ 11; *Committee Objection* at ¶ 16), and Clark lacks Article III standing to make such a request.  (*First Lien Objection* at ¶ 6.)

Clark filed an omnibus reply to the objections.  In addition to reiterating her previous arguments, (*Clark's Reply* at ¶¶ 15-16, 25-26), and attempting to distinguish the cases cited by the Objectors, (*Clark's Reply* at ¶¶ 17-22), she asserted for the first time that the Debtors are judicially and collaterally estopped from arguing that the Survivor Benefit is not protected by § 1114 in light of the decision in *In re Lucent Death*

- 6 -

A-177

*Benefits ERISA Litig.*, 541 F.3d 250 (3d Cir. 2008) ("*Lucent*"). (*Clark's Reply* at ¶¶ 3-14.) According to Clark, Lucent successfully argued in that case that a certain death benefit (the "Death Benefit") constituted an unvested benefit under a welfare plan as defined by ERISA, and given the overlap between the definitions of retiree benefits under the Bankruptcy Code and a welfare plan under ERISA, the Debtors are precluded from arguing that the Survivor Benefit is *not* a benefit under a welfare plan (*i.e.*, a retiree benefit). (*Clark's Reply* at ¶¶ 3-14.) In the same vein, Clark submits that the Debtors' and the Committee's argument that the Supplemental Plan is not a "plan, fund, or program" is moot, given that *Lucent* effectively held that the Death Benefit qualified as such a plan. (*Clark's Reply* at ¶¶ 23-24.) Clark also asserts that the at-will termination clause is irrelevant because a debtor cannot modify or terminate retiree benefits covered by section 1114 except in accordance with that section. (*Clark's Reply* ¶¶ 32-36.)

The Debtors filed a sur-reply, (*Debtors' Sur-Reply to Marlene Clark's Reply In Support the Motion for Order Compelling Compliance with 11 U.S.C. § 1114(e) and Appointing an Official Committee Under 11 U.S.C. § 1114(d)*, dated May 24, 2017 ("*Debtors' Sur-Reply*") (ECF Doc. # 653)), arguing that Clark had improperly raised the judicial and collateral estoppel arguments for the first time in *Clark's Reply*, (*id.* at ¶¶ 1-2), but in any event, the estoppel arguments lack merit.[9] (*Id.* at ¶¶ 3-9.)

---

[9]     I have considered the Debtor's sur-reply to the extent it responds to the issues first raised in Clark's reply because the sur-reply was the one and only opportunity the Objectors had to answer those arguments. Clark subsequently filed a letter sur-reply to the Debtor's sur-reply. (ECF Doc. # 670.) Clark's submission was wholly unauthorized, and amounted to a reply on an issue first raised in her own reply. Accordingly, I have not considered it.

## DISCUSSION

### A.    The Meaning of Section 1114

Section 1114(a) provides:

For purposes of this section, the term "retiree benefits" means payments to
any entity or person for the purpose of providing or reimbursing payments
for retired employees and their spouses and dependents, for medical,
surgical, or hospital care benefits, or *benefits in the event of* sickness,
accident, disability or *death under any plan, fund, or program* (through
the purchase of insurance or otherwise) maintained or established in
whole or in part by the debtor prior to filing a petition commencing a case
under this title.

11 U.S.C. § 1114(a) (emphasis added).  "Retiree benefits" are afforded significant

protections and treatment under the Bankruptcy Code.  The debtor must continue to

pay retiree benefits as administrative expenses throughout a chapter 11 case, it cannot

terminate or modify retiree benefits absent a court order and only after demonstrating

that it has complied with the procedures set forth in section 1114, and if the debtor seeks

to terminate or modify retiree benefits, the court must, upon request, appoint a

committee to represent the interests of retirees.  11 U.S.C. § 1114(d)-(g).

Section 1114 does not, however, protect pension benefits.  *McMillan v. LTV Steel,*

*Inc.*, 555 F.3d 218, 226 (6th Cir. 2009) ("[Section] 1114 does not apply to [the debtor's]

benefit program directed at administering pensions.") (citing *Adventure Res., Inc. v.*

*Holland*, 137 F.3d 786, 795 (4th Cir. 1998)); *In re Lyondell Chem. Co.*, 445 B.R. 296, 301

(Bankr. S.D.N.Y. 2011) (same); *In re WorldCom, Inc.*, 364 B.R. 538, 549-50 (Bankr.

S.D.N.Y. 2007) (same); *In re Exide Techs.*, 378 B.R. 762, 768 (Bankr. D. Del. 2007)

(same); *In re Farmland Indus., Inc.*, 294 B.R. 903, 919 (Bankr. W.D. Mo. 2003) (same).

Thus, § 1114 would not have protected Mr. Clark's Minimum Retirement Benefit were he

still living.  Furthermore, Clark does not contend that the Survivor Benefit constitutes

reimbursement for medical, surgical or hospital care payments, or a benefit in the event of sickness, accident or disability.  Instead, she maintains that the Survivor Benefit is a "payment for . . . benefits in the event of . . . death."  Accordingly, the question posed by the *Motion* is whether Mr. Clark's pension benefit, which was clearly not a "retiree benefit," was transformed into a "retiree benefit" under § 1114(a) because following his death it became payable to his or her surviving spouse.

The statute's plain language serves as the initial basis for statutory interpretation.  *United States v. Ron Pair Enters., Inc.*, 489 U.S. 235, 241 (1989).  Where the statute's meaning is clear from its plain language, the analysis ends unless the literal application produces an absurd result.  *Ron Pair Enters.*, 489 U.S. at 242 ("The plain meaning of legislation should be conclusive, except in the rare cases in which the literal application of a statute will produce a result demonstrably at odds with the intentions of its drafters.") (internal quotation marks omitted); *accord Hartford Underwriters Ins. Co. v. Union Planters Bank, N.A.*, 530 U.S. 1, 6 (2000).  "The plainness or ambiguity of statutory language is determined by reference to the language itself, the specific context in which that language is used, and the broader context of the statute as a whole."  *Robinson v. Shell Oil Co.*, 519 U.S. 337, 341 (1997) (citing *Estate of Cowart v. Nicklos Drilling Co.*, 505 U.S. 469, 477 (1992)); *United Sav. Ass'n. of Texas v. Timbers of Inwood Forest Assocs.*, Ltd., 484 U.S. 365, 371 (1988) ("Statutory construction . . . is a holistic endeavor.  A provision that may seem ambiguous in isolation is often clarified by the remainder of the statutory scheme . . . .").  Where the statute's plain language as clarified by context fails to resolve the ambiguity, a court may resort "first to canons of statutory construction, and, if the meaning remains ambiguous, to legislative history."

A-180

*United States v. Colasuonno*, 697 F.3d 164, 173 (2d Cir. 2012) (quoting *Daniel v. Am. Bd. of Emergency Med.*, 428 F.3d 408, 423 (2d Cir. 2005)).

The phrase "benefits in the event of death" under § 1114 is facially ambiguous because both sides have supplied reasonable interpretations. On the one hand, the surviving spouse's right to receive the benefit arises upon the death of the Retiree, suggesting that it is a "benefit in the event of death." On the other hand, the benefit in the form of the Minimum Retirement Benefit pre-exists the Retiree's death, is not a "retiree benefit" when it is payable to the Retiree, and the only thing that death triggers is a transfer of the Retiree's right to receive deferred compensation to his surviving spouse. In short, the Objectors maintain that an existing benefit that survives the beneficiary's death and becomes payable to a different beneficiary is not a "benefit in the event of death." None of the parties have cited or discussed any specific canons of statutory interpretation, and consequently, we turn to the legislative history.

Section 1114 of the Bankruptcy Code was enacted in direct response to the LTV Corporation's bankruptcy, where LTV announced its intention to stop providing health and life insurance benefits to its retirees almost immediately after filing its chapter 11 petition in this Court. *See* Susan J. Stabile, *Protecting Retiree Medical Benefits in Bankruptcy: The Scope of Section 1114 of the Bankruptcy Code*, 14 Cardozo L. Rev. 1911, 1926 & n.86 (1993) ("Stabile"). Congress responded by passing the Retiree Benefits Bankruptcy Protection Act of 1988, now codified as Bankruptcy Code § 1114. The Senate Report as well as statements from debates in the House of Representatives and the Senate emphasized that the purpose of the legislation was to preserve retiree benefits

- 10 -

related to health, disability and life insurance.  According to the Senate Report:

> The bill, as amended, addresses situations with respect to retiree
> insurance benefits, such as occurred last year when LTV Corporation, after
> filing a Chapter 11 Bankruptcy petition, immediately terminated the *health
> and life insurance benefits* of approximately 78,000 retirees. . . . *This bill
> is not intended to affect current law treatment of pension benefits* in
> Chapter 11 proceedings.

S. Rep. No. 100-119, at 2-4 (1987), *reprinted in* 1988 U.S.C.C.A.N. 683, 683-85

(emphasis added).  In a debate in the House of Representatives over the bill,

Representative Edwards similarly noted:

> HR 2969 is legislation designed to protect the *health, life, and disability
> benefits* of retirees when companies file chapter 11 bankruptcy. . . . It is
> imperative that we protect the retirees from the sudden and unilateral
> termination of their *health, life, and disability benefits* in the event that
> their former employers file for reorganization under the bankruptcy laws.
> Retirees who have devoted their working lives to the betterment of their
> employers' businesses deserve payment of their *retiree health benefits* to
> the fullest extent possible in a reorganization.

134 Cong. Rec. H3488-89 (daily ed. May 23, 1988) (statement of Rep. Edwards)

(emphasis added).  Senator Metzenbaum echoed the same point in a Senate debate held

three days later, stating that "this legislation is a major reform in our bankruptcy laws.

It protects *retiree health and life insurance benefits* when companies go into

bankruptcy."  134 Cong. Rec. S6824-25 (daily ed. May 26, 1988) (statement of Sen.

Metzenbaum) (emphasis added).

      Conversely, section 1114 does not protect pension benefits, a point on which there

is universal agreement.  The Survivor Benefit payable to Clark is based on her right to

receive Mr. Clark's deferred compensation – his pension – and the survivorship of the

Debtors' obligation to make those payments does not transmute a pension payment into

a "retiree benefit" protected by section 1114.  This conclusion is supported by several

- 11 -

A-182

decisions in this and other districts. In *WorldCom*, the court concluded that a retirement plan providing for the payment of deferred compensation was not "for the purpose of providing" the type of benefits identified in section 1114(a), but rather was intended to defer income and associated income taxes. *WorldCom*, 364 B.R. at 550. Furthermore, "that the timing and method of payment of the deferred income may have been altered in the event of death or disability is merely incidental to that purpose." *Id.* Similarly, in *Exide*, the retirement plan provided for annual payments, and upon the death of the retiree after payments had begun, his or her beneficiary would receive either a lump sum distribution equal to the present value of the retiree's benefit or the remaining installment payments. *Exide*, 378 B.R. at 768. The court ruled that the retirement plan did not pay death benefits because the death benefit provision simply provided an alternative for the timing and method of the annual payments that were already due and did not include additional benefits upon the retiree's death. *Id.* at 768-69. Finally, *Lyondell* involved "special retirement allowance" payments owed to a retiree's surviving spouse. There, as here, the spouse beneficiary maintained that the payments were entitled to administrative expense status under § 1114 because they were transferred to her "in the event of" her husband's death, but the court rejected her argument:

> Pension benefits or benefits that provide for annual payments upon retirement are not "retiree benefits." And the feature of the annuity arrangement to provide contingency payments to [the retiree]'s beneficiary upon death does not change that.

*Lyondell*, 445 B.R. at 301 (footnotes omitted).

Clark's attempts to distinguish this case from *WorldCom*, *Lyondell*, and *Exide* are not persuasive. Clark is correct that *WorldCom* and *Exide* involved contingent transfers

to non-spouse transferees where the actual claimant was the retiree rather than the survivor. (*Clark's Reply* at ¶ 18.) Nevertheless, these cases support the proposition that a death benefit feature does not convert a pension payment into a "retiree benefit," and this conclusion is bolstered by the principle of interpretation "that preferential treatment of a class of creditors is in order only when clearly authorized by Congress." *Howard Delivery Serv., Inc. v. Zurich Am. Ins. Co.*, 547 U.S. 651, 655 (2006); *accord Trustees of Amalgamated Ins. Fund v. McFarlin's Inc.*, 789 F.2d 98, 100 (2d Cir. 1986) ("Because the presumption in bankruptcy cases is that the debtor's limited resources will be equally distributed among his creditors, statutory priorities are narrowly construed."). Moreover, Clark does not offer any case law that supports her reading of the statute. She cites *Farmland*, (*see id.* at ¶ 16), where the court held that "plans and programs [that] provide benefits in the event of death . . . constitute 'retiree benefits' within the meaning of § 1114(a) . . . ." *Farmland*, 294 B.R. at 921, but the passage cited by Clark was referring to life insurance benefits, not to transferred pension or deferred compensation benefits. *See id.* In fact, the same court explicitly found that payments under deferred compensation plans and enhanced retirement plans were not protected as retiree benefits under § 1114. *Id.*

## B.    ERISA and *Lucent*

Clark also contends that the Court should look to ERISA to determine the scope of "retiree benefits" under section 1114(a) because its language tracks the definition of "welfare plan" under 29 U.S.C. § 1002(1)(A).[10] (*Clark's Reply* at ¶ 2.); *accord* Stabile, 14

---

[10]    Section 1002(1) defines a "welfare plan" as "any plan, fund, or program . . . established or maintained by an employer . . . to the extent that such plan, fund, or program was established or is maintained for the purpose of providing for its participants or their beneficiaries, through the purchase of

Cardozo L. Rev. at 1931-32 ("These words are taken from the definition of 'employee welfare benefit plan' contained in ERISA."). Moreover, several courts have looked to the parallel definition of "plan, fund, or program" under ERISA for guidance when interpreting the Bankruptcy Code. *See, e.g.*, *Lyondell*, 445 B.R. at 299; *In re Certified Air Techs., Inc.*, 300 B.R. 355, 370-71 (Bankr. C.D. Cal.2003); *In re New York Trap Rock Corp.*, 126 B.R. 19, 22 (Bankr. S.D.N.Y. 1991). While courts should not automatically use ERISA definitions to fill in the blanks in the Bankruptcy Code, *see Howard Delivery*, 547 U.S. at 661-62 (citing cases), both sides agree that the ERISA definitions are relevant. Consequently, I consider them with due regard, however, for the different purposes that animate ERISA and the Bankruptcy Code.

A given program qualifies as a "plan, fund, or program" under ERISA if it requires an ongoing administrative program to meet the employer's obligation. *See Fort Halifax Packing Co., Inc. v. Coyne*, 482 U.S. 1, 11 (1987). Such a program may exist "(1) where an employer's undertaking requires managerial discretion, that is, where the undertaking could not be fulfilled without ongoing, particularized, administrative analysis of each case; (2) where a reasonable employee would perceive an ongoing commitment by the employer to provide some employee benefits; and (3) where the employer was required to analyze the circumstances of each employee's termination separately in light of certain criteria." *Kosakow v. New Rochelle Radiology Assocs., P.C.*, 274 F.3d 706, 737 (2d Cir. 2001) (internal citations and quotation marks omitted). No single factor is determinative, *Hardy v. Adam Rose Ret. Plan*, 576 Fed. App'x 20, 21

---

insurance or otherwise, (A) medical, surgical, or hospital care or benefits, or benefits in the event of sickness, accident, disability, death or unemployment . . . ."

- 14 -

(2d Cir. 2014) (citations omitted), and there is no rule that "one or more of these factors will be determinative in every case." *Tischmann v. ITT/Sheraton Corp.*, 145 F.3d 561, 566 (2d Cir. 1998).

Although Clark argues that the Survivor Benefit is a "plan, fund, or program" under ERISA, she contends that the Court need not consider the *Kosakow* factors.[11] (*Clark's Reply* at ¶ 24.)  Instead, she argues that the decision in *Lucent* collaterally and/or judicially estops the Debtors from contending that the Survivor Benefit is not a welfare plan within the meaning of ERISA, and hence, a "retiree benefit" within the meaning of Bankruptcy Code § 1114.  (*Clark's Reply* at ¶¶ 3-14.)  In that case Lucent, a successor to AT&T, adopted a plan that included the Death Benefit.  The latter provided that in the event of the death of an employee who was receiving or was eligible to receive a pension granted under the plan, the benefit committee could, in its discretion, authorize the payment of the Death Benefit to the employee's surviving spouse or dependent not to exceed the maximum amount that could have been paid as a Sickness Death Benefit if the employee had died on his or her last day of service before retirement.  *Lucent*, 541 F.3d at 252.  The board of directors could change or terminate the plan prospectively, and in 1997, Lucent eliminated the Death Benefit for employees

---

[11]    Nevertheless, the Survivor Benefit, plainly fails to satisfy the first *Kosakow* factor.  The Survivor Benefit is an annuity based on the Minimum Retirement Benefit.  Once the annuity is computed, no further calculation is required, the survivor is not required to do anything, and the benefit is tantamount to a one-off transaction, like a single lump sum benefit, which does not qualify as an ERISA plan under the Supreme Court's decision in *Fort Halifax Packing Co. v. Coyne*, 482 U.S. 1, 12 (1987).  *Hardy v. Adam Rose Ret. Plan*, 957 F. Supp. 2d 407, 415 (S.D.N.Y. 2013), *aff'd*, 576 F. App'x 20 (2d Cir. 2014); *accord Lyondell*, 445 B.R. at 300.  Furthermore, the computation of the amount of the Survivor Benefit involves a simple, one-time mathematical calculation, and does not involve any discretion on the part of the Debtors.  *See Nowak v. Int'l Fund Servs. (N.A.), L.L.C.*, No. 09-CV-5103, 2009 WL 2432715, at *2 (S.D.N.Y. Aug. 7, 2009).

- 15 -

A-186

who retired after January 1, 1998. It made a further amendment in 2003 to eliminate the Death Benefit for all management employees regardless of the date of retirement. *Id.* at 252-53. Several class action lawsuits were filed in 2003 and 2004 challenging the termination of the Death Benefit under ERISA and federal common law. *Id.* at 253. The Third Circuit concluded, *inter alia*, that the Death Benefit portion of Lucent's pension plan was a welfare plan because it did not provide retirement income to the employee, it was not an annual benefit and it did not commence at a normal retirement age, and it did not directly relate to an accrued benefit by paying out an accumulated amount of accrued benefits. *Id.* at 255.

Clark waived this argument by raising it for the first time in her reply. *ABN Amro Verzekeringen BV v. Geologistics Ams., Inc.,* 485 F.3d 85, 97 n.12 (2d Cir. 2007) ("We decline to consider an argument raised for the first time in a reply brief."); *Clubside, Inc. v. Valentin,* 468 F.3d 144, 159 n.5 (2d Cir. 2006) ("[W]e generally do not consider arguments that are raised for the first time in a reply brief."); *Patterson v. Balsamico,* 440 F.3d 104, 113 n.5 (2d Cir. 2006) ("This Court generally will not consider arguments raised for the first time in a reply brief."). Even if she did not waive the argument, it lacks merit because it is based on the mistaken view that the Debtors were parties or in privity with parties to the *Lucent* litigation. The party asserting collateral estoppel must show, an "identity of issue which has necessarily been decided in the prior action and is decisive of the present action, and, second, there must have been a full and fair opportunity to contest the decision now said to be controlling." *Schwartz v. Pub. Adm'r of the Cty. of Bronx,* 246 N.E.2d 725, 729 (N.Y. 1969). The party asserting judicial estoppel must demonstrate that "1) a party's later position is 'clearly

- 16 -

A-187

inconsistent' with its earlier position; 2) the party's former position has been adopted in some way by the court in the earlier proceeding; and 3) the party asserting the two positions would derive an unfair advantage against the party seeking estoppel." *DeRosa v. Nat'l Envelope Corp.,* 595 F.3d 99, 103 (2d Cir. 2010). In both cases, the party to be estopped had to have been a party or in privity with a party to the earlier proceeding that forms the basis of the estoppel.

The Debtors were not parties to the *Lucent* litigation, (*see Amended Complaint, Foss v. Lucent Techs.*, at ¶¶ 21–24, Case No. 03-05017 (D.N.J. Nov. 10, 2005), Doc. # 44), nor in privity with any parties. The Debtors were spun off by Lucent in 2000, and the *Lucent* lawsuits were not filed until 2003 and 2004 by which time the Debtors existed as entirely separate entities. In addition, the concept of privity is limited to "those who control an action although not parties to it. . . ; those whose interests are represented by a party to the action. . .; [and] successors in interest to those having derivative claims." RESTATEMENT (FIRST) OF JUDGMENTS § 83 (1942) (citations omitted); *accord Ferris v. Cuevas*, 118 F.3d 122, 126 (2d Cir. 1997); *Watts v. Swiss Bank Corp.*, 265 N.E.2d 739, 743 (N.Y. 1970). Clark does not contend that the Debtors controlled the *Lucent* litigation or participated in it. In addition, the Debtors' interests were not represented or implicated in *Lucent* which involved a different issue. *Lucent* concerned the Death Benefit under the Lucent Technologies Inc. Management Pension Plan of 1996, *Lucent*, 541 F.3d at 252, but the Survivor Benefit is contained in the Debtors' 2009 Supplemental Plan. Finally, the Debtors are not successors in interest with derivative claims that were adjudicated in *Lucent*. Accordingly, the Debtors are not estopped based on arguments that Lucent made or decisions that the Court of Appeals reached in

that case.

Furthermore, Clark failed to demonstrate that the characteristics of the Death Benefit that drove the *Lucent* decision are present in the Survivor Benefit. To the contrary, unlike the Death Benefit, the Survivor Benefit is directly related to the annual payments of accrued deferred compensation otherwise payable to the Retiree, and are directly tied to the eligibility for retirement payments under the Supplemental Plan. Finally, as previously stated, bankruptcy's goal of "equal distribution among creditors" and "the complementary principle that preferential treatment of a class of creditors is in order only when clearly authorized by Congress," *Howard Delivery*, 547 U.S. at 655, weigh against the conclusion that the *Lucent* serves as a conclusive guide to the interpretation of "retiree benefits" under section 1114.

In conclusion, the Survivor Benefit is not a "retiree benefit" within the meaning of 11 U.S.C. § 1114(a), and the portion of the *Motion* seeking the appointment of a retiree committee is denied. The Court has considered Clark's remaining arguments and concludes that they have been rendered moot or lack merit. Submit order.

Dated:   New York, New York
         September 18, 2017

                                        /s/ *Stuart M. Bernstein*
                                        STUART M. BERNSTEIN
                                        United States Bankruptcy Court

A-189

**UNITED STATES BANKRUPTCY COURT**
**SOUTHERN DISTRICT OF NEW YORK**

|   |   |
|---|---|
| In re: | ) Chapter 11 |
| | ) |
| AVAYA INC., *et al.*,[1] | ) Case No. 17-10089 (SMB) |
| | ) |
| Debtors. | ) (Jointly Administered) |
| | ) |
| | ) |

**ORDER DENYING MARLENE CLARK'S MOTION FOR ORDER**
**DETERMINING SURVIVORSHIP BENEFITS UNDER SUPPLEMENTAL**
**PLAN ARE "RETIREE BENEFITS" UNDER BANKRUPTCY CODE**
**SECTION 1114(a), COMPELLING COMPLIANCE WITH SECTION 1114(e),**
**AND APPOINTING AN OFFICIAL COMMITTEE UNDER SECTION 1114(d)**

Upon consideration of *Marlene Clark's Motion for Order Determining Survivorship Benefits Under Supplemental Plan Are "Retiree Benefits" Under Bankruptcy Code Section 1114(a), Compelling Compliance with Section 1114(e), and Appointing an Official Committee Under Section 1114(d)* [Docket No. 522] (the "Motion"); and this Court having jurisdiction over this matter pursuant to 28 U.S.C. §§ 157 and 1334 and the *Amended Standing Order of Reference from the United States District Court for the Southern District of New York*, dated December 1, 2016; and this Court having found that this is a core proceeding pursuant to 28 U.S.C. § 157(b)(2), and that this Court may enter a final order consistent with Article III of the United States Constitution; and this Court having found that venue of this proceeding and the Motion in this district is proper pursuant to 28 U.S.C. §§ 1408 and 1409; and the Court having

---

[1] The Debtors in these chapter 11 cases, along with the last four digits of each Debtor's federal tax identification number, include: Avaya Inc. (3430); Avaya CALA Inc. (9365); Avaya EMEA Ltd. (9361); Avaya Federal Solutions, Inc. (4392); Avaya Holdings Corp. (9726); Avaya Holdings LLC (6959); Avaya Holdings Two, LLC (3240); Avaya Integrated Cabinet Solutions Inc. (9449); Avaya Management Services Inc. (9358); Avaya Services Inc. (9687); Avaya World Services Inc. (9364); Octel Communications LLC (5700); Sierra Asia Pacific Inc. (9362); Sierra Communication International LLC (9828); Technology Corporation of America, Inc. (9022); Ubiquity Software Corporation (6232); VPNet Technologies, Inc. (1193); and Zang, Inc. (7229). The location of Debtor Avaya Inc.'s corporate headquarters and the Debtors' service address is: 4655 Great America Parkway, Santa Clara, CA 95054.

A-190

held a hearing on the Motion on May 25, 2017; and after due deliberation thereof; and for the

reasons set forth in the *Memorandum Decision Regarding Determination of Survivorship*

*Benefits as "Retiree Benefits"* filed on September 18, 2017 [Docket No. 1182], it is HEREBY

ORDERED THAT:

1.     The Motion is DENIED.

2.     This Order shall be immediately effective and enforceable upon its entry.

New York, New York
Dated: September 20, 2017

/s/ STUART M. BERNSTEIN
THE HONORABLE STUART M. BERNSTEIN
UNITED STATES BANKRUPTCY JUDGE

A-191

**UNITED STATES BANKRUPTCY COURT**
**SOUTHERN DISTRICT OF NEW YORK**

| | |
|---|---|
| In re: | Chapter 11 |
| AVAYA INC., *et al.*,[1] | Case No. 17-10089-smb |
| Debtors. | Jointly Administered |

<u>**NOTICE OF APPEAL**</u>

Creditor Marlene Clark hereby appeals the *Memorandum Decision Regarding Determination of Survivorship Benefits as "Retiree Benefits,"* entered September 18, 2017 [ECF No. 1182], a copy of which is attached hereto as <u>Exhibit 1</u>, and the *Order Denying Marlene Clark's Motion for Order Determining Survivorship Benefits under Supplemental Plan are "Retiree Benefits" under Bankruptcy Code Section 1114(a), Compelling Compliance with Section 1114(e), and Appointing an Official Committee under Section 1114(d)*, entered September 20, 2017 [ECF No. 1201], a copy of which is attached hereto as <u>Exhibit 2</u>.  The names of all parties to the contested matter appealed from, and the names and addresses of their respective attorneys, are:

| | |
|---|---|
| <u>Marlene Clark</u> | <u>Debtors</u> |
| Jeffrey Chubak | James H.M. Sprayregen, P.C. |
| STORCH AMINI PC | Jonathan S. Henes, P.C. |
| 140 East 45th Street, 25th Floor | Patrick J. Nash, Jr., P.C. |
| New York, New York 10017 | Ryan Preston Dahl |
| | Bradley Thomas Giordano |
| | KIRKLAND & ELLIS LLP |
| | 601 Lexington Avenue |
| | New York, New York 10022 |

---

[1] The Debtors in these chapter 11 cases include Avaya Inc.; Avaya CALA Inc.; Avaya EMEA Ltd.; Avaya Federal Solutions, Inc.; Avaya Holdings Corp.; Avaya Holdings LLC; Avaya Holdings Two, LLC; Avaya Integrated Cabinet Solutions Inc.; Avaya Management Services Inc.; Avaya Services Inc.; Avaya World Services Inc.; Octel Communications LLC; Sierra Asia Pacific Inc.; Sierra Communication International LLC; Technology Corporation of America, Inc.; Ubiquity Software Corporation; VPNet Technologies, Inc.; and Zang, Inc..

A-192

<u>Official Committee of Unsecured Creditors</u>
Lorenzo Marinuzzi
Todd M. Goren
MORRISON & FOERSTER LLP
250 West 55th Street
New York, New York 10019

<u>Ad Hoc First Lien Group</u>
Ira S. Dizengoff
Philip C. Dublin
Abid Qureshi
AKIN GUMP STRAUSS HAUER &
    FELD LLP
One Bryant Park
New York, New York 10036

<u>Ad Hoc Crossover Group</u>
Kristopher M. Hansen
Sayan Bhattacharyya
Gabriel E. Sasson
STROOCK & STROOCK & LAVAN LLP
180 Maiden Lane
New York, New York 10038

Dated: September 20, 2017
          New York, New York

STORCH AMINI PC

/s/ Jeffrey Chubak
Jeffrey Chubak
140 East 45th Street, 25th Floor
New York, New York 10017
(212) 490-4100
jchubak@storchamini.com

*Attorneys for Creditor Marlene Clark*

A-193